# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Blanche M. Manning | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 04 C 0698 | **DATE** | October 8, 2004 |
| **CASE TITLE** | *Hollinger International, Inc. v. Hollinger Inc. et al.* | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons set forth in the attached Memorandum and Order, this Court GRANTS Defendants Motion to Dismiss the First Amended Complaint [74-1] and dismisses Counts I and II with prejudice and Counts III - XXIX without prejudice. Given this ruling, the Court also dismisses as moot, the following pending motions in this case: (1) the Horizon Defendants' Supplemental Motion to Dismiss [78-1]; (2) Defendant Barbra Black's Motion to Dismiss Counts XIII and XXVIII for Lack of Subject Matter Jurisdiction [77-1]; (3) Defendant Conrad Black's Supplemental Motion to Dismiss Counts I and II [76-1]; and (4) Defendant Daniel Colson's Motion to Dismiss [106-1].

(11) ☐ [For further detail see order on the reverse side of the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | **Document Number** |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | OCT 08 2004 | |
| | Notified counsel by telephone. | | date docketed | 130 |
| | Docketing to mail notices. | | rbf | |
| | Mail AO 450 form. | U.S. DISTRICT COURT | docketing deputy initials | |
| | Copy to judge/magistrate judge. | 2004 OCT -6 AM 11:01 | | |
| | | FILED-604 | date mailed notice | |
| RTS | courtroom deputy's initials | | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

HOLLINGER INTERNATIONAL, INC. )
                                 )
               **Plaintiff,**      )
                                   )     **Hon. Blanche M. Manning**

**v.**                                     )
                                   )     **Case No. 04 C 0698**
                                   )
HOLLINGER INC., et al.            )
                                   )
             **Defendants.** )

DOCKETED

OCT 0 8 2004

## MEMORANDUM AND ORDER

Plaintiff Hollinger International, Inc. ("International"or "the Company") brought the instant action alleging that Hollinger Inc. ("Inc.") and individual and corporate defendants (collectively, "Defendants") used their positions as officers, directors, and controlling shareholders of International to "loot" over $380 million from the Company. In its First Amended Complaint ("the Complaint"), International alleges violations of the Racketeer Influenced and Corrupt Organization Act, 18 U.S.C. §§ 1962 and 1964 ("RICO"), and state law claims for breach of fiduciary duty, unjust enrichment, and civil conspiracy. The present matter comes before this Court on Defendants' Motion to Dismiss on the grounds that 18 U.S.C. § 1964(c) bars the RICO claims.[1] For the reasons set forth below, this Court GRANTS this motion.

---

[1]     The Motion to Dismiss is brought by all individual and corporate Defendants, except for Defendant Daniel W. Colson, who is currently contesting jurisdiction in a separate motion to dismiss.

## BACKGROUND[2]

International brought this action to recover $380.6 million, which it contends Defendants, who include the controlling shareholders of International and companies controlled by individual Defendants, looted through a series of fraudulent transactions. By alleging RICO violations, International seeks to recover treble damages – $1.25 billion – plus attorneys' fees and costs.

### **The Parties**

International is a Delaware corporation which owns and operates numerous domestic and foreign newspapers. Although a publicly traded company, International is controlled by Inc. which owns 30.3% of its equity and 72.8% of its voting rights. Inc., in turn, is owned by Defendant Ravleston Corporation which is controlled by Defendant Conrad Black, International's former CEO and chairman, and Defendant David Radler, International's former deputy chairman and president.

---

[2]      The facts in the Background section are derived from the Complaint. Additionally, because this motion is brought under 18 U.S.C. § 1964(c), this Court will examine the facts and claims in the following separate but factually similar actions brought in this district: (1) securities class actions ("the Securities Class Actions") against International; and (2) an enforcement action brought by the Securities and Exchange Commission ("SEC") ("the SEC Action") against International and many of the Defendants in this case. See Florida Evergreen Foliage v. E.I. Dupont De Nemours and Co., 165 F. Supp. 2d 1345, 1350, 1356-58 (S.D. Fla. 2001) (in dismissing RICO claims under section 1964(c), the court compared the RICO claims to allegations in a separate securities class action suit); Tyrone Area Sch. Dist. v. Mid-State Bank & Trust Co., 1999 WL 703729, at *4 (W.D. Pa. Feb. 9, 1999) (in dismissing RICO claims under subsection (c), the court examined the RICO allegations in relation to the claims in an enforcement action brought by the SEC).

**RICO Predicate Acts** [3]

In support of its RICO claims (Counts I and II), International sets forth "predicate acts" which allege that Defendants caused International "to transfer to them [1] sham non-compete payments, [2] sell them valuable newspaper assets at below market prices, and [3] pay them other unwarranted, excessive, and unauthorized payments."

### Non-Compete Payments

International alleges that Defendants fraudulently caused the Company to transfer to them over $90 million in non-compete payments, which rightfully should have gone to International. Defendants failed to disclose these payments to International's board, its non-controlling shareholders, or in its SEC filings. Where Defendants did obtain board approval or publicly disclose the transfers, they made material misstatements and omissions. While unnecessary to detail all of these alleged improper transfers because they all basically follow the same modus operandi, the Court will describe some of the more blatant allegations.

For example, International alleges that Defendants forced the Company to sell certain of its publishing assets to Intertec Publishing Corporation ("Intertec") for approximately $75 million. As part of the sale, Intertec agreed to pay $2 million to International for entering into a non-compete agreement. Although Inc. was not mentioned in the agreement, Defendants had International transfer the $2 million payment to Inc. "Defendants never obtained

---

[3]     To determine whether the section 1964(c) bars International's RICO claims, this Court need only examine whether the RICO predicate acts could be "actionable" as securities fraud. See Gatz v. Ponsoldt, 297 F. Supp. 2d 719, 730 (D. Del. 2003). Therefore, in an attempt to simplify the complex facts set forth in International's 175 page and 514 paragraph Complaint, this Court will only discuss the predicate acts as they relate to subsection (c). Additionally, although different Defendants are alleged to have committed the various predicate acts, for the purposes of this opinion, this Court will describe the alleged predicate acts as committed by Defendants generally.

[International's] independent directors' approval to make this $2 million payment . . . , nor did they disclose this payment to [International's] public majority non-controlling shareholders." (First Am. Compl. at ¶¶ 80, 287-88.)

Additionally, when International sold certain of its newspapers to Community Newspaper Holdings, Inc. ("CNHI") for $472 million, $50 million of the purchase price was in consideration for a non-compete agreement. Although Inc. is a holding company and does not actually publish newspapers (and thus not a threat to compete), Defendants had Inc. included as a signatory in the non-compete agreement. Then without obtaining approval of International's independent directors or disclosing this transaction to the Company's "public non-controlling shareholders," Defendants caused $12 million of the $50 million non-compete payment to be wired to Inc. (Id. at ¶¶ 82, 289-90.)

After fraudulently obtaining $14 million from the above non-complete payments, Defendants transferred the money back to International as repayment for a prior loan. Defendants, however, did not disclose the fact that they repaid the loan with International's own money. Likewise, Defendants had International issue a material misstatement in its 2000 10-K annual report by reporting that a redemption of stock, not the fraudulent non-compete payments, extinguished the loan. (Id. at ¶¶ 83, 291)

Defendants also brought about the sale of other publications owned by International to Defendant Horizon Publications, Inc. ("Horizon") for $43.7 million, which included a $5 million payment for a non-compete agreement. Although Inc. was not a threat to compete, it signed the non-compete agreement, after which Defendants caused International to transfer $1.2 million of the $5 million payment to Inc. When this transaction was presented to the board by Defendants, they did not disclose the $1.2 million payment to Inc. Likewise, this payment was never

-4-

disclosed to the "majority non-controlling shareholders." (Id. at ¶¶ 84-85, 294.)

In 2001, International sold all of its Canadian newspapers – over 200 – to CanWest Global Communications Corp. ("CanWest") for $2.33 billion. Included in this purchase price was a payment for $52.9 million for an agreement not to compete. Although Defendants were not signatories to the CanWest non-compete agreement, they induced International to transfer to them the entire $52.9 million, plus interest. To get approval from International's board for this payment, Defendants made numerous material misrepresentations and omissions. In an attempt to hide this misappropriation, Defendants forced International to make materially false misstatements and omissions in its SEC filings and in public statements. For example, when Defendant Black was confronted with this transaction at International's annual shareholders' meeting, he made several false public statements to hide the fraudulent and unfair nature of the CanWest payments. In addition to the non-compete payments, International alleges that the CanWest transaction was "[un]fair to [International's] public non-controlling shareholders." (Id. at ¶¶ 98-120, 306-08.)

**Horizon Transactions**

In orchestrating the above $43.7 million sale to Horizon, Defendants failed to disclose, as required by law, their significant ownership interest in Horizon. This omission was particularly important given that International's assets were sold to Horizon at well "below fair market value," resulting in a loss for International and a windfall for Defendants. (Id. at ¶¶ 84-85, 184-193, 197-209, 292-94.)

Defendants also effectuated the sale of millions of dollars in other assets to Horizon at well "below fair market value." Like the other Horizon transaction, Defendants failed to disclose its ownership interest in Horizon to International's board, its shareholders, or in International's

SEC public filings. Additionally, Defendants caused International to make materially false statements in its SEC filings by asserting that these exchanges were "market value transactions," when in fact International sold its assets at well below market value. (Id. at ¶¶ 184-96, 210-274, 298-301, 304-05.)

### Bradford Transactions

Similar to the Horizon transactions, Defendants formed Bradford Publishing Co. ("Bradford") to purchase newspaper assets from International at prices "substantially below market value." Defendants also failed to disclose their ownership interest in Bradford to International's board, its shareholders, or in its SEC filings. Additionally, Defendants had International make materially false statements in its SEC filings by stating that these sales were "market value transactions." (Id. at ¶¶ 194-96, 235-49, 302-03.)

### Digital Management Incentive Plan

Defendants also fraudulently converted over $5 million from International in what were termed "incentive payments" for managing investments of an International subsidiary – Digital. To get approval for these payments, Defendants made "knowingly false representations" by stating that the incentive plan was in-line with comparable plans at other companies. In fact, the incentive plan was "unusual and excessive because it paid bonuses based on liquidity . . . without regard to the investment's portfolio's overall performance." Additionally, Defendants' used their positions to have International make investments in entities which Defendants had undisclosed interests. (Id. at ¶¶ 169-83, 315-17.)

### Sham Broker Fees

International further alleges that Defendants incorporated Moffat Management Inc. ("Moffat") to provide management and consulting services to International. Defendants then

caused International pay Moffat $900,000 for "broker" services. Moffat, however, never actual

performed any "broker" services. Moreover, Defendants failed to disclose this payment to

International's board or shareholders and had this payment recorded on International's books as

a legitimate "broker fee." (Id. at ¶¶ 160-65, 295-297.)

In all, International alleges that Defendants abused their positions of control and trust to

misappropriate $380.6 million in assets from International.

## SEC Enforcement Action

Prior to the filing of this action, the SEC brought an enforcement action against

International alleging violations of federal securities laws – SEC v. Hollinger International, Inc.

Case No. 04 C 336 (N.D. Ill. Judge Manning).[4] The SEC alleged that from 1999 until at least

2001, International improperly transferred at least $32 million to corporate insiders and related

entities, including Defendants Inc., Black, and Radler. These improper transfers were facilitated

by many of the fraudulent non-compete payments alleged by International in the instant action.

The SEC further alleged that in an attempt to hide these transactions, International made false

statements and failed to disclose material information in violation of the Securities Exchange Act

of 1934 and SEC rules. International settled the SEC Action in a consent judgment, wherein

International agreed to allow an independent committee to investigate the "unauthorized

transfer[] of [the Company's] assets" via "non-competition payments."[5]

---

[4]       In addition to the action against International, on August 27, 2004, the SEC gave
Defendant Inc. notice that it intended to file an action against it for violation of securities laws
based in part on the transfer of International's assets to Inc. through sham non-compete
agreements.

[5]       After entry of the consent judgment, Inc. sought to intervene and vacate the judgment.
This Court granted Inc.'s motion to intervene but denied the motion to vacate. Inc. then
appealed this decision but voluntarily dismissed the appeal pursuant to Federal Rule of Appellate
Procedure 42(b).

**Shareholder Securities Class Actions**

In addition to the present action and the SEC Action, purchasers of International's stock between August 1999 and March 2003, brought at least three securities class actions against International and many of the Defendants in this action – Case Nos. 04 C 0834, 1276, and 2505 (N.D. Ill. consolidated before Judge Coar). The Securities Class Actions allege that International and Defendants violated federal securities laws by making material misrepresentations and omissions regarding the same conduct alleged in this case – e.g., the non-compete payments, sale of assets to related entities at below market value, and inflated and improper management fees. According to the class plaintiffs, these misrepresentations and omissions "deceive[d] the investing public, including [the class plaintiffs] . . . and cause[d] them to purchase [International's] securities at artificially inflated prices." (Compl. in Washington Area Carpenters Pension and Retirement Fund, 04 C 2505, ¶¶ 228-246, Ex. 1 to Aff. in Supp. of Defs.' Mot. to Dismiss the First Am. Compl.)

## STANDARD OF REVIEW

In ruling on a motion to dismiss pursuant to Rule 12(b)(6), the court must assume the truth of all facts alleged in the pleadings, construing allegations liberally and viewing them in the light most favorable to the non-moving party. See, e.g., McMath v. City of Gary, 976 F.2d 1026, 1031 (7th Cir. 1992); Gillman v. Burlington N. R.R. Co., 878 F.2d 1020, 1022 (7th Cir. 1989).[6] Dismissal is properly granted only if it is clear that no set of facts which the plaintiff

---

[6]     When ruling on a 12(b)(6) motion, courts are generally limited to the facts set forth in the complaint. Here, however, because this motion is also brought under 12(b)(1), the Court may look beyond the complaint to any document submitted with the motion or in response to the motion. Ezekiel v. Michel, 66 F.3d 894, 897 (7th Cir. 1995). Likewise, as explained below, when determining whether section 1964(c) applies, courts often look to complaints in related

could prove consistent with the pleadings would entitle the plaintiff to relief. <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46 (1957); <u>Kunik v. Racine County, Wis.</u>, 946 F.2d 1574, 1579 (7th Cir. 1991) (<u>citing</u> <u>Hishon v. King & Spalding</u>, 467 U.S. 69, 73 (1984)).

The court will accept all well-pled factual allegations in the complaint as true. <u>Miree v. DeKalb County</u>, 433 U.S. 25, 27 n.2 (1977). In addition, the court will construe the complaint liberally and will view the allegations in the light most favorable to the non-moving party. <u>Craigs, Inc. v. General Electric Capital Corp.</u>, 12 F.3d 686, 688 (7th Cir. 1993). The court, however, is neither bound by the plaintiff's legal characterization of the facts, nor required to ignore facts set forth in the complaint that undermine the plaintiff's claims. <u>Scott v. O'Grady</u>, 975 F.2d 366, 368 (7th Cir. 1992).

## ANALYSIS

Defendants contend that this Court should dismiss International's RICO claims (Counts I and II) on the grounds that 18 U.S.C. § 1964(c), as amended by Section 107 of the Private Securities Litigation Reform Act ("PSLRA"), Pub. L. No. 104-67, 109 Stat. 737 (1995), bars RICO claims "that would have been actionable as fraud in the purchase of securities" ("the RICO Bar"). In response, International contends that subsection (c) does not apply because none of the allegations in the Complaint directly relate to the purchase or sale of securities. Before addressing the merits of these contentions, this Court will first examine the language of subsection (c), the legislative history of the PSLRA, judicial interpretations of the RICO Bar, and whether securities law encompasses fraudulent schemes which do not directly involve the sale or purchase of securities.

shareholder securities class actions and SEC actions which allege the same conduct asserted in the RICO action. Accordingly, this Court will consider limited facts outside of the Complaint.

Section 1964(c) states in relevant part that:

> Any person injured in his business or property by reason of any violation of section 1962 in this chapter may sue therefor . . . and shall recover threefold the damages . . . , <u>except that no person may rely upon any conduct that would have been actionable as fraud in the purchase of securities to establish a violation of section 1962.</u>

(Emphasis added.) The legislative history of subsection (c) reveals that Congress intended not only "to eliminate securities fraud as a predicate offense in a civil RICO action," but also to prevent plaintiffs from attempting "to plead other specified offenses, such as mail or wire fraud, as predicate acts under civil RICO <u>if such offenses are based on conduct that would have been actionable as securities fraud.</u>" H.R. Conf. Rep. No. 104-369, at 47 (1995) (emphasis added). In testifying before the House Commerce Committee, the SEC chairman, stated that the rationale for the RICO Bar was that:

> securities laws generally provide adequate remedies for those injured by securities fraud[; therefore,] it is both unnecessary and unfair to expose defendants in securities cases to the threat of treble damages and other extraordinary remedies provided by RICO.

141 Cong. Rec. H2771, reprinted in 1996 U.S.C.C.A.N. 679, 746 (1995).

Based on the above language, courts broadly construe section 1964(c) to preclude wire and mail fraud from forming predicate acts under RICO "if such conduct would also be actionable as securities fraud." <u>In re Enron Corp. Sec. Lit.</u>, 284 F. Supp. 2d 511, 619 (S.D. Tex. 2003).[7] Courts should not permit "surgical presentation" of the facts to "undermine the congressional intent behind the RICO amendment." <u>Bald Eagle Area Sch. Dist. v. Keystone Fin., Inc.</u>, 189 F.3d 321, 329-30 (3d Cir. 1999). <u>See also</u> <u>Gatz v. Ponsoldt</u>, 297 F. Supp. 2d 719, 730 (D. Del. 2003) ("a plaintiff cannot circumvent the PSLRA's exclusion of securities fraud as a RICO predicate act through artful pleading"); <u>Burton v. Ken-Crest Servs., Inc.</u>, 127 F. Supp. 2d

---

[7] Because neither the Seventh Circuit nor any courts in this district have interpreted the scope of section 1964(c), this Court will look to cases from other circuits.

673, 677 (E.D. Pa. 2001) (plaintiffs "cannot magically revive his [RICO] claim by picking out discrete details of his allegations and then claiming they are not actionable as securities fraud").

"The proper test is whether the conduct pled as predicate offenses is actionable as securities fraud." Gatz, 297 F. Supp. 2d at 730. In applying this test, courts carefully examine the predicate acts in relation to the overall fraudulent conduct to determine if they are part of a scheme that operated as a fraud on sellers or purchasers of securities. See Bald Eagle, 189 F.3d at 330; Gatz, 297 F. Supp. 2d at 730; In re Enron Corp. Sec. Lit., 284 F. Supp. 2d at 622; Florida Evergreen Foliage, 165 F. Supp. 2d at 1350, 1356-58 (M.D. Fla. 2001); Tyrone Area Sch. Dist. v. Mid-State Bank & Trust Co., 1999 WL 703729, at *4 (W.D. Pa. Feb. 9, 1999).

In Gatz, 297 F. Supp. 2d at 721-23, the plaintiff shareholders brought RICO and state law claims against the controlling shareholders and affiliated corporate entities, alleging that the defendants looted the corporation through a series of fraudulent transactions which benefitted the controlling shareholders. The defendants contended that the RICO claims were barred under 18 U.S.C. § 1964(c) because the predicate acts were "actionable" under federal securities law. Id. at 730. In response, the plaintiffs asserted that the RICO Bar did not apply because they did not "allege that they were purchasers or sellers of securities." Id. at 731.

In dismissing the RICO claims, the court examined the entire fraudulent scheme as a whole to determine if it fell within section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5. Id. at 730-31. The court found that "the alleged scheme involved a series of fraudulent transactions designed to loot [the company] for the purposes of maximizing [the controlling shareholders'] compensation." Id. The predicate RICO acts, which alleged the use of wires and mails, facilitated the looting of the company. Id. Broadly applying the RICO bar to prevent the use of "artful pleading" to avoid the bar, the court held that "the conduct alleged as

-11-

predicate acts by the plaintiffs would be actionable as securities fraud and, consequently, may not serve as predicate acts for purpose of a RICO civil action." Id. at 731.

Similarly, in In re Enron Corp. Securities Litigation, 284 F. Supp. 2d at 622, the shareholder plaintiffs alleged RICO and state law claims, asserting that the defendants, who were officers of the company, enacted a fraudulent scheme to "loot" the company. Granting the defendants' motion to dismiss the RICO claims under section 1964(c), the court held that while the predicate acts were technically not actionable as securities fraud, the court could not look at these acts in a vacuum. Id. Instead, the court was required to consider the fraudulent scheme as a whole. Id. Applying this broad test, the court found that "the predicate acts [] are part of an overreaching scheme and conspiracy to defraud current and prospective shareholders . . . with all alleged acts and omissions intended to achieve the same goal, personal enrichment of [the defendants] at the expense of the corporation [and] its shareholders." Id. Accordingly, section 1964(c) barred the RICO claims because the predicate acts were part of a scheme "that operated as a fraud on sellers or purchasers of securities." Id.

Although both sets of plaintiffs in Gatz and Enron had standing to bring securities fraud claims, the RICO bar operates irrespective of whether the RICO plaintiff has standing to bring a securities claim -- i.e., was a purchaser or seller of the company's stock – as long as another plaintiff could bring a securities action based on the alleged conduct. For example, in Gatz, 297 F. Supp. 2d at 731, in rejecting the plaintiffs contention that the RICO Bar did not apply because they did not "allege that they were purchasers or sellers of securities," the court held that "[w]hether plaintiffs were purchasers or sellers of securities would only be relevant to the inquiry of their standing to bring a securities fraud claim, whereas [section 1964(c)] . . . applies regardless of whether a particular plaintiff has standing to bring a civil action under §

-12-

10b and Rule 10b-5." See also In re Enron Corp. Sec. Lit., 284 F. Supp. 2d at 619 (the RICO Bar applies "regardless of whether a particular plaintiff has standing to bring a cause of action under the securities laws").

In determining whether the RICO conduct is actionable, courts also consider whether there are any pending shareholder securities class actions or SEC actions which allege the same conduct asserted in the RICO action. Where the SEC or the class plaintiffs base their securities fraud claims on the conduct as alleged in the RICO action, courts generally find that the RICO claims are "actionable" as securities fraud. See, e.g., Bald Eagle, 189 F.3d at 328 (noting that the SEC's complaint alleged the same scheme which "is at the heart of this RICO action"); Florida Evergreen Foliage, 165 F. Supp. 2d at 1356-57 (in dismissing RICO claims under section 1964(c), the court compared the RICO action with a shareholder action to determine if the predicate acts were actionable as securities fraud); In re Ikon Office Solutions, Inc., 86 F. Supp. 2d 481, 486 (E.D. Pa. 2000) (same); Tyrone Area Sch. Dist., 1999 WL 703729, at *4 ("that the conduct involved in the [] scheme is actionable under securities laws is evidenced by the SEC's commencement of a suit for violations of federal securities laws" based on the conduct alleged in the RICO claims).

Here, after carefully reviewing the predicate acts alleged in the Complaint in relation to Defendants' scheme to loot the Company and comparing the allegations here to the allegations in the Securities Class Actions and the SEC Action, this Court finds that the alleged predicate offenses are "actionable" as securities fraud under 10(b) and 20(a) of the Securities and Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a) and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) and

thus are barred by section 1964(c).[8]

Before applying the above principles to the present allegations, however, this Court will briefly set forth the applicable securities laws which could be applicable to the allegations in International's Complaint. To state a valid securities fraud claim under section 10(b) or Rule 10b-5, a plaintiff must allege that "the defendant (1) made a misstatement or omission, (2) of material fact, (3) with scienter, (4) in connection with the purchase or sale of securities, (5) upon which the plaintiff relied, and (6) that reliance proximately caused plaintiff's injuries." In re HealthCare Compare Corp. Sec. Litig., 75 F.3d 276, 280 (7th Cir. 1996).[9] To properly plead a claim under section 20(a), a plaintiff must allege that the defendant: (1) exercised general control over the entity principally liable; and (2) possessed the power or ability to control the specific transaction upon which the primary violation was predicated, even if such power was not exercised. Donohue v. Consolidated Operating & Prod. Corp., 982 F.2d 1130, 1138-39 (7th Cir. 1992).[10]

---

[8]    In reaching this conclusion, the Court does not make any determination as to the merits of any securities fraud claims against Defendants or International. The Court simply finds that the RICO claims here are "actionable," which is defined as "[f]urnishing the legal ground for a lawsuit or other legal action." Black's Law Dictionary (7th ed. 1999).

[9]    Section 10(b) prohibits the use "in connection with the purchase or sale of any security . . . [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b). Rule 10b-5 makes it unlawful for any person:

> (a) To employ any device, scheme, or artifice to defraud, (b) [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or (c) [t]o engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

[10]    Section 20(a) states in pertinent part that: "[e]very person who, directly or indirectly, controls any person liable under this chapter or rule or regulation . . . shall be liable jointly and

Here, International contends that the conduct alleged in its Complaint does not constitute "actionable" securities fraud because none of the allegations were in "connection with the purchase or sale of securities." This interpretation, however, is too narrow and has been rejected. Courts "broadly construe" the "in connection with the purchase or sale" requirement, 3 Fletcher Cyclopedia of Private Corp., § 900.85 (May 2004) (citing cases), to include omissions and misrepresentations reasonably calculated to influence the investing public to purchase or sell securities. See Goldberg v. Meridor, 567 F.2d 209, 218-19 (2d Cir. 1977); Britt v. Cyril Bath Co., 417 F.2d 433, 435 (6th Cir. 1969). See also Jacoboni v. KPMG LLP, 314 F. Supp. 2d 1172, 1186 (M.D. Fla. 2004) (when analyzing the RICO predicate acts in relation to the entire fraudulent scheme, courts give credence to the principle that the securities law should be broadly construed to "encompass a wide range of activity"). This broad interpretation supports the underlying purpose of Congress in enacting section 10(b) – "to make sure that buyers of securities get what they think they are getting and that sellers of securities are not tricked into parting with something for a[n] [inadequate] price." 4 Broomberg & Lowenfels on Securities Fraud, § 6:570 (2004). See also Superintendent of Ins. of New York v. Bankers Life and Cas. Co., 404 U.S. 6, 12 (1971) (Congress intended section 10(b) to protect "the entire community of interests in the corporation").

Based on this broad interpretation, "[u]nder Rule 10b-5, when a party undertakes to disclose anything, it has the duty to speak the full truth." Issen v. GSC Enter., Inc., 538 F. Supp. 745, 751 (N.D. Ill. 1982). Therefore, corporations are required to disclose material events in their annual reports, including transactions between the corporation and companies in which the

severally." 15 U.S.C. § 78t(a).

corporation's controlling shareholders have an interest. See id. See also Boggess v. O.T. Hogan, 328 F. Supp. 1048, 1052 (N.D. Ill. 1971) (holding that failure to disclose insider transactions stated a cause of action under section 10(b)).

Courts also hold that a securities law violation occurs when "the corporation is influenced by its controlling shareholders to engage in a transaction adverse to the corporation's interests (in effect, the minority shareholders' interests) and there is non-disclosure or misleading disclosures as to the material facts of the transaction." See Goldberg, 567 F.2d at 217. See also Wright v. Heizer, 560 F.2d 236, 246-49 (7th Cir. 1977) (section 10(b) permits a cause of action where a breach of fiduciary duty to a non-controlling shareholder involving conflict of interest occurs in conjunction with a deception, non-disclosure, or misrepresentation in the purchase of securities).

With these principles in mind, the Court now turns to the predicate acts International alleges in support of its RICO claims. These acts include Defendants' use of the mails and wires to facilitate their scheme to loot International. Defendants allegedly devised several schemes to use their ownership and control of International to fraudulently convert $380.6 million in assets from the Company. As detailed above, these schemes included fraudulent non-compete payments, sale of assets to entities controlled by Defendants at well below market value, and inflated and unearned management fees. While the predicate acts alone are not per se violations of securities law, they were an integral part of Defendants' scheme to loot International. Indeed, as explained below, without the use of the mails and wires, Defendants would not have been able to successfully loot over $380 million from International.

For example, when International sold some of its publishing assets to CNHI for $472 million, $50 million of the purchase price was for non-compete agreements. Even though Inc

does not actually publish newspapers (and thus not a threat to compete), Defendants allegedly had Inc. included as a signatory in the non-compete agreement. Then without obtaining approval of International's independent directors or disclosing this transaction to the Company's "public non-controlling shareholders," Defendants allegedly caused $12 million of the $50 million non-compete payment to be wired to Inc. (Compl. at ¶¶ 82, 289-90.)

Likewise, in the Moffat scheme, Defendants allegedly induced International to pay Moffat $900,000 for "broker" services. Moffat, a company controlled be Defendants, however, never actually performed any "broker" services. To complete this "sham transaction," Defendants used the mails and telephones, e.g., sending the $900,000 sham payment by Federal Express across state lines. Once finalized, Defendants allegedly disguised this transaction by failing to disclose this payment to International's board or shareholders and causing it to be recorded on International's books as a "broker fee." (Id. at ¶¶ 160-65, 295-297.)

Similarly, Defendants allegedly formed several shell companies, e.g., Horizon and Bradford, and then caused International to sell assets to these shells at "substantially below market value." To facilitate these fraudulent sales, Defendants are alleged to have used "wires in interstate and foreign commerce." In an attempt to disguise these transactions, Defendants allegedly failed to disclose their ownership interest to International's board, its shareholders, or in its SEC filings and forced International to make materially false statements in its SEC filings by stating that these transactions were "market value transactions." (Id. at ¶¶ 194-96, 235-49, 302-03.)

In addition to the actions alleged in the Complaint, the Securities Class Actions, brought by purchasers of International's stock, allege that International and several of Defendants in this case violated sections 10(b) and 20(a) and Rule 10b-5 by making material misrepresentations

and omissions regarding the same conduct alleged in this action – e.g., the non-compete

payments, sale of assets to related entities at below market value, and inflated and improper

management fees. The class plaintiffs allege that these misrepresentations and omissions

"deceive[d] the investing public, including [the class plaintiffs] . . . and cause[d] them to

purchase [International's] securities at artificially inflated prices." (Compl. in <u>Washington Area</u>

<u>Carpenters Pension and Retirement Fund</u>, 04 C 2505, ¶¶ 228-246, Ex. 1 to Aff. in Supp. of

Defs.' Mot. to Dismiss the First Am. Compl.)

Likewise, the SEC Action alleged that from 1999 until at least 2001, International

improperly transferred at least $32 million to corporate insiders and related entities, including

Defendants Inc., Black, and Radler. These improper transactions include many of the fraudulent

non-compete payments alleged by International in the instant action. The SEC further alleged

that in an attempt to facilitate and hide these transactions, International falsified its corporate

books and records and failed to disclose material information in its SEC filings, in violation of

the Securities Exchange Act of 1934 and SEC rules. (SEC Compl., Ex. 4 to Aff. in Supp. of

Defs.' Mot. to Dismiss the First Am. Compl.) In addition, on August 27, 2004, the SEC gave

Defendant Inc. notice that it intended to file an action against it for securities fraud based in part

on the transfer of International's assets to Inc. through sham non-compete agreements.

Based on the above allegations (in the Complaint, the Securities Class Actions, and the

SEC Action), this Court concludes that International's predicate acts would be a part of an

overreaching scheme to defraud International (and thus also its majority non-controlling

shareholders) by misappropriating and usurping the Company's assets for their personal

enrichment at the expense of International and the other shareholders. To facilitate and disguise

this scheme, Defendants used the mails and wires (the predicate acts) and caused International to

-18-

make material misstatements and omissions in its financial records and public filings with the SEC. Accordingly, the predicate acts would be part of a scheme which is actionable under securities law, and therefore, the RICO claims are barred by 18 U.S.C. § 1964(c). The Court therefore GRANTS the motion to dismiss Counts I and II (the RICO claims).[11]

Having dismissed the RICO claims, International's sole basis for federal subject matter jurisdiction, the Court must now address whether to exercise supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over International's remaining state law claims. Section 1367(a) authorizes federal courts to exercise supplemental jurisdiction over state law claims, but this, however, does not mean that federal courts must exercise jurisdiction in all cases. See City of Chicago v. Int'l College of Surgeons, 522 U.S. 156, 172 (1997). Instead, supplemental jurisdiction is "a doctrine of discretion, not [a litigant's] right . . . ." Id. Pursuant to section 1367(c), "[t]he district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if-"

(1) the claim raises a novel or complex issue of State law,

(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3) the district court has dismissed all claims over which it has original jurisdiction, or

(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c)(1)-(4).

District courts should "deal with cases involving [supplemental] claims in the manner that best serves the principles of economy, convenience, fairness and comity which underlie the

---

[11] In holding that section 1964(c) precludes International's RICO claims, this Court is not making any determination as to validity of the fraudulent actions underlying these claims. This decision simply holds that the claims are "actionable" as securities fraud.

[supplemental] jurisdiction doctrine." Int'l College of Surgeons, 522 U.S. at 172. See also Wright v. Associated Ins. Co. Inc., 29 F.3d 1244, 1251 (7th Cir. 1994). As a "general rule . . . when all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendent state-law claims rather than resolving them on the merits." Id. Only in the "unusual cases in which the balance of factors to be considered under the [supplemental] jurisdiction doctrine -- judicial economy, convenience, fairness and comity" should the district court hear "the state-law claims on the merits" after dismissal of the original claim granting the court jurisdiction. Wright, 29 F.3d at 1251.

In the context of cases involving the RICO Bar, after dismissing the RICO claims, courts generally refuse to exercise supplemental jurisdiction over the remaining state law claims. See Bald Eagle, 189 F.3d at 327 (affirming district court's decision not to exercise supplemental jurisdiction over remaining state law claims); Tyrone Area Sch. Dist., 1999 WL 703729, at *4 (declining to exercise supplemental jurisdiction over remaining state law claims after dismissing RICO claims).

Here, because all of International's federal claims have been dismissed and International has failed to cite any special circumstances for this Court to retain jurisdiction, this Court sees no reason for exercising jurisdiction over the remaining state law claims and therefore dismisses Counts III-XXIX without prejudice.

## CONCLUSION

For the reasons discussed, this Court GRANTS Defendants Motion to Dismiss the First Amended Complaint [74-1] and dismisses Counts I and II with prejudice and Counts III - XXIX without prejudice. Given this ruling, the Court also dismisses as moot, the following pending motions in this case: (1) the Horizon Defendants' Supplemental Motion to Dismiss [78-1]; (2) Defendant Barbra Black's Motion to Dismiss Counts XIII and XXVIII for Lack of Subject Matter Jurisdiction [77-1]; (3) Defendant Conrad Black's Supplemental Motion to Dismiss Counts I and II [76-1]; and (4) Defendant Daniel Colson's Motion to Dismiss [106-1].

It is so ordered.

ENTER:

_____
**BLANCHE M. MANNING**
**U.S. DISTRICT COURT JUDGE**

DATE: _10 - 8 -04_