**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| HOLLINGER INTERNATIONAL, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **Hon. Blanche M. Manning** |
| v. | ) | |
| | ) | **Case No. 04 C 0698** |
| | ) | |
| HOLLINGER INC., et al. | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

Plaintiff Hollinger International, Inc. ("International" or "the Company") brought the instant action alleging that Defendant Hollinger Inc. ("Inc.") and other corporate and individual defendants (collectively, "Defendants") used their positions as officers, directors, and controlling shareholders of International to "loot" hundreds of millions of dollars from the Company. In its Second Amended Complaint, International alleges state law claims for breach of fiduciary duty, unjust enrichment, conversion, and civil conspiracy. The present matter comes before this Court on Defendants' various motions to dismiss under Federal Rules of Civil Procedure 12(b)(2), (6), and (7) and 19. For the reasons set forth below, this Court DENIES all pending motions to dismiss.

## BACKGROUND[1]

International brought this action to recover $425.2 million (plus interest), which it contends Defendants looted (and/or facilitated the looting of) through a series transactions from 1994 to April 2003.

### The Parties

The litigants in this action are all related through, what can only be described for lack of a better word, an incestuous web of corporate ownership and greed. International is a Delaware corporation, whose corporate offices were located in Chicago, Illinois, during the time of the alleged looting. It owns and operates hundreds of domestic and foreign newspapers, including the Chicago Sun-Times. Although a publicly traded company, International is controlled by Inc., a Canadian corporation. At the time of the alleged looting, Inc. owned 30.3% of the equity in International but controlled 72.8% of its voting rights.[2]

Inc. docs not conduct any business of its own but is simply "an investment vehicle" through which Defendants Conrad Black and David Radler control International. Inc. is controlled by Defendant Ravelston Corporation, which owns 78% of its equity. Ravelston, in turn is a "private holding company"controlled by Black and Radler, who respectively own 65.1% and 14.1% of its shares.

Using the above corporate structure, Black and Radler placed themselves and other

---

[1] The facts in the Background section are derived from: (1) the First and Second Amended Complaints; (2) the opinion of Vice Chancellor Strine of the Court of Chancery of Delaware in Hollinger International, Inc. v. Black, et al., 844 A.2d 1022 (Del. Ch. 2004) ("the Delaware Litigation" or "Delaware Action"); and (3) exhibits attached to parties' submissions, many of which are referenced in the Second Amended Complaint, including but not limited to the "Restructuring Proposal" and the submissions and court filings from the Delaware Litigation.

[2] Inc. has since reduced its holdings and now owns 18% of the equity and 68% of the voting rights in International.

Defendants, whom they allegedly controlled, in key positions at International, its subsidiaries, and companies doing business with International.[3] For example, Black was International's CEO and chairman of its board of directors ("the Board"). Radler was the deputy chairman of the Board and the president and COO of International. Defendant John Boultbee, who owned a small interest in Ravelston, sat on the Board and was International's CFO and an executive vice-president of finance. Defendant John Colson, also a shareholder of Ravelston, was a member of the Board and CEO of several of International's subsidiaries which received excessive payments from International. Defendant Barbara Amiel Black ("Amiel Black"), Conrad Black's wife (collectively, "the Blacks"), served on the Board and was a vice-president at International and a shareholder in at least one company (Defendant Ravelston Management Inc.) to which International allegedly paid unwarranted management fees. Lastly, International alleges that Defendant Richard Perle sat on the Board and on its audit, compensation, and executive committees, while serving as an officer in a company (Digital Management) which received alleged excessive fees for managing International's investments.

**The Looting of International**

Using their controlling interests and positions as officers and directors, Black and Radler allegedly conspired with the other individual Defendants to loot International by causing it to: (1) make unwarranted "non-competition payments" to Defendants; (2) sell hundreds of millions of dollars of its publishing assets "at below market value prices" to companies controlled by Black and Radler; (3) loan money to Inc. at "below market interest rates"; and (4) pay Defendants, either directly or indirectly, through companies they controlled, "unwarranted,

---

[3]     Individual Defendants resigned from most of their positions with Inc. after their alleged conduct in this action came to light.

excessive, and unauthorized" "management fees," "incentive payments," and other compensation. Each of these alleged "schemes" will be explained in turn.

### Non-Compete Payments

From January 1999 to November 2001, Defendants allegedly caused International to pay them over $88 million in "sham non-compete payments," which rightfully should have gone to the Company. These payments were made in connection with International selling several of its local newspapers and were often included in the sale price of the newspapers. In exchange for these payments, Defendants agreed not to compete with the purchasers of these papers. While this is standard practice in the newspaper industry, according to International, the problem with these payments was that Defendants were not a threat to compete. Thus, there was no reason for them to receive the non-compete payments. For example, Defendants Inc. and Ravelston, are holding companies, without the ability to compete, but respectively received $16.55 million and $26.43 million in unwarranted non-compete payments.

The first of these improper non-compete payments was made in January of 1999 in connection with the sale certain of International's publishing assets to Intertec Publishing Corporation ("Intertec") for approximately $75 million. As part of the sale, Intertec agreed to pay $2 million to International for entering into a non-compete agreement. Although Inc. was not mentioned in the sales agreement, Defendant Radler allegedly had International transfer the entire $2 million payment to Inc.

In February of 1999, International sold some of its other newspapers to Community Newspaper Holdings, Inc. ("CNHI") for $472 million ("the CNHI I Transaction"). Included in this price was $50 million in consideration for a non-compete agreement. Although Inc. was not a threat to compete and CNHI did not ask it to sign the non-compete agreement, Defendants

-4-

Black, Radler, and Boultbee had Inc. included as a signatory in the non-compete agreement and as a "non-competition covenantor" in the sales agreement. Then without obtaining Board approval, Radler caused $12 million of the $50 million non-compete payment to be wired to Inc.[4]

Next, in June of 1999, Black and Radler had International sell more of its assets to Horizon Publications, Inc. ("Horizon") (a company, which as explained below, was controlled by Black and Radler) for $43.7 million ("Horizon I "). The price included a $5 million payment for a non-compete agreement. As in the earlier transactions, Black and Radler caused Inc. to be included "as a non-compete covenantor in the asset purchase agreement." As a result, Inc. received $1.2 million of the $5 million non-compete payment.

Over a year later, in September of 2000, International again sold certain of its newspapers, this time to Forum Communications Co. for $14 million. As in the other deals, $400,000 of the sale price was for the execution of a non-compete agreement. Inc. was included as a signatory to the non-compete agreement and received $100,000 of the total payment.

In October 2000, International sold additional assets to PMG Acquisition Corporation for $59 million, which included a $2 million payment for a non-compete agreement. As before, Radler caused Inc. to be included as a signatory in the non-compete clause. He then had International transfer $500,000 of the $2 million payment to Inc. Well after the completion of this sale, in April of 2001, Black, Radler, and Boultbee had International pay them $600,000 ($285,000 to Black and Radler (each) and $15,000 to Boultbee) for agreeing not to compete with

---

[4]     After obtaining $14 million in non-complete payments from the assets sales to Intertec and CNHI, Defendants transferred the money back to International as repayment for a prior loan (which is detailed below). Defendants, however, did not disclose the fact that they repaid the loan with International's own money.

PMG.

In November 2000, International entered into another sales agreement with CNHI ("the CNHI II Transaction") for $90 million, which included a $2.25 million non-compete payment. As in the earlier transactions, Black and Radler had International include Inc. in the non-compete agreement and then transferred $750,000 of the payment to Inc. Additionally, Radler "caused [the] closing documents to be altered at closing to create a sham basis for making non-competition payments to Black, Radler, and Boultbee." As a result, International, at Radler's "instruction," transferred $4.3 million of the purchase price to Black and Radler (each) and $450,000 to Boultbee.

Also in November 2000, International agreed to sell the majority of its Canadian newspapers – over 200 – to CanWest Global Communications Corp. ("CanWest") for $2.1 billion. Included in this purchase price was a payment for $51.8 million for an agreement not to compete. Although Defendants Black, Radler, Boultbee, and Ravelston were not signatories to the CanWest non-compete agreement, they allegedly induced International to give them the entire payment plus interest – $52.9 million of which $26.44 million went to Ravelston, $11.9 million to Black and Radler (each), and $1.32 million to Boultbee. In orchestrating these payments, Black and Ravelston allegedly made numerous misstatements to the Board.

In an even bolder move, in February 2001, Black, Radler, and Boultbee entered into non-compete agreements with a subsidiary of International – American Publishing Company, which had previously sold "substantially all of its assets" to Horizon. Because it conducted very little business and was a subsidiary of International, it is unclear why American Publishing would need to protect itself from competition by Defendants, who were its owners. As a result of these non-compete agreements, International inexplicably paid Black and Radler $2,612,500 each and

$135,500 to Boultbee.

The final two sets of non-compete payments were made in July and November of 2001 in connection with International's sale of certain Canadian newspapers to Osprey Media Group. Included in the price of these transactions was $5.17 million in non-compete payments. Like the other transactions, Black, Radler, and Boultbee caused International to transfer most of this non-compete payment to themselves – approximately $2.37 million each to Black and Radler and $245,000 to Boultbee.

In all, International alleges that Defendants misappropriated $88,021,498 in non-compete payments which rightfully belonged to the Company. Of this amount, Black and Radler each received $21,431,936, while $2,170,433 went to Boultbee. In addition, Inc. and Ravelston, which are controlled by Black and Radler, received $26,437,193 and $16,550,000 respectively.

### Sale of International's Assets to Horizon and Bradford

Black and Radler allegedly formed Horizon in 1998 and Bradford Publishing Co. ("Bradford") in 2000, for the sole purpose of using them to buy newspaper assets from International at "below market prices." Through personal ownership and other companies that they controlled, Black and Radler owned up to 80% of Horizon and at least 50% of Bradford. The remainder of the equity in these companies was dispersed to individuals who Black and Radler "dominated or controlled or, who were loyal to them" because these investors were either their employees, friends, or business partners. In addition, Radler was the president, CEO, and a director at Horizon.[5]

In all, International made five sales to Horizon ("Horizon I" to "Horizon V") and one sale

---

[5]     Black and Radler allegedly went to great lengths to hide their control over Horizon and Bradford and failed to fully disclose their ownership interests to the Board or in International's public filings.

to Bradford. In Horizon I, which closed on June 30, 1999, 33 individual local newspapers were sold for $43.7 million. In seeking the Board's approval, Black and Radler allegedly made numerous misrepresentations and manipulated the true value of the assets, including that the purchase price was equal to an offer from "an arm's length purchaser" (CNHI). In fact, however, CNHI had offered $18 million more than Horizon for the same assets. Indeed, shortly after closing on Horizon I, Horizon sold one of the publications which Black and Radler represented was worth $78,000 for $673,314.

Adding insult to injury, Black and Radler "arranged" for International to "finance the entire . . . purchase price at closing" without disclosing this fact to the Board. Horizon eventually defaulted on this obligation and currently owes $5.6 million to International. Additionally, as discussed below, Black and Radler caused International to finance the Horizon I transaction at "a below-market interest rate." In all, International now seeks damages in excess of $20 million for the Horizon I sale.

In Horizon II, completed on April 1, 2000, Black and Radler caused International to enter into "an asset exchange agreement," under which it "swapped" certain assets with Horizon. In seeking Board approval, Defendants made numerous misstatements regarding the value of the assets to be exchanged. Unbeknownst to the Board, International was exchanging profitable newspapers for publications which were "mostly losing money." In fact, one of the unprofitable papers was an asset which Horizon acquired from International in Horizon I. International now alleges that the "exchanged publications . . . were worth millions less than the properties . . . received."

In Horizon III, Black and Radler had International transfer ownership of two newspapers to Horizon. Instead of being compensated for this transfer, however, International agreed to pay

-8-

$161,999 to Horizon. To get Board approval, Black and Radler made numerous misstatements, including telling the Board that these two papers had "experienced significant losses and [were] unlikely to yield profits." Defendants, however, did not disclose that a third party had recently offered to purchase the two allegedly unprofitable papers for $750,000. Indeed, 18 months after the sale, Horizon sold the two papers for $730,000.

Additionally, in September 2000, Black and Radler caused International to transfer two regional newspapers in the Horizon IV transaction. Unlike the previous Horizon transactions, Defendants did not even seek Board approval. Instead, this transaction was secretly facilitated through the CNHI II Transaction. Prior to closing on CNHI II, Radler got CNHI's consent to include the two Horizon IV assets with the other publications CNHI had agreed to purchase. The CNHI II purchase agreement, however, called for CNHI to immediately assign these two assets to Horizon. In exchange for facilitating this transfer, CNHI received a $5.2 million discount on the purchase price of the assets it was actually purchasing. Instead of making up this reduction in the purchase price, however, Horizon only paid $4.1 million to International – resulting in an immediate loss of $1.1 million to International.

In the final transaction (Horizon V), International sold a group of publications to Horizon for $1 (one dollar). Two years prior, International had purchased these same assets for approximately $1.75 million and nine months before had received an offer to sell them for $1.25 million. Like the other transactions, to get Board approval, Black and Radler falsely stated that the publications were losing money when in fact they were very profitable.

In addition to the Horizon transactions, in July of 2000, International sold four of its publications to Bradford for $37.5 million. International contends that this transaction was unfair to the majority non-controlling shareholders because: (1) Black and Radler understated

the value of these assets by manipulating valuation figures; (2) a third-party had offered to buy the same publications for $10.6 million more than Bradford paid; (3) the purchase was financed in part by a $6 million interest free loan from International; and (4) International signed a guarantee with a third-party lender for an additional loan of $22 million, which Bradford used to pay the remainder of the purchase price. Like the Horizon transactions, when presenting this sale to the Board, Black and Radler did not disclose the above information.

In conclusion, International contends that Black and Radler usurped several corporate opportunities and cheated the Company out of tens of millions of dollars in orchestrating the above sales to Bradford and Horizon.

### Loans to Related Parties

International also alleges that Black and Radler breached their fiduciary duties by having International make at least two loans to Inc. at "below market interest rates." In September 1997, Black and Radler forced International to loan Inc. $42.5 million at a 1.4% interest rate. International alleges that based on Inc.'s lack of creditworthiness this was a "grossly low rate." Moreover, the terms of the loan called for it to be repaid in 90 days. Inc., however, did not repay the loan until February of 1999 – over a year after the agreed upon date. Even more egregious, Inc. "did not even pay all of the nominal interest" and, as detailed above, used $14 million in improper non-compete payments, which it had misappropriated from International, to repay the loan.

In July of 2000, International made a second loan of $46.8 million to Inc. at 13% interest. Inc., though, never made the agreed upon interest payments because a month later it "unilaterally reduced" the rate to just under 5% (a decrease of over 60%). Even with the reduced interest rate, however, Inc. did not repay the loan and still owes a balance of $33.5 million.

### Excessive Management Fees, Incentive Payments, and Compensation

International further alleges that Defendants looted the Company by arranging unwarranted, excessive, and unauthorized management fees, incentive payments, and other improper compensation.

### Management Fees Paid to Inc. and Ravelston

Corporations in the United States usually directly hire and compensate their professional senior management (e.g., the CEO, CFO, COO, etc.). These senior officers work exclusively for the hiring corporation and do not split their services and time with companies doing business with the hiring corporation.

International alleges that in contrast to the practice of most corporations, Black and Radler, in a "virtually unprecedented" move, caused the Company to "outsource" its management from Defendants Ravelston and Inc.[6] As a result, since 1994, International has paid over $226 million in management fees to Inc. and Ravelston. According to International, these fees "were far in excess of the fair market value the Company was receiving, and grossly in excess of the cost to [Inc.] and Ravelston for providing such services."

In getting the Board to approve International's annual "management services agreements" with Ravelston and Inc., Defendants drafted the contracts themselves and did not have an independent law firm representing International review the agreements. The fees paid under these contracts were determined solely by Defendants without any rational basis for calculating the fair value of services being provided to International. According to International, Defendants' only alleged basis in determining the managements fees was to "keep the [] fees as

---

[6] Inc. allegedly provided management services from 1994 to 1997, while Ravelston did so from 1997 until October of 2003.

high as possible" without regard to the value of the services provided to the Company. In addition, under the guise of paying for its management, International paid for a large portion of the Blacks' "extravagant" travel and living expenses, including $90,000 to repair a Rolls Royce owned by Ravelston but used exclusively by the Blacks.

### Sham Broker Fees

International further alleges that Defendants incorporated Moffat Management Inc. ("Moffat") to provide management and consulting services to International. Defendants then caused International pay Moffat $900,000 for "broker" services. Moffat, however, never actually performed any "broker" services. Defendants failed to disclose this payment to the Board and had this payment recorded on International's books as a legitimate "broker fee."

### Digital Management Incentive Plan

Defendants also caused International to pay them over $5 million in "incentive payments" for managing International's investments through Digital Management Inc. (a subsidiary of International). To get approval for these payments, Defendants falsely told the Board that the incentive plan was "in-line with comparable plans at other companies." In fact, however, the incentive plan was "unusual and excessive because it paid bonuses based on liquidity . . . without regard to the investment portfolio's overall performance." In a memorandum to Black, Colson explicitly acknowledged that Digital's fee structure "is high in comparison with similar plans used by other companies.[7]" For example, despite losing over $68 million on its investments managed by Digital, International paid Perle over $3.1 million in "incentive payments"for his performance as Digital's CEO. Additionally, many of the

---

[7]    Although he knew that the Digital fee structure was unreasonable, Colson nevertheless approved the payments to Digital and later received over a million dollars from Digital.

investments Digital put International's money into were entities in which Defendants had undisclosed interests.

## Other Unreasonable Payments and Compensation

International also alleges that Defendants looted its coffers by paying themselves unreasonable salaries and having International pay for personal travel and other life style expenses not associated with work done for the Company. For example, although she "performed little if any work for the Company," International paid Defendant Amiel Black over $1.14 million in salary and bonuses between 1999 to 2003, in addition to the grant of 370,000 options worth millions of dollars.

Apparently not prepared to pay for their extravagant life style themselves, the Blacks allegedly had International pay for such things as: (1) a "tip" for the doorman at an upscale New York boutique; (2) millions of dollars in charitable donations made in the Blacks' name; (3) a collection of FDR memorabilia used by Black to write a book, for which International paid $9 million -- allegedly three times its actual value; and (4) corporate jet rides for the Blacks for personal travel at a cost of $4.7 to $6.5 million a year. Additionally, in December of 2000, Black had International sell him an apartment it owned for $2.55 million, which was well underpriced given that the Company had purchased the apartment in 1994 for $3 million dollars.

In all, International alleges that Defendants abused their positions of control and trust to misappropriate $425.2 million from the Company in the above transactions.

## International Opens an Internal Investigation Resulting in the Delaware Litigation[8]

In May of 2003, one of International's largest stockholders, Tweedy Browne Company, LLC ("Browne") demanded that the Board initiate an investigation into the non-compete payments made to Black, Radler, Boultbee, and Inc. in connection with the CNHI II Transaction (which is detailed above). In response, the Board established a special committee ("the Special Committee"), made up of newly appointed independent directors, to investigate and, if necessary, to recover these alleged improper and unauthorized payments.[9]

A few months after commencing its investigation, in late October 2003, the Special Committee concluded that $32.15 million in non-compete payments had wrongly been paid to Black, Radler, Boultbee, and Inc.[10] Particularly troubling to the Special Committee was that these payments were made without "proper authorization" from the Board and were not fully disclosed in International's public SEC filings. Also of concern was that $16.55 million was given to Inc., even though it was simply a holding company with "no operational capacity to compete with anyone."

In November of 2003, after being confronted with these unauthorized and undisclosed non-compete payments, Black, fearing litigation from both the Special Committee and the SEC,

---

[8]     The facts surrounding International's internal investigation are taken from the opinion in the Delaware Litigation, Hollinger International, Inc., 844 A.2d 1022.

[9]     The Special Committee consisted of three members including Gordon A. Paris, International's current CEO.

[10]     As explained in detail above, these non-compete payments were made in connection with International selling some of its smaller local regional newspapers. In exchange for these payments, International agreed that neither it nor any of its related companies would start a new newspaper in that area to compete with the publication which was just sold. By October of 2003, the Special Committee had uncovered three asset sales in which wrongful non-compete payments were made to Defendants (including the CNHI II Transaction).

"sued for peace" by entering into an agreement with the Special Committee – termed the "Restructuring Proposal" or "Restructuring Agreement." Under the Restructuring Proposal, Black, without admitting to any wrongdoing, agreed to: (1) return the non-compete payments he received and "endeavor to cause Inc. to do the same"; (2) allow the continuation of the Special Committee's work until June 1, 2004; (3) use his best efforts to effectuate the sale of some of Inc.'s assets, in a way which would benefit all of International's shareholders (termed the "Strategic Process"); (4) step down as CEO (but remain chairman) to be replaced by Gordon A. Paris; (5) terminate the current Ravelston management agreement and negotiate a new more reasonable management fee structure; and (6) ensure an independent Board. Likewise, Radler and Boultbee agreed to repay the non-compete payments and resign from all of their positions with International.

Under the Strategic Process, Black agreed that: (1) the Board would engage a financial advisor to value International's assets and to search for a possible purchaser; (2) he would "devote his principal attention" and use his "best efforts" to effectuate a sale of International's assets to benefit all of International's shareholders; and (3) he would refrain from selling his interest in Inc. unless he gave "reasonable notice" to the Board and only under circumstances that such a sale would not negatively affect International's attempt at maximizing the value of its assets.

Immediately after agreeing to the Restructuring Agreement and the Strategic Process, however, Black began to violate their terms. Under the Strategic Process, International engaged an investment banking company to value and search for purchasers of some of International's assets, including the London Daily Telegraph ("the Telegraph"). Unbeknownst to the Special Committee, Black immediately began to do "an end-run around the Strategic Process." Black

-15-

entered into secret negotiations for the sale of Inc. to the Barclays (an English media company). The Barclays hoped to gain control of the Telegraph by purchasing Inc. and thereby acquiring control of International. In attempting to facilitate this purchase, Black used confidential information to his own advantage. In exchange for selling Inc.'s interest in International (at the low end of the value determined by the investment bankers), Black would receive a $10 million severance package for himself. When word of his actions leaked and the Board confronted him, Black lied and intentionally misled the Board as to his dealings with the Barclays.

Around this same time, Black "began steps to repudiate his commitment to repay the [non-compete payments] due . . . under the Restructuring Proposal." In fact, on December 31, 2003, Black failed to make his first scheduled repayment, thus breaching the Restructuring Process.

After learning that Black was attempting to sell the Telegraph indirectly (thereby usurping a corporate opportunity belonging to International), the Board considered passing a "Rights Plan," which would put a "poison pill" in place to dissuade the Barclays from their proposed purchase. Upon learning of the Rights Plan, Black threatened to remove the Board and/or sue the Special Committee. In fact, Black later filed a defamation suit against certain directors in a Canadian court.

After finally coming to a satisfactory deal with the Barclays, Black publicly disclosed the deal and repudiated the Restructuring Proposal. As part of the agreement with the Barclays, Black agreed to use his best efforts to prevent International from selling the Telegraph to another party or taking any actions to prevent the Barclays from taking control of the Telegraph. After learning of Black's double-dealing, the Board formed a Corporate Review Committee ("CRC"), composed of all the independent directors, which was given "broad authority to act for the

Company and to adopt such measures as a shareholder rights plan."

Upon learning of the CRC, Black threatened to remove and sue the Board and caused International's bylaws to be amended ("the Bylaw Amendments"). The "Bylaw Amendments fundamentally altered the power that the International independent directors possessed" and in effect allowed Black to "unilaterally block any material sale of assets, the board from adopting a shareholder rights plan, and prevent the signing of a merger agreement." The independent directors, however, refused to follow the Bylaw Amendments and adopted the Rights Plan.

In response to Black's actions, on January 16, 2004, International brought the Delaware Action against Black and Inc. alleging that Black breached his duty of loyalty and breached the Restructuring Agreement and the Strategic Process. International sought:
(1) an injunction preventing Black from selling Inc. to the Barclays; (2) a declaration that the Bylaw Amendments are ineffective; and (3) a determination that the Rights Plan was valid.

After an expedited trial, the Delaware court found that Black breached his fiduciary duty of loyalty, the Restructuring Agreement, and the Strategic Process by: (1) attempting to sell the Telegraph to the Barclays for his own benefit at the expense of the majority non-controlling shareholders and using confidential inside corporate information in this attempt; (2) misleading the Board about his actions; and (3) failing to repay the non-compete payments in violation of his promise to do so in the Restructuring Proposal. Accordingly, the Delaware court enjoined Black from proceeding with the sale to the Barclays and found that the Rights Plan was legally enacted but that the Bylaw Amendments were improper. In a later "final judgment," the Delaware court granted summary judgment in favor of International on its claim that Black breached the Restructuring Proposal and his fiduciary duty of loyalty and awarded International $21,154,025 against Black and Inc. jointly and $8,693,053 against Black individually. These

-17-

damages represent the amounts (plus interest) of the non-compete payments which Black promised that he and Inc. would repay in the Restructuring Proposal.

**The Chicago Action**

On January 28, 2004, shortly after filing the Delaware Action, International brought the instant action. In its initial nine count, 58-page complaint, International alleged state law claims for breach of fiduciary duty, unjust enrichment, and civil conspiracy against Inc., Ravelston, Black, Radler, and Boultbee in connection with the looting of International.

International subsequently filed a 188-page, 30-count First Amended Complaint against all of the current Defendants and Horizon and Bradford alleging violations of the Racketeer Influenced and Corrupt Organization Act, 18 U.S.C. §§ 1962 and 1964 ("RICO"), and state law claims for breach of fiduciary duty, unjust enrichment, and civil conspiracy. In a Memorandum and Order, entered on October 8, 2004, this Court dismissed the RICO counts on the grounds that 18 U.S.C. § 1964(c), as amended by Section 107 of the Private Securities Litigation Reform Act ("PSLRA"), Pub. L. No. 104-67, 109 Stat. 737 (1995), bars RICO claims "that would have been actionable as fraud in the purchase of securities." In dismissing these counts, the Court ruled that International could file an amended complaint asserting diversity jurisdiction.

International then filed its 205-page, 44-count Second Amended Complaint against all Defendants in the First Amended Complaint, except for Horizon and Bradford, who are non-diverse, alleging essentially the same conduct alleged in the prior complaint, which is based on the alleged looting of International. Defendants now seek to dismiss the Second Amended Complaint pursuant to: (I) Rule 12(b)(2) for lack of personal jurisdiction; (II) Rules 12(b)(7) and 19 for failure to join indispensable parties; and (III) Rule 12(b)(6) for failure to state a claim.

The Court will address each of these motions in turn.

## ANALYSIS

### I.    Motions to Dismiss for Lack of Personal Jurisdiction

Defendants Colson and Perle have moved to dismiss, pursuant to Rule 12(b)(2), on the

grounds that this Court does not have personal jurisdiction over them. In ruling on a Rule

12(b)(2) motion, the court may consider matters outside the pleadings, such as affidavits and

other materials submitted by the parties. O'Hare Int'l Bank v. Hampton, 437 F.2d 1173, 1176

(7th Cir. 1971). The plaintiff bears the burden of establishing personal jurisdiction by a

preponderance of the evidence. Turnock v. Cope, 816 F.2d 332, 333 (7th Cir. 1987). The court

must resolve any factual disputes in the plaintiff's favor, and accept the allegations in the

complaint as true, to the extent that they are not controverted by other evidence in the record. Id.

The court must also accept uncontested jurisdictional facts presented by the defendant as true.

Connolly v. Samuelson, 613 F. Supp. 109, 111 (N.D. Ill. 1985).

A federal court sitting in diversity has personal jurisdiction over nonresident defendants

only if jurisdiction would be proper in the state in which the federal court sits. Michael J.

Neuman & Assocs., Ltd. v. Florabelle Flowers, Inc., 15 F.3d 721, 724 (7th Cir. 1994). Non-

residents are subject to jurisdiction in Illinois if: (A) they fall under one of the provisions of the

Illinois long-arm statute; and (B) due process would not be violated under either the United

States Constitution or the Illinois Constitution. Heritage House Restaurants, Inc. v. Continental

Funding Group, Inc., 906 F.2d 272, 279 (7th Cir. 1990).

### A.    The Illinois Long-Arm Statute

International asserts two grounds under which this Court allegedly has personal jurisdiction under the Illinois-long arm statute (735 ILCS 2-209). First, International contends that section 2-209(a)(12) applies to Defendants Colson and Perle (both of whom were not residents of Illinois but were directors of International during the time of the alleged looting). Alternatively, International alleges that this Court can assert jurisdiction under the "conspiracy theory of personal jurisdiction" and section 2-209(a)(2) over Colson for allegedly conspiring with Black and Radler to loot the Company. The Court will discuss each of these theories in turn.

#### 1.    Section 2-209(a)(12)

Under section 2-209(a), "[a]ny person whether or not a citizen or resident of this State . . . submits . . . to the jurisdiction of this State as to any cause of action <u>arising from</u> . . . (12) [t]he <u>performance of duties as a director</u> . . . of a corporation . . . having its <u>principal place of business in this State</u>." 735 ILCS 5/2-209(a)(12) (emphasis added).

Defendants contend that subsection (a)(12) does not apply because International's claims "do[] not arise out of [their] performance of duties as [] director[s]." Instead, International has "sued for [] beach of those duties." Therefore, according to Colson and Perle, subsection (a)(11), which covers claims for breach of duty, applies. Under this section, Illinois law only permits personal jurisdiction if the breach of the duty occurred "within this State." 735 ILCS 5/2-209(a)(11).

This contention is without reason in law or under the plain language of the statute. While it is true that subsection (a)(11) encompasses breaches of duties occurring within Illinois, nothing in subsection (a)(12) limits its reach where the performance of the duties also results in a

breach of fiduciary duty. It makes perfect sense for the Illinois General Assembly to enact a section of the long-arm statute encompassing breaches of fiduciary duties occurring within Illinois by all persons (not just directors) and to enact a separate and broader subsection encompassing breaches of fiduciary duties arising out of directors' performance of their duties, regardless of where the breach took place, as long as the company for whom the director worked was incorporated in or had its principal place of business in Illinois. Indeed, Illinois courts faced with claims against directors, who were not Illinois residents, where the claims arose out of the performance of the directors' corporate duties, have held that the directors fell within section 2-209(a)(12). See, e.g., Int'l Bus. Mach. Corp. v. Martain Property & Caus. Ins. Agency, Inc., 666 N.E.2d 866, 870 (Ill. App. Ct. 1996) (subsection (a)(12) "is unambiguous . . . . [i]t provides that directors . . . are subject to long-arm jurisdiction simply because they have performed duties as a corporate . . . director"); People ex rel. Morse v. E&B Coal Co., 634 N.E.2d 436, 442-43 (Ill. App. Ct. 1994) (finding that a defendant who accepted position as director with an Illinois corporation fell within the scope of Illinois long arm statute).

The cases cited by Colson in support of his contention that subsection (a)(12) does not encompass claims against directors for breaches of fiduciary duties are completely inapposite. Although these cases found that non-resident directors did not fall under the Illinois long-arm statute, section 2-209(a)(12) was not even at issue because the corporations for which the directors worked were neither incorporated in Illinois nor had their principal place of business in Illinois. See Alpert v. Bertsch, 601 N.E.2d 1031, 1033, 1037 (Ill. App. Ct. 1992) (no jurisdiction over non-resident director of Delaware corporation whose principal place of business was in South Carolina, where decision constituting the alleged breach of fiduciary duty took place in South Carolina); Heil v. Morrison Knudsen Corp., 863 F.2d 546, 547-49 (7th Cir. 1988) (no

-21-

jurisdiction over non-resident directors of a Delaware corporation with its principal place of business in Idaho, even though the board made the decision, which allegedly violated their fiduciary duties, at a meeting in Chicago).

Consequently, this Court will apply section 2-209(a)(12) and examine whether the claims against Colson and Perle "arose out of" the performance of their duties as directors of International and whether International's principal place of business is in Illinois.

International alleges generally that Colson and Perle used their positions as officers and/or directors of International to loot and/or facilitate the looting of the Company. As to Colson, International asserts claims for breach of fiduciary, unjust enrichment, conversion, and conspiracy. These claims are alleged to have arisen from Colson's position as a director of International, a position he held from 1995 to 2003. International alleges that in exchange for using his position as a director to facilitate the overall looting, Colson received, through the actions of Black and Radler: (1) over $1.8 million dollars in "incentive payments" through the Digital scheme; (2) over $1 million in unauthorized bonuses; and (3) part of the $226 million excessive management fees paid to Ravelston (a company in which he had an undisclosed interest).

With respect to Ravelston, International alleges that Colson used his directorship, including his position on the compensation committee, to have International pay Ravelston fees well above fair market value for performing management and administrative functions that should and could have been performed by International's own employees. As explained in detail above, during the relevant time, International paid over $226 million in "excessive management fees" to Ravelston and Inc. As a shareholder of Ravelston, Colson received a portion of these fees.

-22-

In addition, Colson allegedly conspired with other Defendants to misappropriate over $5 million from International through "incentive payments" made to Digital. As explained above, Colson acknowledged that the payments to Digital were "high in comparison with similar plans used by other companies." Nevertheless, while on the Board, Colson approved these payments without expressing his concern to his fellow Board members. International alleges that in exchange for his silence, Black arranged for Colson to receive s payment of $1.8 million from Digital.

Similarly, International alleges that Perle abused his positions as a director with International (including membership on the executive, audit, and compensation committees) and CEO of Digital to loot and facilitate the looting of the Company. Although it lost over $68 million on its investments managed by Digital, International paid Perle over $3.1 million in "incentive payments" for his performance as Digital's CEO. Despite having his "independence compromised" by these unwarranted payments, Perle remained on International's executive and compensation committees where he improperly "signed-off" on a number of "unfair related party transactions that benefitted Defendants Black and Radler." International alleges that Perle knew that these transactions were improper but nevertheless, approved them in return for Black granting his generous compensation package with Digital.

Accordingly, construing section 2-209(a)'s "arising from requirement . . . liberally," as is required, Heil., 863 F.2d at 549, this Court finds that International has properly alleged that its claims against Colson and Perle "arose out of" their "performance" as its directors. See, e.g., Stearn v. Malloy, 89 F.R.D. 421, 423 (E.D. Wis. 1981) (applying the Wisconsin long-arm statute, the court held that the allegation that a defendant "carried out several acts detrimental to the corporation" while acting as a director was sufficient to allege that the action arose out of the

-23-

defendant's conduct as a director).

Under the second requirement of section 2-209(a)(12), this Court must examine whether Illinois is International's "principal place of business." With regard to this inquiry, this Court has not found (nor have the parties cited) any decisions interpreting this term with respect to subsection (a)(12). Perle and International both assert that this Court should apply the "nerve center test" to determine the location of International's "principal place of business." Wisconsin Knife Works v. Nat'l Metal Crafters, 781 F.2d 1280, 1282 (7th Cir. 1986). Under the "nerve center test," courts "look for the corporation's brain, and ordinarily find it where the corporation has its headquarters." Id. (Emphasis added.) Thus, "although the state in which a corporation has its headquarters is not always the state of the corporation's principal place of business, usually it is."[11] Id.

Although he argued under the "nerve center test" in his opening brief, in his reply brief, Colson contends that this Court should apply the test in Illinois Life & Health Ins. Guarantee Association v. Boozell, 682 N.E.2d 291, 298 (Ill. App. Ct. 1997), which includes the "nerve center" as one of five factors courts should consider in determining a corporation's principal place of business. The other four factors in the Boozell test are "the location": (1) "of the offices responsible for the main activities of the entity"; (2) "where the business of the entity is carried out"; (3) "of business decision-making"; and (4) of "the residences of the [officers and directors]." Id.

Under both the nerve center test and the additional Boozell factors, there are ample facts

---

[11]    In Chamberlain Manuf. Corp. v. Maremont Corp., 828 F. Supp. 589, 590-91 (N.D. Ill. 1993), in applying the "nerve center test" from Wisconsin Knife, in addition to considering the location of the corporation's headquarters, the court looked at the location of where: (1) important corporate decisions are made; (2) the corporations' general counsel, directors, officers, and shareholders reside; and (3) the corporation kept its bank accounts.

-24-

in the record at this time to support International's assertion that, at the time of the alleged looting, its corporate headquarters, and hence its "principal place of business," was located in Chicago, Illinois. According to the Declaration of Lynda Loye, International's former assistant corporate counsel, International's "principal executive offices were [until 2004] located in Chicago" at the offices of the Chicago Sun-Times. This assertion is consistent with International's SEC filings during the relevant time which listed this location as the "[a]ddress of its Principal Executive Office."[12] In addition, International kept its corporate minutes and books at its office in Chicago. Several meetings of the Board and the audit and compensation committees were held in Chicago at the offices of the Sun-Times. Likewise, when individual directors signed off on corporate consents, including many of the transactions at issue in this action, they received the consents from International's general counsel in Chicago and returned the signed documents to International's legal department in Chicago. Furthermore, International's checking and most of its bank accounts were with banks located in Chicago. Consequently, at this time, resolving factual conflicts in favor of Illinois, as is required, this Court finds that International has sufficiently shown that its "principal place of business" at the time of the alleged looting was in Chicago.[13]

---

[12]    Chicago certainly would be the logical location. Although International owns and operates newspapers around the world (including the United States, Canada, United Kingdom, and Israel) it owns over 100 newspapers in the Chicago area, including the Sun-Times, one of the largest newspapers in the United States, and has over a thousand employees in Illinois.

[13]    Defendants contend that while International's "nominal executive offices may have been in Chicago, its real executive offices were undeniably in New York and Toronto." This argument is based on the general assertion that: (1) most of the Board meetings took place in New York; and (2) Ravelston and Inc., the companies who were given the management contracts, were located in Toronto. While this may be true, these facts are not determinative. Indeed, "[i]t is common for large corporations to hold their board meetings in different places rather than just at corporate headquarters." Heil, 863 F.2d at 550. Therefore, at this time, this Court finds that these facts do not rebut the fact that International's "principal executive office" was in Chicago.

Based on the above, this Court thus finds that it has jurisdiction over Colson and Perle under section 2-209(a)(12) because the claims against them arose out of the performance of their duties as directors of International, whose principal place of business was in Illinois at the time the claims arose.

## 2. The "Conspiracy Theory of Personal Jurisdiction"

In addition to section 2-209(a)(12), International contends that section 2-209(a)(2) applies to Colson because he conspired with Black and Radler, who worked out of the Company's Chicago executive offices, to loot the Company.[14]  Under Illinois law, a plaintiff may assert a "conspiracy theory of personal jurisdiction" against a non-resident defendant, who, although did not itself commit a tort in Illinois, conspired with others to do so.  See Cleary v. Phillip Morris Inc., 726 N.E.2d 770, 773 (Ill. App. Ct. 2000).  Under this theory, the plaintiff must sufficiently allege that: (1) the non-resident defendant "was part of an actionable conspiracy"; and (2) "a co-conspirator performed a substantial act in furtherance of the conspiracy in Illinois." Id.

Colson contends that the above requirements are not met because International cannot allege that: (1) he participated in an "actionable conspiracy"; (2) a co-conspirator committed a tortious act in Illinois in furtherance of the conspiracy; (3) a "conspiracy [] exist[ed] among a corporation's own officer or employees"; and (4) there was an civil conspiracy because Delaware law precludes such a claim.  The Court will address each of these contentions in turn.

To allege an actionable conspiracy, the plaintiff must do more than "simply allege that a corporate defendant participated in a conspiracy." United Phosphorus, Ltd. v. Angus Chem. Co.,

---

[14]    Under section 2-209(a)(2) the "commission of a tortious act within this State" is a sufficient basis to assert personal jurisdiction under the Illinois long-arm statute.

-26-

43 F. Supp. 2d 904, 912 (N.D. Ill. 1999). Instead, the plaintiff must: (1) "point[] to evidence showing the existence of [a] conspiracy and the defendants' knowing participation in that conspiracy"; and (2) "allege[] specific facts warranting [an] inference that the defendant was a member of the conspiracy."[15] Id. at 913. A plaintiff may meet this burden through either direct or circumstantial evidence. Id. at 912. In determining whether a plaintiff has sufficiently alleged a conspiracy, the court "must construe all facts relating to jurisdiction in favor of the plaintiff, including disputed or contested facts." Id. at 913.

Here, after carefully reviewing the allegations in the Second Amended Complaint and the parties' submissions, this Court finds that International has sufficiently alleged facts warranting an inference that Colson was a knowing member of a conspiracy, whose purpose was to loot the Company. As detailed above, International alleges that Colson conspired with the other Defendants to loot International through the payment of excessive and unauthorized non-competition payments, management fees, incentive payments, and other compensation and the sale of publishing assets "at below market value prices." According to International, in exchange for using his position as a director to facilitate the overall looting, Colson received, through the actions of Black and Radler: (1) over $1.8 million dollars in "incentive payments" through the Digital scheme; (2) over $1 million in unauthorized bonuses; and (3) part of the $226 million excessive management fee paid to Ravelston (a company which he had an undisclosed interest in).

To rebut these general allegations, Colson contends that he "never had [any] agreements, understandings or discussions with anyone at anytime concerning excessive or improper

---

15      Illinois law defines a conspiracy as "an agreement or combination of two or more people or entities to do an unlawful act." Salaymeh v. Interqual, Inc., 508 N.E.2d 1155, 1158 (Ill. App. Ct. 1987).

-27-

compensation, payments, bonuses or fees to me from [International]" or any of its parents or subsidiaries. According to Colson, the above payments and fees were made to him based on his preexisting interests in Digital and Ravelston and his position as a director.

This statement, however, conflicts with specific evidence put forth by International. For example, according to Peter Atkinson, a former officer of International, Inc. and Ravelston, after a September 2000 Board meeting, in which the CanWest non-compete payments were presented for approval, Colson called him "and expressed his displeasure" at not receiving any of the non-compete payments. Atkinson told Colson to take the matter up with Black. Apparently Colson did so because Black subsequently told Atkinson that "he would make Dan [Colson] whole." Shortly thereafter, Black arranged to have Colson paid "a large year-end bonus" for his work as an officer at Ravelston. In a facsimile to Colson from Black regarding this payment, Black stated "I trust this is satisfactory. There will be further dispositions as we discussed in the future." (Ex. 7, Appendix of Exhibits to International's Opposition brief.) Indeed, according to Atkinson, in September of 2001, International, at Black's direction, made a $1.07 million payment to Colson for no particular reason.[16]

In 2002, in a "Memo" to Defendants Colson, Radler, and Boultbee, Black stated:

> We have pretty well won the great battle over the non-competition agreements and a decent interval has passed. A conciliatory gesture should be made now that could not be construed as a sign of weakness or a confession of excess. We should steer the middle course between accommodating the present assertive and suspicious mood of investors.

(Ex. 8, Appendix of Exhibits to International's Opposition brief.) Black further stated that to prevent future complaints by the non-controlling shareholders that, "without mentioning it publicly or to the directors, use of corporate aircraft for personal use should, henceforth, be

---

[16]     Colson denies ever complaining to Black and contends that the payments were made for work he did for Digital and Ravelston.

charged to Ravelston." Black then went on to outline some of the practices which are now at issue in this case, such as the payment of his personal expenses by International, the management fees, and the CanWest transaction. Black closes with "[t]he Goose keeps laying a golden egg every year and the best, by far, is yet to come."

Additionally, according to Linda Loye, a former in-house counsel at International, Colson and Radler met to discuss the allocation of the alleged excessive management fees paid to Ravelston by International and in 2001 and 2002, Colson received over $3.4 million of these fees.

Likewise, with respect to the "incentive fees" paid to Digital, in a "memo" to Black, Colson stated that the fee structure "is high in comparison with similar plans used by other companies." At the Board meeting approving the Digital fees, however, neither Colson nor Black objected when a fellow Board member stated that the incentive payments were "consistent with those type of bonuses found in the marketplace." International alleges that in exchange for his silence, Colson received $1.8 million from Digital.

Accordingly, based on the above, resolving any factual disputes in favor of International, this Court finds that International has presented sufficient facts to warrant an inference that Colson knowingly conspired with Black, Radler, and other Defendants to loot the Company.

Next, this Court also finds that International has sufficiently alleged that at least two of Colson's co-conspirators (Defendants Radler and Black) committed various torts and breaches of their fiduciary duties in furtherance of the conspiracy in Illinois. In the Second Amended Complaint at paragraph 369, International details 14 acts committed in furtherance of the looting which occurred in Chicago. Colson has not attempted to rebut these allegations other than to generally assert that these acts were not "authorized or undertaken for the benefit" of Colson.

This contention, even if a legal requirement, which it is not (the act only need be in furtherance of the conspiracy), is incorrect. Many of the 14 alleged acts committed in furtherance of the looting which occurred in Chicago were done to facilitate the alleged improper payment of the Digital incentive fees and the Ravelston management fees, part of which was then paid to Colson.

Colson also contends that International cannot legally allege a "conspiracy" because under Illinois law a "conspiracy cannot exist among a corporation's own officers or employees." While this is true, see J.C. Whitney & Co. v. Renaissance Software Corp., 98 F. Supp. 2d 981, 983 (N.D. Ill. 2000), the mere fact that alleged coconspirators are officers of the same corporation does not necessarily defeat a claim that they conspired to commit a tort. A corporate employee and his employer "can be liable for conspiracy if it is shown that the [employee] acted outside the scope of his employment and/or acted to achieve some personal gain." Jamaica Citizens Bank, Ltd. v. North Am. Special Risk Assocs., Inc., 1996 WL 648712, at *5 (N.D. Ill. Nov. 1, 1996).

Here, the Second Amended Complaint alleges that individual Defendants (including Colson) breached their fiduciary duties "in their capacities as employees and agents of [Inc.] and Ravelston, as well as their individual capacities as officers and directors of the Company." (Second Am. Complt. at ¶ 365.) Moreover, as detailed herein, International has made numerous allegations that Black and Radler conspired with Colson (and the other Defendant directors of International, many of whom were also officers of Inc. and Ravelston) to loot the Company for their own personal gain and that in doing so they acted outside the scope of their employment. Accordingly, this Court finds that International has sufficiently alleged an actionable conspiracy under Illinois law.

-30-

Colson's final contention against "conspiracy jurisdiction" is that Delaware law does not provide for a claim for "civil conspiracy," and therefore, International cannot allege "an actionable conspiracy." Even if this Court were to apply Delaware law, this contention likewise fails. Similar to Illinois, to allege a "civil conspiracy" under Delaware law "requires: (1) an agreement between two or more people; (2) an unlawful act done to further the conspiracy; and (3) damage to the plaintiff." Capano Management Co. v. Transcontinental Ins. Co., 78 F. Supp. 2d 320, 331 (D. Del. 1999). See also Nicolet, Inc. v. Nutt, 525 A.2d 146, 149-50 (Del. 1987) (same).

Accordingly, this Court finds that this Court may exercise personal jurisdiction over Colson under "conspiracy theory of personal jurisdiction."

## B. Due Process

In addition to finding that Colson and Perle fall within the scope of the Illinois long-arm statute, the Court must ensure that the exercise of personal jurisdiction comports with due process. To assert personal jurisdiction consistent with federal due process, the defendants must have: (A) "certain minimum contacts with the forum state" such that (B) the maintenance of the suit does not offend "traditional notions of fair play and substantial justice."[17] Int'l Shoe Co. v.

---

[17]     With respect to due process under the Illinois Constitution, Illinois courts "have given little guidance as to how state due process protection differs from federal protection in the context of personal jurisdiction." RAR, Inc. v. Turner Diesel Ltd., 107 F.3d 1272, 1276 (7th Cir. 1997). Id. As a general rule, "'jurisdiction [under the Illinois constitution] is to be asserted only when it is fair, just, and reasonable . . . considering the quality and nature of the defendant's acts which occur in Illinois or which affect interests located in Illinois.'" Id. (quoting Rollins v. Ellwood, 565 N.E.2d 1302, 1316 (Ill. 1990)). Without specific guidance from Illinois courts, federal courts sitting in diversity in Illinois focus on federal due process in determining if Illinois due process guarantees are satisfied. See Mors v. Williams, 791 F. Supp. 739, 743 (N.D. Ill. 1992). Consequently, absent a clear indication that exercise of jurisdiction here violates the Illinois Constitution, this Court will rely on its federal analysis of jurisdiction to determine if personal jurisdiction  comports with Illinois due process.

Washington, 326 U.S. 310, 316 (1945).

The court's assessment of minimum contacts depends on whether "general" or "specific" jurisdiction is at issue. RAR, 107 F.3d at 1277. Specific jurisdiction refers to jurisdiction over a defendant in a suit "arising out of or related to the defendant's contacts with the forum." Id. The court may exercise specific jurisdiction over defendants if they "purposefully established minimum contacts within the forum state" and those contacts "make personal jurisdiction fair and reasonable under the circumstances." Id. In examining a defendant's contacts with a particular state, the court must determine whether the defendant "purposefully availed itself of the privilege of conducting activities" in the forum state so that it "should reasonably anticipate being haled into court there." Id. In other words, the focus of the court's inquiry must be on the "relationship among the defendant, the forum, and the litigation." Heritage House Rests., Inc. v. Cont'l Funding Group, Inc., 906 F.2d 276, 283 (7th Cir. 1990). The main factor in specific jurisdiction analysis is foreseeability – was it reasonably foreseeable to the defendant that its action could result in litigation in the state in question. Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472-74 (1985). Contacts that are "random, fortuitous, or attenuated" are not sufficient to establish that a state's exercise of personal jurisdiction over the defendant was foreseeable. Heritage House, 906 F.2d at 283. Moreover, in examining the contacts in a specific jurisdiction analysis, the court cannot "simply aggregate all of the defendant's contacts with the state – no matter how similar in terms of geography, time, or substance." RAR, 107 F.3d at 1277.

In contrast to specific jurisdiction, general jurisdiction is applicable when the lawsuit neither arose nor was related to the defendant's contacts with forum state. Id. Such jurisdiction is permitted only where the defendant has "continuous and systematic general business contacts" with the state. Id. The general jurisdiction standard is "a fairly high standard requiring a great

-32-

amount of contacts." Jamik, Inc. v. Days Inn of Mount Laurel, 74 F. Supp. 2d 818, 822 (N.D. Ill. 1999). Factors courts examine in determining whether general jurisdiction exists include: (1) whether and to what extent the defendant conducts business in the forum state; (2) whether the defendant maintains an office or employees within the forum state; (3) whether the defendant sends agents into the forum state to conduct business; (4) whether the defendant advertises or solicits business in the forum state; and (5) whether the defendant has designated an agent for service of process in the forum state. See Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 416 (1984).

If the court finds that it has either specific or general jurisdiction, the court must still ensure that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice." Int'l Shoe Co., 326 U.S. at 316. Under this determination, the court examines: (1) the interest of the state in providing a forum to the plaintiff; (2) the interest of the state in regulating the activity involved; (3) the burden of defense in the forum on the defendant; (4) the relative burden of prosecution elsewhere on the plaintiff; (5) the extent to which the claim is related to the defendant's local activities; and (6) the avoidance of a multiplicity of suits on conflicting adjudications. See Asahi Metal Inds. Co. v. Super. Ct. of Cal., 480 U.S. 102, 115 (1987); Burger King, 471 U.S. at 472-73, 476-77. Because no one factor is dispositive, this Court must balance all of the factors. Euromarket Designs, Inc. v. Crate & Barrel Ltd., 96 F. Supp. 2d 824, 840 (N.D. Ill. 2000). However, the most important factors to consider are the interests of the forum and the relative convenience of the defendant in litigating in that forum. Kohler Co. v. Kohler Int'l, Ltd., 196 F. Supp. 2d 690, 700 (N.D. Ill. 2002).

Courts which have found section 2-209(a)(12), or similar statutes from other states, applicable have generally found that due process is not violated by the exercise of jurisdiction

-33-

over non-resident directors of corporations incorporated in or having their principal place of business in that state. For example, in International Business Machines Corp., 666 N.E.2d at 871, the court held that "[a]s a director and officer of an Illinois corporation, [the defendant] tacitly accepted both the duties and benefits conferred upon him by Illinois law." Thus, the defendant director had "fair warning . . . that he may one day be [brought] into court here for his conduct as . . . director." Id. "Any other conclusion would render" section 2-209(a)(12) "meaningless." Id. See also People ex rel. Morse v. E&B Coal Co., 634 N.E.2d 436, 442-43 (Ill. App. Ct. 1994) (finding no due process violation in exercising personal jurisdiction over director of an Illinois corporation); Banwell v. Illinois College of Optometry, 981 F. Supp. 1137, 1142 (N.D. Ill. 1997) (same); Florists' Transworld Delivery, Inc. v. Fleurop-Inerflora, 261 F. Supp. 2d 837, 844 (E.D. Mich. 2003) (due process not violated by exercise of jurisdiction over defendant who fell under Michigan long-arm statute providing for jurisdiction for acts "arising out of" actions of a director of a company with its principal place of business in Michigan); Simmons v. J.C. Templeton, 684 So. 2d 529, 534 (La. Ct. App. 1997) (finding that directors "purposefully availed themselves of the privilege of conducting business in [the state] by receiving salaries from a corporation with its principal place of business in [the state] and by attending a special board meeting [there]"); Martin v. Ju-Li Corp., 332 N.W.2d 871, 873 (Iowa 1983) (finding that "allegations of direct wrongdoing against a corporation in Iowa by its officers and directors," was enough to meet the requirements of the long-arm statute and due process).

Colson and Perle contend that International Business Machines Corp and E&B Coal are not applicable because: (1) these cases applied a "hybrid approach" – e.g., combined all contacts without regard to specific or general jurisdiction and involved companies incorporated in Illinois; and (2) it was not "foreseeable" that Colson and Perle could be subject to jurisdiction in

Illinois. The Court finds these contentions without support in either the law or the facts currently before the Court. While it is true that International Business Machines Corp and E&B Coal did not apply a separate analysis for general or specific jurisdiction, their holdings have never been overruled let alone criticized. Also, it is completely reasonable to charge a non-resident director of a company incorporated in Illinois with the knowledge that by accepting the directorship he or she could one day be brought before a court in Illinois. Likewise, the fact that International was incorporated in Delaware, not Illinois, does not affect the foreseeability of International's directors being brought before an Illinois Court because 2-209(a)(12) specifically includes companies either incorporated in this state or with their principal place of business in Illinois.

Accordingly, under International Business Machines Corp and E&B Coal the exercise of jurisdiction over Colson and Perle comports with due process because they voluntarily accepted directorships with International, whose principal place of business at the time of the alleged looting was in Chicago, Illinois.

This finding aside, this Court concludes that International has set forth sufficient facts to meet the requirements for "specific jurisdiction" – i.e., Colson and Perle "purposefully established minimum contacts within the forum state" and those contacts "make personal jurisdiction fair and reasonable under the circumstances" so that they "should reasonably [have] anticipate[d] being haled into court here." RAR, 107 F.3d at 1277.

With respect to Colson, International alleges that he used his position with the Company to wrongfully obtain unauthorized bonuses and part of the excessive management fees paid to Ravelston. According to International, Colson conspired with Radler, who worked out of the Chicago office and annually presented the proposed management fees to the Board for approval. Once the unreasonable management fees were approved, the checks paying those fees (and the

directors' compensation) were drawn on International's account at an Illinois bank. Likewise, International alleges that to hide the payment of unwarranted bonuses which were issued from International's Illinois bank, Colson sent misleading "corporate disclosure forms" to International's legal department in Chicago.

As for Perle, many of the improper transactions which he signed off on as a member of the Board and the audit and compensation committees were done through written consents, not voting at an actual meeting. Perle received the consents from International's general counsel in Chicago and returned the signed documents to International's legal department in Chicago.

In sum, this Court finds that by accepting directorships with a company with its principal place of business in Illinois and exercising their duties as directors, both Colson and Perle had fair warning that they could be subject to suit in this state in connection with the performance of their duties as directors.

This Court also finds that exercise of jurisdiction over Colson and Perle will not "offend traditional notions of fair play and substantial justice." Illinois was, at the time of the looting, International's principal place of business, and thus, this state has an interest in litigating claims against International's directors. See Builders Bank v. SWH Fnding Corp., 2004 WL 1699022, at *5 (N.D. Ill. July 29, 2004). In addition, International owns many newspapers in this state, including the Sun-Times, and employs thousands workers in Illinois. Moreover, neither Colson nor Perle have set forth any reasons as to why litigating this action in Illinois would be so inconvenient as to deprive them of due process.

Accordingly, because this Court finds that personal jurisdiction is proper under the Illinois long-arm statute and does not violate due process, the Rule 12(b)(2) motions to dismiss are DENIED.

-36-

## II.   Motion to Dismiss for Failure to Join Indispensable Parties

Next, this Court turns to Defendants' Motion to Dismiss for Failure to Join Indispensable

Parties under Rules 12(b)(7) and 19.  In ruling on a motion to dismiss for failure to join an

indispensable party, the court must accept the allegations of the complaint as true.  Davis

Companies v. Emerald Casino, Inc., 268 F.3d 477, 479 (7th Cir. 2001); Pasco Int'l (London)

Ltd. v. Stenography Corp., 637 F.2d 496, 499 (7th Cir. 1980).  The court may, however, look

outside of the pleadings and consider extrinsic evidence.  Davis, 268 F.3d at 480; English v.

Cowell, 10 F.3d 434, 437 (7th Cir. 1993); Capitol Leasing Co. v. Fed. Dep. Ins. Corp., 999 F.2d

188, 191 (7th Cir.1993).

A motion to dismiss under Rule 19 requires a two-step analysis.  First, the court must

determine whether or not a party is necessary or, in Rule 19 nomenclature, a "person to be joined

if feasible."  Fed. R. Civ. P. 19(a); U.S. ex rel Hall v. Tribal Dev. Corp., 100 F.3d 476, 478 (7th

Cir. 1996).  To determine if a party is necessary under Rule 19(a), courts examine whether:

(1) complete relief can be accorded among the present parties to the lawsuit; (2) the absent

party's ability to protect its interest will be impaired; and (3) any existing parties might be

subjected to a substantial risk of multiple or inconsistent obligations unless the absent party is

joined.  Thomas v. United States, 189 F.3d 662, 667 (7th Cir. 1999).

Second, if a party is found to be necessary under Rule 19(a) but cannot be joined, the

court must then decide if the action can proceed in "equity and good conscience" without the

necessary party, or whether it should be dismissed.[18]  Fed. R. Civ. P. 19(b).  In other words, the

second step in the bifurcated Rule 19 analysis is to determine if the absent party is

---

[18]     The defendant bears the burden in a Rule 19 motion of "showing that [the missing parties] must be joined for just adjudication."  Florian v. Sequa Corp., 2002 WL 31844985, at *3 (N.D. Ill. Dec. 18, 2002).

"indispensable." Hall, 100 F.3d at 479. Rule 19(b) provides four factors to be considered in determining whether a party is "indispensable." These factors include whether: (1) a judgment entered in the absence of the missing party will be prejudicial to the absent or existing party; (2) any such prejudice can be lessened or avoided by reshaping the judgment; (3) the judgment will be adequate; and (4) the plaintiff will have an adequate remedy if the action is dismissed. Moore v. Ashland Oil, Inc., 901 F.2d 1445, 1447 (7th Cir. 1990).

Here, Defendants contend that Bradford and Horizon are necessary and indispensable parties because they have an interest in the subject matter of this action which will be prejudiced without their participation in this case.

A careful reading of the First and Second Amended Complaints reveals that Bradford and Horizon have an interest in this litigation, but that this interest will not be prejudiced to such an extent as to require dismissal under Rule 19. As explained in detail above, one of the major allegations in this action is that Black and Radler, who had an undisclosed controlling interest in Bradford and Horizon, used their positions with International to orchestrate the sale of International's assets to these companies at well below market value. In the First Amended Complaint, in which Bradford and Horizon were named as Defendants, International sought to rescind the above sales. After this Court dismissed the RICO counts, International dropped Bradford and Horizon to ensure complete diversity but still seeks essentially the same relief as it did in the First Amended Complaint. In the Second Amended Complaint, International seeks "an order granting a constructive trust" on Black and Radler's ownership interests in Horizon and Bradford. Because Black and Radler own or control 80% of Horizon and at least 50% of Bradford, a constructive trust would give International a controlling interest in these companies. Accordingly, this Court finds that Bradford and Horizon have an interest in this action.

Having an interest in and of itself, however, is not sufficient under Rule 19. The interest must be one which is not adequately protected by the existing parties and which could be prejudiced by an adverse ruling. Extra Equipamentos E Exportacao, LTDA v. Case Corp., 361 F.3d 359, 363-64 (7th Cir. 2004). It is not enough that an absent party is "an indispensable witness," Salton, Inc. v. Phillips Domestic Appliances and Personal Care, 391 F.3d 871, 880 (7th Cir. 2005), or a joint-tortfeasor, who could be subject to future litigation or bound by the judgment. Pasco Int'l (London) Ltd. v. Stenography Corp., 637 F.2d 496, 505 (7th Cir. 1980); Cargo Pacific Logistics, Inc. v. Concord Express, Inc., 1996 WL 699649, at *5 (N.D. Ill. Nov. 27, 1996); Swana Bus. Creit Corp. v. Pilevsky, 1991 WL 38713, at * 2 (N.D. Ill. Mar. 21, 1991).

In Extra Equipamentos E Exportacao, LTDA, 361 F.3d at 360-61, the plaintiff and the defendant's subsidiary entered into an agreement, which the subsidiary later disavowed. The plaintiff then brought an action for fraud against the defendant/parent company alleging that it misrepresented its authority to bind its subsidiary to the agreement. Id. The defendant then moved to dismiss under Rule 19 on the grounds that the subsidiary was a necessary and indispensable party. Id. The district court granted that motion after holding that the subsidiary's interests could be prejudiced by an adverse judgment against its parent. Id.

On appeal, the Seventh Circuit vacated and remanded on the grounds that in analyzing "indispensability," the district court should have taken into account the fact that the absent party was a "100 percent subsidiary" of the defendant. Id. at 363-64. According to the Seventh Circuit, it is extremely unlikely that the absent party/subsidiary would be prejudiced if not a party to this action because the parent company would fully protect the subsidiary's interests. Indeed, the court stated that "we have great difficulty seeing how a 100 percent subsidiary could ever be an indispensable party." (Emphasis in original.)

Although the parties in <u>Extra</u> had a complete identity of interest, other courts have found that for purposes of Rule 19(b) "precise alignment of interests" is not necessary for the court to find that the absent party is not indispensable. <u>Wyandotte Nation v. City of Kansas City, Kansas</u>, 200 F. Supp. 2d 1279, 1292 (D. Kan. 2002) (finding that absent party not indispensable because their interests "are substantially similar" and they both "seek the same outcome"). Courts have held that an absent party was not indispensable where: (1) its interests were "adequately represented by the parties who are present," <u>Sanwa Business Credit Corp. v. Pilevsky</u>, 1991 WL 38713, at *2 (N.D. Ill. March 21, 1991); (2) the "defendant has the incentive and the ability to litigate for its own as well as [the missing party's] interests," <u>North Shore Gas Co. v. Salomon, Inc.</u>, 896 F. Supp. 786, 791 (N.D. Ill. 1995); and (3) both the absent and present parties "want the same thing." <u>Evangelical Lutheran Church in America v. Atlantic Mut. Ins. Co.</u>, 173 F.R.D. 507, 508-09 (N.D. Ill. 1997).

Here, although not a complete identity of interest, this Court finds that Black and Radler dominate Bradford and Horizon to such an extent that their interests are almost completely aligned, so that Black and Radler will protect the absent parties' interests as if they were their own (which they essentially are). Through personal ownership and other companies that they control, Black and Radler, directly and indirectly, own or control up to 80% of Horizon and at least 50% of Bradford.[19] Black and Radler dispersed the remainder of the equity in these companies to individuals whom they controlled and/or dominated because the other owners were either their employees, friends, or business partners. In addition, Radler was the president, CEO, and a director at Horizon.

---

[19] Black and Radler allegedly went to great lengths to hide their control over Horizon and Bradford and failed to disclose their ownership interests to the Board or in International's public filings with the SEC.

Black and Radler formed Horizon in 1998 and Bradford in 2000, allegedly for the purpose of using them to loot International. As explained in detail above, they used these entities to purchase International's assets at below market value and then sold the assets to third parties at higher prices and personally pocketed the difference. International now seeks a "constructive trust" on Black and Radler's ownership interests in Horizon and Bradford, which would allow the Company to disgorge the improper profits that the companies received in the deals with International. Thus, Black and Radler will ultimately bear the brunt of any judgment against Horizon and Bradford and thus have a clear and certain motivation to defend the interests of Horizon and Bradford as if they were their own interests.

This Court thus finds that, although not a complete identity of interests, Black and Radler have almost identical interests as Bradford and Horizon and will adequately protect those interests in their absence.[20] Accordingly, because Bradford and Horizon are not indispensable parties, this Court DENIES the motion to dismiss for failure to join indispensable parties.

## III.     Motion to Dismiss for Failure to State a Claim

In addition to the Rule 12(b)(2) and (7) motions, Defendants Black, Inc., and Perle have moved to dismiss pursuant to Rule 12(b)(6). In ruling on a motion to dismiss pursuant to Rule 12(b)(6), the court must assume the truth of all facts alleged in the pleadings, construing allegations liberally and viewing them in the light most favorable to the non-moving party. See, e.g., McMath v. City of Gary, 976 F.2d 1026, 1031 (7th Cir. 1992); Gillman v. Burlington N. R.R. Co., 878 F.2d 1020, 1022 (7th Cir. 1989). Dismissal is properly granted only if it is clear

---

[20]     In addition to the prejudicial prong, this Court finds that none of the other three Rule 19(b) factors support a finding of indispensability. For example, any prejudice to Horizon and Bradford can be lessened by this Court fashioning a judgment to protect their minority investors' interests from a judgment in this case. Likewise, International can get complete relief for the improper sales to Horizon and Bradford from their owners – Black and Radler.

that no set of facts which the plaintiff could prove consistent with the pleadings would entitle the plaintiff to relief. Conley v. Gibson, 355 U.S. 41, 45-46 (1957); Kunik v. Racine County, Wis., 946 F.2d 1574, 1579 (7th Cir. 1991) (citing Hishon v. King & Spalding, 467 U.S. 69, 73 (1984)).

The court will accept all well-pled factual allegations in the complaint as true. Miree v. DeKalb County, 433 U.S. 25, 27 n.2 (1977). In addition, the court will construe the complaint liberally and will view the allegations in the light most favorable to the non-moving party. Craigs, Inc. v. General Electric Capital Corp., 12 F.3d 686, 688 (7th Cir. 1993). However, the court is neither bound by the plaintiff's legal characterization of the facts, nor required to ignore facts set forth in the complaint that undermine the plaintiff's claims. Scott v. O'Grady, 975 F.2d 366, 368 (7th Cir. 1992).

Defendants have set forth three separate grounds for dismissal. Black and Inc. contend that this action is barred by the doctrine of res judicata. Perle asserts that dismissal is proper because: (1) the statute of limitations bars the one claim against him (Count 24); and (2) International has failed to allege a claim for breach of fiduciary duty. The Court will discuss each of these contentions in turn.

### A.    Res Judicata

Black and Inc. assert that the claims in this case are precluded by the decision of the Delaware Chancery Court in Hollinger International, Inc. v. Black, 844 A.2d 1022 (Del. Ch. 2004) and its "final judgment" granting summary judgment in favor of International on its claims that Black breached the Restructuring Proposal and his fiduciary duty of loyalty by failing to repay the non-compete payments as promised in the Restructuring Proposal and attempting to sell-off the Telegraph in a deal designed to benefit himself at the expense of the majority non-controlling shareholders. According to Defendants, International should have

-42-

presented the claims in this case in the earlier filed Delaware Action. By failing to do so, Defendants contend that res judicata precludes International from bringing those claims in this action.

Under Delaware law, res judicata "bars litigation between the same parties if the claims in the later litigation arose from the same transaction that forms the basis of the previous adjudication." Kossol v. Ashton Condominium Assoc., Inc., 637 A.2d 827, 1994 WL 10861, at *2 (Del. 1994).[21] In determining if res judicata applies, courts examine whether the claims from both cases are based on the same "underlying transaction." Maldonado v. Flynn, 417 A.2d 378, 381-82 (Del. Ch. 1980). If the same transaction or "identical" set of facts form the basis of the prior and current actions then the court should dismiss the later filed action. Id.; Kossol, 1994 WL 10861, at *2. "In other words, a plaintiff [is] not permitted, after [bringing] a case on one theory, to pursue a different theory based on the same proof." Trans World Airlines, Inc. v. Hughes, 317 A.2d 114, 119 (Del. Ch. 1974) (emphasis added). The policy underlying this rule is that "it is fairer to require a plaintiff to present in one action all of his theories of recovery relating to a transaction, and all evidence relating to those theories, than to permit him to prosecute overlapping or repetitive actions in different courts [] at different times." Maldonado, 417 A.2d at 382.

Here, after carefully comparing the Second Amended Complaint in this case and the complaint, the decision, and the judgment from the Delaware Litigation, this Court finds that the present litigation and the Delaware Action arose out of a different set of operative facts (i.e.,

---

[21]     In accordance with the Full Faith and Credit Act, 28 U.S.C. § 1738, to determine the res judicata effect of a state court decision in a subsequent federal action, the federal court should apply the res judicata law of the state where the initial decision arose. Marrese v. American Academy of Othopedic Surgeons, 470 U.S. 373 (1985).

separate transactions).[22] As detailed above, the Delaware Action arose out of: (1) the Special Committee's investigation, which began in May 2003, into certain non-compete payments; (2) the Restructuring Proposal and Strategic Process, which International entered into with Black in late November of 2003; and (3) Black's violation of these agreements immediately after executing them. The Delaware court found that Black breached his fiduciary duty of loyalty, the Restructuring Proposal, and the Strategic Process by: (1) attempting to sell the Telegraph to the Barclays for his own benefit at the expense of the other shareholders and using confidential inside corporate information in this attempt; (2) misleading the Board about his actions; and (3) failing to repay certain non-compete payments in violation of his promise to do so in the Restructuring Proposal. In a "final judgment," the Delaware awarded International $21,154,025 against Black and Inc. jointly and $8,693,053 against Black individually. These amounts include non-compete payments received by Black and Inc. that Black promised to repay in the Restructuring Proposal.

In contrast, in the present action, which was filed shortly after the Delaware Litigation, International alleges state law claims for breach of fiduciary duty, unjust enrichment, and civil conspiracy against Defendants (including Black and Inc., the lone defendants in the Delaware Litigation), for allegedly using their positions as officers, directors, and controlling shareholders of International to "loot" over $425 million from the Company. This looting took place from 1994 to April 2003 and was completed before Black committed the breaches alleged in the Delaware Action.

---

[22]     The Court notes that in a related case filed in Delaware, Defendant Ravelston stated, in a submission to the Canadian court, that "[t]he Delaware action had nothing to do with the dispute" of the management fees paid by International. "Instead, [the Delaware action] was focused entirely on the Restructuring Proposal." (International's Motion to Supplement its Opposition Brief, Ex. A at 9 [Docket No. 225-1].)

Although both actions concern the non-compete payments made in the CNHI II Transaction, only this action alleges any wrongdoing in relation to those payments. Indeed, the proof needed to succeed in each action is different. The Delaware Action arose out of Black's conduct in November 2003 to January 2004, when he attempted to sell the Telegraph and failed to repay certain non-compete payments in breach of the Restructuring Proposal and the Strategic Process. The Delaware Action did not allege that the non-compete payments were improper, only that Black breached his commitment to repay those monies as promised in the Restructuring Proposal.

In contrast, the present action, as detailed fully above, alleges that from 1994 to April 2003 Black (and other Defendants) looted International by causing it to: (1) sell valuable newspaper assets to companies controlled by Defendants at below market prices; (2) pay them "sham non-compete payments" in connection with these sales; (3) award them other unwarranted, excessive, and unauthorized payments, including management fees and salaries; and (4) make low interest loans to Inc.

Accordingly, this Court finds that res judicata does not apply because the two actions did not arise out of the same transaction and the proof underlying the claims in each action involve separate conduct which occurred at different times.[23]

In the alternative to dismissal under res judicata, Black and Inc. contend that this Court

---

[23]    Although not argued in their opening briefs, in their joint reply brief, Black and Inc. contend that this action is precluded by the "accord and satisfaction" doctrine in addition to res judicata. Under this theory, Black and Inc. contend that the Restructuring Proposal was actually a settlement agreement (the accord) which resolved the parties' dispute over the non-compete payments. Therefore, because International sued on the Restructuring Agreement in the Delaware Action, it cannot now sue on the underlying breach of duty. This contention likewise fails because, as explained above, the Restructuring Proposal only covered a small portion of the alleged improper non-compete payments ($32.15 million out of over $88 million) and the agreement specifically allowed for the Special Committee to continue its investigation.

should abstain from hearing this case under the <u>Colorado River</u> abstention doctrine until the Delaware Supreme Court issues a decision in the appeal of the Delaware Action. Under <u>Colorado River Water Conservation District v. United States</u>, 424 U.S. 800, 818 (1976), a district court may abstain from hearing a case when considerations of "[w]ise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation," support abstention in favor of a pending parallel state court case. Abstention under <u>Colorado River</u> is "appropriate only in exceptional circumstances." <u>AXA Corporate Solutions v. Underwriters Reins. Corp.</u>, 347 F.3d 272, 278 (7th Cir. 2003). Before a court can consider whether exceptional circumstances justify a stay under <u>Colorado River</u>, it must first consider whether the federal action is "parallel" to the state proceeding. <u>Id.</u> Two suites are "parallel" only if "substantially the same parties are contemporaneously litigating <u>substantially the same issues</u> in another forum." <u>Id.</u> (emphasis added). Here, as explained above, this action and the Delaware Litigation do not involve "substantially the same issues." Thus, abstention is not appropriate under <u>Colorado River</u>.

Accordingly, this Court DENIES the motions to dismiss brought by Black and Inc.

## B.    Statute of Limitations

Perle contends that under the Illinois Borrowing Statute the Delaware three-year statute of limitations bars this action. In response, International contends that the Illinois five-year statute of limitations governs this action, and even if Delaware's statute of limitations applied, the statute was tolled. The Court will address each of these contentions in turn.

Under the Illinois Borrowing Statute, 735 ILCS 5/13-210, "[w]hen a cause of action has arisen in a state or territory out of this State . . . and, by the laws thereof, an action thereon cannot be maintained by reason of lapse of time, an action thereon shall not be maintained in this

-46-

State." Courts interpreting this statute hold that the foreign statute of limitations is applicable where: (1) none of the litigants are Illinois residents; and (2) the cause of action "arose outside of Illinois." Caraluzzi v. Prudential Sec., Inc., 824 F. Supp. 1206, 1213 (N.D. Ill. 1993). For purposes of the borrowing statute, a corporation is a resident of the state where it is incorporated. Tellular Corp. v. Mentor Graphics Corp., 282 F. Supp. 2d 869, 872 (N.D. Ill. 2003).

Because International is incorporated in Delaware and none of the Defendants are Illinois residents, the only question is whether this action "arose" in Delaware. In the context of the Illinois Borrowing Statute, in determining where the action arose, courts apply the "most significant relationship test" as adopted from the Second Restatement. Tellular Corp., 282 F. Supp. 2d at 872. Under section 145 of the Restatement (Second) Conflict of Laws, to determine where a tort claim arose, Illinois courts examine:

> (a) the place where the injury occurred;
> (b) the place where the conduct causing the injury occurred;
> (c) the domicile, residence, nationality, place of incorporation and place of business of the parties; and
> (d) the place where the relationship, if any, between the parties [was] centered.

In Caraluzzi, 824 F. Supp. at 1209-11, the plaintiff sued his former securities broker for breach of fiduciary duty, fraud, and negligent misrepresentation. The crux of the plaintiff's claim was that the defendant sent him monthly statements detailing his investments which misrepresented their true value. Id. at 1211. In determining that the breach of fiduciary claim "arose" in Connecticut for purposes of applying the Illinois Borrowing Statute, the court noted that the defendant mailed the fraudulent statements to the plaintiff's Connecticut address from Connecticut where the defendant was located. Id. at 1213-14.

Here, other than the fact that International is incorporated in Delaware, Perle has not put forth any other reasons as to why the breach of fiduciary claim arose in Delaware. While this

Court does not hold at this time that Illinois has the "most significant relationship" to this action, Illinois certainly has more of a relationship to the breach of fiduciary claim against Perle than Delaware. Many of the consents which underlie the breach of fiduciary claim against Perle were mailed or faxed from International's corporate headquarters in Chicago to Perle in Maryland and were returned to Chicago by Perle. Likewise, most of International's bank accounts upon which the alleged improper payments were drawn were located in Chicago. Accordingly, this Court finds that the Illinois Borrowing Statute does not require that this Court apply Delaware's three-year statute of limitations.

Moreover, even if the Delaware three-year statute applied, this Court finds that it was tolled under Delaware's doctrine of equitable tolling. Under Delaware law, the statute of limitations is tolled in "claims against directors" alleged to have breached their fiduciary duties by approving a self dealing transaction, where the directors "are controlled by, or are not independent of, the controlling shareholder" that engaged in the self dealing. In re Maxxam, Inc., 1997 WL 187317, at *12 (Del. Ch. April 4, 1997). See also Litman v. Prudential-Bache Properties, Inc., 1994 WL 30529, at *3-4 (Del Ch. Jan. 14, 1994). Under this doctrine, the statute is tolled until the plaintiff learned of or should have reasonably learned of its injury. Id.

Here, International alleges that Perle was not a completely independent director. While sitting on the Board and on its audit, compensation, and executive committees, Perle served, via an appointment from Black, as CEO of Digital. During his tenure with Digital, despite losing over $68 million on its investments managed by Digital, International paid Perle over $3.1 million in "incentive payments" for his performance as Digital's CEO. Accordingly, this Court finds that Perle was not an independent director for purposes of determining when he breached his fiduciary duty by approving Black's self-dealing transactions because he was beholden to

-48-

Black for, among other things, his compensation at Digital.

As for when International knew or should have known of its injuries, as explained in detail above, International alleges that Black and Radler used their authority as the controlling shareholders to loot International from 1994 to April 2003. Black and Radler apparently kept their conduct secret from the majority non-controlling shareholders until May of 2003, when one of International's largest non-controlling stockholders demanded that the Board initiate an investigation into certain non-compete payments. In response, the Board created the Special Committee, which in late October 2003, concluded that $32.15 million in non-compete payments had wrongly been paid to Black, Radler, Boultbee, and Inc. Thus, this Court finds that the Delaware three-year statute of limitations began to run at the earliest in May of 2003. Therefore, even if this Court were to apply Delaware's statute of limitations, it does not bar the breach of fiduciary duty claim against Perle.

## C. Breach of Fiduciary Duty

Perle has also moved to dismiss the sole claim against him (breach of fiduciary duty) on the grounds that International has failed to allege and cannot allege that he breached his duties of loyalty, good faith, or care while serving as a director. The Court will address each of these duties in order.

Under Delaware's business judgment rule, there is a presumption that directors make decisions "on an informed basis, in good faith and in the honest belief that the [decision] was taken in the best interests of the company." Orman v. Cullman, 794 A.2d 5, 19-20 (Del. Ch. 2002). To overcome this presumption and to allege that a director breached his duty of loyalty in voting to approve a corporate transaction which benefitted the controlling shareholder at the expense of the corporation and the other shareholders, the plaintiff must allege: (1) the director

was "interested in the outcome" of the alleged self dealing transaction; or (2) "lacked independence to consider objectively whether the transaction was in the best interest of the company and all its shareholders." Id. at 22.

Here, International alleges that Perle breached his fiduciary duty of loyalty by consenting to the alleged improper self dealing transactions without reading, discussing, or evaluating the underlying details. International, however, has not alleged that Perle had a direct financial interest in any of the transactions at issue. The question thus is whether he "lacked independence" from Black and Radler – the controlling shareholders, who pushed through and personally benefitted from the disputed transactions.

To sufficiently plead "lack of independence," the plaintiff must allege "particularized facts" supporting a "reasonable inference" that the director was "beholden" to the controlling shareholder through a close personal, family, or business relationship. Id. at 24, 25 n.50. A director is "considered beholden to (and thus controlled by) another when the allegedly controlling entity has the unilateral power (whether direct or indirect through control over other decision makers), to decide whether the director continues to receive a benefit, financial or otherwise," which is of material importance to the director. Id. at 25 n.50, 30. This control has also been held to apply to past benefits which the controlling shareholder conferred upon the director. In re Ply Gem Indus. Inc. Shareholders Lit., 2001 WL 1192206, at *1 (Del. Ch. Oct. 3, 2001).

Applying this standard, Delaware courts have held that directors who provide services (outside of their role as directors) for "material benefits" to the company, or another company dominated by the controlling shareholder, lack independence and thus may not assert the protections of the business judgment rule. For example, in Orman, 794 A.2d at 30, the court

held that a director, who provided consulting services to the company, was beholden to the controlling shareholder because the continuation of his consulting contract (which was worth $75,000) rested upon the discretion of the controlling shareholder. Similarly, in In re Emerging Com. Shareholders Lit., 2004 WL 1305745, at *33 (Del. Ch. June 4, 2004), the court found that a director, whose outside legal practice derived much of its business through the controlling shareholder, was not an independent director. See also Telxon Corp. v. Meyerson, 802 A.2d 257, 265 (Del. 2002) (director not independent because his law firm received "a substantial portion of its revenue" from the controlling shareholder and businesses he controlled).

Here, International alleges that during the time Perle sat on the Board and approved the disputed self-dealing transactions, Black had Perle appointed CEO of Digital Management, which as explained above, was a subsidiary of International whose sole function was to manage investments for International. Despite losing over $68 million on its investments managed by Digital, International paid Perle over $3.1 million in "incentive payments" for his performance as Digital's CEO. International alleges that Black personally dictated Perle's compensation (which this Court finds to be "material") with Digital. Consequently, at this time, this Court finds that International has alleged "particularized facts" supporting a "reasonable inference" that Perle was "beholden" to Black and thus not independent.

Additionally, Perle contends that International has failed to allege a claim for breach of duty of good faith. To allege a claim against corporate directors for breach of their duty to act in good faith, the plaintiff must allege that the directors "consciously and intentionally disregarded their responsibilities, adopting a we don't care attitude about the risks concerning a material corporate decision." In re Emerging Com. Shareholders Lit., 2004 WL 1305745, at *43. In other words, directors violate their duty of good faith if "they knew that they were making material

decisions without adequate information and without adequate deliberation." Id. at 43 n.192 (quoting In re Walt Disney, 825 A.2d 275, 289 (Del. Ch. 2003)).

Here, International alleges that Perle breached his fiduciary duty of good faith by consenting to the alleged improper self-dealing transactions without reading, discussing, or evaluating the underlying details or asking any questions or that the deals be reviewed by the audit committee or an independent third party. Perle's failure to even question these transactions is particularly troubling if, as International alleges, he knew that they were related-party transactions in which Black stood on both sides of the deal. Instead, he simply signed off on them without giving thought to whether the transactions would be detrimental to International and its majority non-controlling shareholders. Accordingly, at this time, the Court finds that International has sufficiently alleged that Perle breached his duty of good faith.

Perle also asserts that International has failed to allege a claim for breach of his duty of care because such a claim is barred by section 102(b)(7) of the Delaware General Corporate Code, which allows Delaware corporations to insert a provision in their certificate of incorporation which shields directors for liability for breaches of the duty of care.[24] Orman, 794 A.2d at 39. Under this provision, "absent cause for suspicion," directors are not liable for their decisions if they based their decisions on information provided by corporate management. In re Caremark Int'l Inc. Derivative Litig., 698 A.2d 959, 969 (Del. Ch. 1996)

Here, International alleges that Perle did not even read the information provided by management when he consented to the disputed transactions. Such an omission would be grossly negligent if, as alleged, he knew that the transactions he was approving involved entities

---

[24] The parties do not dispute that International's certificate of incorporation contains a provision shielding its directors from liability for breaches of the duty of care.

directly or indirectly controlled by Black. Such knowledge would be "cause for suspicion" and at a minimum require Perle to at least read the information provided on the transactions. Therefore, this Court holds that International has properly alleged a cause of action for breach of the duty of care.

In conclusion, this Court DENIES Perle's motion to dismiss under Rule 12(b)(6).[25]

---

[25] Perle also contends that even if International properly alleged a claim for breach of fiduciary duty, International's request for disgorgement should be stricken because Delaware law does not recognize a faithless fiduciary doctrine, and thus, International has no right to the compensation it paid Perle. This contention likewise fails because at least one Delaware court has held that corporate officers may be required to forfeit their compensation if their breach of fiduciary duty was of "some detriment to the corporation or conflict of interest on the part of the officer." Criton v. Merritt-Chapman &Scott Corp., 409 A.2d 607, 611 (Del. Ch. 1977). Because International has alleged a detriment and a conflict of interest, the Court denies Perle's request at this time.

## CONCLUSION

For the reasons set forth above, this Court DENIES: (1) Defendant Colson's Motion to Dismiss for Lack of Personal Jurisdiction [185-1]; (2) Defendant Perle's Motion to Dismiss, pursuant to Rules 12(b)(2) and (6) [188-1 and 193-1]; (3) Defendants' Motion to Dismiss for Failure to Join an Indispensable Party [178-1, 194-1 and 195-1]; and (4) Defendants Black and Inc.'s Motions to Dismiss under Rule 12(b)(6) [184-1 and 182-1]. It is so ordered.

ENTER:

**BLANCHE M. MANNING**
**U.S. DISTRICT COURT JUDGE**

DATE: _3/11/05_