IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

HOLLINGER INTERNATIONAL INC., )
                                        )
       **Plaintiff,**           )
                                        )
       **v.**               )     **Case No. 04 C 698**
                                        )     **Magistrate Judge Nan R. Nolan**
**HOLLINGER INC., et al.**         )
                                        )
       **Defendants.**         )

## MEMORANDUM OPINION AND ORDER

Defendants Hollinger Inc., The Ravelston Corporation Limited, Ravelston Management, Inc., Conrad Black, F. David Radler, John A. Boultbee, and Barbara Amiel-Black (collectively, the "Defendants) move to compel the production of documents from Plaintiff Hollinger International, Inc. ("Hollinger") pursuant to Federal Rule of Civil Procedure 37(a)(2)(B). For the reasons that follow, Defendants' Motion to Compel [174-1] is denied.

## DISCUSSION[1]

As background, Hollinger states that it has produced more than 840,000 pages of documents, retrieved from more than ten locations found on two continents and spanning nine time zones. Hollinger has produced the 513-page Special Committee Report regarding all of the transactions at issue and will be producing all of its submissions to the government about those transactions. Defendants now move to compel production of three additional categories of documents: (1) documents in the possession, custody, and control of the Special Committee relating to this litigation

---

[1] The factual allegations and procedural background of this case has been set forth in previous decisions in this matter including, Hollinger Int'l., Inc. v. Hollinger Inc., 2005 WL 58900 (N.D. Ill. March 11, 2005); Hollinger Int'l., Inc. v. Hollinger Inc., 2005 WL 327058 (N.D. Ill. Feb. 3, 2005); and Hollinger Int'l, Inc. v. Hollinger Inc., 2004 2278545 (N.D. Ill. Oct. 8, 2004). The Court assumes familiarity with those facts.

and materials used by the Special Committee in creating its Report; (2) the Cook Report; and (3) certain documents related to Hollinger's financial condition.[2] Hollinger opposes production of these categories of documents on various grounds. The Court addresses the parties' contentions below.

## A.    **Documents Used to Create the Special Committee Report**

Defendants argue that they are entitled to discover all documents, including drafts of the Special Committee Report, notes from witness interviews, attorney memoranda and other unspecified materials, used to create the Special Committee Report.[3] Hollinger asserts that these documents are protected from disclosure as attorney work-product and by the attorney-client privilege. Because the Court holds that the work product privilege applies to all the undisclosed documents at issue and the parties have briefed only the work-product issue, the Court does not address the applicability of the attorney-client privilege.[4]

---

[2] Counsel notified the Court that on April 5, 2005, the parties reached an agreement regarding production of a fourth category of documents–i.e., "documents produced by non-parties to the Special Committee during the course of its investigation."

[3] Request No. 8 of Defendants' First Set of Joint Requests for Production of Documents sought production of "The Special Committee Report, including without limitation, all drafts, revisions, changes, and materials used to create the Special Committee Report." Ex. A to Defs' Memo.

[4] The Court notes that Hollinger has not provided a privilege log. Hollinger argues that it should not be required to individually log every internal O'Melveny communication, O'Melveny/Breeden communication, and communications between O'Melveny, Breeden, and the Special Committee members on a privilege log because such a process would be costly and unduly burdensome. Defendants respond that no date has been set for the exchange of privilege logs and the parties have not yet had an opportunity to meet and confer on the scope of the privilege logs. Counsel are directed to meet and confer in an attempt to agree to a date for exchanging privilege logs and the scope of the logs.

## Work Product Doctrine

The work product doctrine is codified in Federal Rule of Civil Procedure 26(b)(3). Rule 26(b)(3) protects "documents and tangible things ... prepared in anticipation of litigation or for trial." The work product doctrine encompasses documents prepared in anticipation of litigation by a party's representative or agent. See Fed. R. Civ. P. 26(b)(3) (covering material "prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent) . . . .")); United States v. Nobles, 422 U.S. 225, 238-239 (1975) (recognizing that "attorneys often must rely on the assistance of investigators and other agents in the compilation of materials in preparation for trial."). Thus, the doctrine protects against "invading the privacy of an attorney's course of preparation [which] is so well recognized and so essential to an orderly working of our system of legal procedure that a burden rests on the one would invade that privacy to establish adequate reasons to justify production through a subpoena or court order." Hickman v. Taylor, 329 U.S. 495, 512 (1947).

Most courts distinguish between ordinary work product and opinion work product. Ordinary work product "includes raw factual information." Baker v. General Motor Corp., 209 F.3d 1051, 1054 (8th Cir. 2000). Opinion work product includes counsel's mental impressions, conclusions, opinions, or legal theories. Id. An assertion of work-product privilege may be overcome upon a showing of substantial need, but the courts are cautioned to give even greater protection to attorney opinions which include mental impressions, conclusions, or legal theories concerning the prospective litigation.[5] Upjohn v. Co. v. United States, 449 U.S. 383, 399 (1981) (declining to decide whether attorney work product based on oral statements from witnesses are entitled to absolute protection from disclosure but

---

[5] Defendants have not argued that they have a substantial need for the undisclosed material.

making clear that when a party seeks to discover such information, a showing of substantial need and undue burden is not sufficient. Rather, the moving party must make "a far stronger showing of necessity and unavailability."); Logan v. Commercial Union Ins. Co., 96 F.3d 971, 976 n.4 (7th Cir. 1996) (stating Fed. R. Civ. P. 26(b)(3) "expressly admonishes courts to give even greater protection against disclosure of *opinion* work product, meaning 'the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.'").

The parties do not directly distinguish between opinion work product and ordinary work product. Production of ordinary work product does not appear to be at issue here. As the Court understands it, the withheld materials include drafts of the Report, notes from witness interviews, and attorney memoranda.[6] The Court reaches no conclusion regarding any other category of documents. The undisclosed drafts of the Special Committee Report embody the impressions of its counsel. The drafts "reveal the Special Committee's confidential legal analysis, litigation strategy, and attorney-client communications." Rosenberg Dec. ¶ 6.[7] Counsel to the Special Committee states that the handwritten interview notes "tend to contain notations about, among other things, investigation and litigation strategy, follow-up questions to ask the witness, and other avenues of inquire to pursue." Id. ¶ 7. The Supreme Court has recognized that an attorney's notes of witness' oral statements tends to reveal the attorney's mental processes because it discloses "what he saw fit to write down regarding witnesses' remarks." Upjohn, 449 U.S. at 399 (quoting Hickman, 329 U.S. at 513) (stating "[f]orcing an attorney to disclose notes and memoranda of witnesses' oral statements is particularly disfavored

---

[6] Hollinger has not specified any other disputed types or categories of documents used to create the Special Committee Report.

[7] Jonathan Rosenberg is a partner in the law firm of O'Melveny & Myers LLP. O'Melveny & Myers is counsel to the Special Committee of Plaintiff Hollinger.

because it tends to reveal the attorney's mental processes); see also Baker, 209 F.3d at 1054 (explaining "[a]ttorney notes reveal an attorney's legal conclusions because, when taking notes, an attorney focuses on those facts which she deems legally significant.").[8] Finally, the Court assumes that the memoranda at issue constitute internal, legal memoranda prepared by attorneys which analyze the facts under the applicable legal standards. The undisclosed documents thus constitute classic opinion work product of the Special Committee's counsel because they contain the attorneys' mental impressions, conclusions, opinions and legal theories.

## In Anticipation of Litigation

Defendants maintain that the withheld documents are not entitled to work product protection because they were not created "in anticipation of litigation." The test for determining whether materials were prepared in anticipation of litigation is "whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained *because* of the prospect of litigation." Binks Mfg. Co. v. National Presto Indus., Inc., 709 F.2d 1109, 1119 (7th Cir. 1983). "The mere fact that litigation does eventually ensue does not, by itself, cloak materials prepared by an attorney with the protection of the work product privilege; the privilege is not that broad." Id. at 1118. Moreover, "it is important to distinguish between an 'investigative report prepared in the ordinary course of business' as a precaution for the 'remote prospect of litigation' and materials prepared because 'some articulable claim, *likely* to lead to litigation . . . ha[s] arisen.'" Logan, 96 F.3d at 977.

---

[8] The notes of the witness interviews contain both fact and opinion work product. Because Hollinger has agreed to provide Defendants with the factual summaries of the witness interviews, all that remains undisclosed is counsel's confidential assessments of the witnesses' testimony.

5

Given the context of the Special Committee's work, the Court has no problem concluding that it had an overriding litigation purpose. The Special Committee was formed in response to two letters and Form 13D SEC filings, dated May 19, 2003 and June 11, 2003, from Hollinger minority shareholder Tweedy Brown Company, who demanded "that the Board . . . investigate and take corrective action respecting the payments made to the Executives under the [non-competition] Agreements . . .[and] take all action necessary, including litigation, to recover" any damages to Hollinger. See Kirby Mcinerney & Squire LLP letter dated May 19, 2003, Ex. 1 to Pl's Opp. As the Delaware chancery court found: "Tweedy Browne demanded that the board investigate the payment of over $70 million in non-competition payments made to Black, Radler, Atkinson, and . . . Boultbee [and] asserted that these payments were violations of the duty of loyalty owed by the recipients to [Hollinger]." Hollinger Int'l, Inc. v. Black, 844 A.2d 1022, 1034 (Del. Ch. 2004), aff'd, 2005 WL 927015 (Del. Supr. April 19, 2005).

On June 16, 2003, the Hollinger Board, including at that time Defendants Black, Radler, and Amiel Black, passed a resolution authorizing the Special Committee to investigate Tweedy Browne's allegations and "to determine, in its sole discretion, whether to prosecute litigation with respect to the allegations set forth in the [Tweedy Browne] demand letter." Defs' Memo., Ex. D at 4; see Hollinger Int'l Inc., 844 A.2d at 1034 (stating "the [Hollinger] board resolved to form a 'Special Committee' with the mandate and power to investigate and, if it believed warranted, prosecute litigation on behalf of [Hollinger] as to the matters raised in the demand letters."). The Committee was further authorized "to take any other action, including the initiation of litigation, that the Special Committee deem[ed] appropriate in its sole discretion, against any director, officer, employee of the Company based on upon the Special Committee's determination that such individual improperly acted or failed to act with

respect to [Tweedy's] Allegations." Defs' Memo., Ex. D at 4. The Chairman of the Special Committee, Gordon Paris, testified in the trial of the Delaware case that the mandate of the Special Committee was "to investigate all of the allegations enumerated within [Tweedy Browne's] 13D and the demand letter and any other matters that come to their attention, and take whatever action is appropriate to seek, if appropriate, any restitution with respect to those allegations." Defs' Memo., Ex. E at 16.

Thereafter, in June of 2003, the Special Committee retained the Law Offices of Richard C. Breeden ("Breeden") and O'Melveny and Myers ("O'Melveny") as counsel to assist in the investigation. Rosenberg Dec. ¶ 2. Breeden then retained the services of Richard C. Breeden & Co., LLC ("Breeden & Co."), to assist in the investigation by providing forensic accounting, financial, and legal analysis. Id. During the course of its investigation, the Committee interviewed more than 60 witnesses and reviewed nearly 750,000 pages of documents. Report at 4. Its investigation took fourteen months to complete. In late-2003, O'Melveny and Breeden began preparing an interim report describing the Special Committee's findings on the "non-compete" payments made to Defendants Hollinger Inc., Ravelston, Black, Radler, and Boultbee one of the categories of related-party transactions the Special Committee was investigating. Rosenberg Dec. ¶ 4. On August 30, 2004, the Special Committee issued its final Report. The Report "covers the results of the Special Committee's investigation since it was formed in June 2003 in response to allegations of fiduciary duty violations and other misconduct at Hollinger." Id. at 1. The Report "includes a detailed review of dozens of individual payments and transactions during the period 1997-2003." Id. at 4.

Hollinger has demonstrated that the Special Committee Report was created in anticipation of litigation. The Special Committee's Report was not developed in the "ordinary course of business"

7

involving only "a remote prospect of litigation." Rather, the Special Committee was formed to investigate allegations of Defendants' alleged self-dealing and to recover damages from them, if necessary. At the time the investigation began, Tweedy Browne had articulated claims against Defendants including, among other things, improper non-competition payments, excessive management fees, and Hollinger's sale of newspaper assets to Horizon Publications and Bradford Publishing Company, entities that Black and Radler control. Tweedy Browne had demanded that the Hollinger Board take all action necessary, including litigation, to recover any damages to Hollinger from those claims. The Special Committee's work from the outset was in response to specific claims by Tweedy Browne, and the same attorneys who are litigating this case were involved in conducting the investigation and drafting and advising on the Report. The prospect of litigation was identifiable and not remote because specific claims had arisen and action had been demanded.

In re Kidder Peabody Sec. Litig., 168 F.R.D. 459 (S.D. N.Y. 1996), on which Defendants principally rely, is distinguishable. In Kidder, Kidder's outside counsel investigated a fraud by one of the firm's traders. Id. at 461. Kidder issued a press release indicating that it had hired a prominent attorney who was a former head of enforcement at the SEC "to lead a comprehensive investigation into what went wrong and to recommend steps to prevent a recurrences." Id. at 463. The Kidder court held that outside counsel's factual summaries of statements made by interviewees were not created "principally or exclusively" to assist in contemplated or ongoing litigation. Id. The court contrasted Kidder's situation with the "many situations in which a private corporation finds it necessary to conduct an internal investigation because of concern about possible wrongdoing and consequent litigation and liability" because "Kidder's unique public profile and its vulnerability to the ebb and flow of market opinion and the predations of its competitors made it urgent that the internal

investigation be well publicized and viewed as the inquiry of and 'independent' and incorruptible outsider." Id. at 466. The Kidder court found that a "detailed and painstaking inquiry was required for pressing business purposes and thus would have been undertaken regardless of whether litigation was threatened." Id. Thus, the court concluded that "business considerations were apparently driving Kidder and GE to hire a distinguished outside attorney to conduct an in-depth inquiry and to publicize that effort, and those concerns were entirely independent of the need to prepare for litigation." Id. at 467.

In contrast, the Special Committee Report was formed and the Report was created because litigation was reasonably anticipated. There was no readily separable business purpose for the Special Committee's investigation and Report. It was formed to address Tweedy Browne's shareholder derivative demand, investigate the claims alleged, and if appropriate, sue for corrective action and restitution. See Granite Partners L.P. v. Bear, Stearns & Co. Inc., 184 F.R.D. 49, 53 (S.D. N.Y. 1999) (distinguishing Kidder because "[f]rom the outset, the Trustee intended to make his report public but at the same time contemplated that the Report might also provide grounds for asserting claims against third parties."). Moreover, in contrast to the investment brokerage firm in Kidder, no evidence has been presented here that the Special Committee was formed because Hollinger was worried about losing customers to competitors. See Kidder, 168 F.R.D. at 465 (noting "[a]s the financial press reported at the time, competitors were immediately interested in luring away Kidder's best traders and customers, and Kidder thus had a very pressing interest in promptly assuring the public as well as government regulators and its own personnel that it was not in any way responsible for [the trader's] fraud and was, indeed, anxious to take the lead in ferreting out the facts.").

The standard applied by the Magistrate Judge in <u>Kidder</u>–that the documents must be "created principally or exclusively to assist in contemplated litigation"—is also not the applicable legal standard in the Seventh Circuit and has since been rejected by the Second Circuit. <u>United States v. Adlman</u>, 134 F.3d 1194, 1198 and n.3 (2d Cir. 1998) (stating "[w]e believe that a requirement that documents be produced primarily or exclusively to assist in litigation in order to be protected is at odds with the text and the policies of the Rule. Nowhere does Rule 26(b)(3) state that a document must have been prepared *to aid* in the conduct of litigation in order to constitute work product, much less *primarily or exclusively* to aid in litigation. Preparing a document 'in anticipation of litigation' is sufficient.") (citing <u>Kidder</u> as one of the courts applying this incorrect standard). The standard applied by the Seventh Circuit regarding whether a document is entitled to work product protection is "if in light of the nature of the document and the factual situation in the particular case, the document can be fairly said to have been prepared or obtained because of the prospect of litigation." <u>Logan</u>, 96 F.3d at 977-78; <u>Binks</u>, 709 F.2d at 1119. When viewed under the appropriate "because of" standard, the Court has no trouble finding that the Special Committee's investigation was conducted and the resulting Report was prepared because of the likely prospect of litigation.

<u>In re Woolworth Corp. Sec. Class Action Litig.</u>, 1996 WL 306576 (S.D. N.Y. June 7, 1996), is more analogous to this case. After Woolworth's Treasurer made allegations of accounting irregularities, the Audit Committee of Woolworth's Board of Directions and a Special Committee of independent directors retained the law firm of Paul, Weiss to investigate the allegations. The law firm and its accounting expert gathered and analyzed relevant information and documents, interviewed forty-five Woolworth employees, and prepared a report that plaintiffs "used as a roadmap for their litigation." <u>Id</u>. at *1. The plaintiff shareholders moved to compel production of the law firm and its

10

accounting experts' internal notes and memoranda created in the process of their investigation. The district judge rejected plaintiffs' argument that the notes and memoranda were not prepared in anticipation of litigation because "[a]ll participants knew when Paul, Weiss became involved that litigation–civil, and possibly criminal–as well as regulatory action were virtually certainties. Applying a distinction between 'anticipation of litigation' and 'business purposes' is in this case artificial, unrealistic, and the line between is here essentially blurred to oblivion." Id. at *3. See also In re Grand Jury Subpoena, 357 F.3d 900, 910 (9th Cir. 2004) (finding that litigation purpose so permeated any non-litigation purpose that the two purposes could not be discretely separated.).[9]

## Subject Matter Waiver

Defendants alternatively argue that Hollinger created a subject matter waiver of the work-product doctrine "when it publicly filed the Special Committee Report and used it offensively in this litigation." Defs' Reply at 8. On August 30, 2004, Hollinger publicly filed the Special Committee Report in SEC v. Hollinger International, Inc., No. 04 C 0336 (N.D. Ill.) (J. Manning). O'Melveny also provided the SEC on January 14, 2004 with a 44-page draft of the factual portion of the Special Committee Interim Report on non-compete payments, with a request for confidential treatment.[10] Rosenberg Dec. ¶ 5. Prior to disclosure to the SEC, the document was carefully analyzed by Special Committee counsel to redact any legal conclusions, mental impressions, or other privileged

---

[9] The Court agrees with Hollinger that "[e]very action by a public corporation–even litigation decisions–can be characterized as partly motivated by business considerations. To hold that any such 'mixed motives' preclude work product protection would eviscerate the doctrine." Hollinger Surreply at 3.

[10] Hollinger explains that the Special Committee provided the draft in an effort to cooperate with the SEC in its ongoing investigation of Hollinger and in light of its concern that Black would disband the Special Committee. Rosenberg Dec. ¶ 5.

11

information. Id. Hollinger has agreed to provide this draft document to the Defendants in this action but is withholding production of other drafts of the Report on the grounds of work-product privilege. The SEC also requested that the Special Committee provide copies of memoranda summarizing witness interviews conducted by Special Committee counsel and their consultants. O'Melveny complied with that request. These memoranda contain the factual information provided by the witnesses during their interviews but exclude counsel's mental impressions about witnesses. Hollinger will produce these memoranda to Defendants. Id. ¶ 7.

Hollinger does not seek to shield the documents that were disclosed to the SEC or publicly from Defendants. These materials are obviously no longer confidential. Rather, Hollinger contends that the undisclosed underlying documents such as drafts of the Report, interview notes, and attorney legal memoranda are protected from disclosure by the work product doctrine and no waiver has occurred as to these documents.

The work product doctrine is not absolute, and thus, its protection may be waived. Nobles, 422 U.S. at 239 (stating "[t]he privilege derived from the work-product doctrine is not absolute. Like other qualified privileges, it may be waived."). For example, when a party makes testimonial use of work product "the normal rules of evidence come into play with respect to cross-examination and production of documents." Id. at 239 n.14. Waiver may also occur by disclosure or by implication where fairness mandates. Subject matter waiver based on disclosure is a form of implied waiver which is designed to ensure fairness to litigants. In re Von Bulow, 828 F.2d 94, 103 (2d Cir. 1987). "What constitutes a wavier with respect to work-product materials depends, of course, upon the circumstances." Nobles, 422 U.S. at 240 n.14.

The issue of waiver with respect to work product in the context of corporate investigations is complex. Defendants rest their subject matter waiver argument on three cases, Kidder, Klein v. FPL Group, Inc., 2003 WL 22768424 (S.D. Fla. Sept. 26, 2003), and Granite Partners, L.P. v. Bear, Stearns & Co. Inc., 184 F.R.D. 49 (S.D. N.Y. 1999). These cases do not support a finding that Hollinger has waived its work product protection over the Special Committee counsel's legal analyses, mental impressions, and attorney-client communications involved in the investigative and Report compilation process.

In Kidder, the Magistrate Judge held that a corporation had waived the attorney-client privilege with respect to its attorney's investigative notes from interviews with its employees and incorporated into a final report.[11] Kidder, 169 F.R.D. at 469-73. The Kidder court found waiver because Kidder had publicly released the report, the report contained explicit paraphrases of the interviews, and the corporation made repeated and extensive use of the report in the litigation, as well as in an arbitration and an investigation conducted by the SEC. Also, a court had explicitly relied on the report on one occasion to rule in favor of Kidder's parent company. Id. at 471. The court concluded that Kidder had waived protection of the attorney-client privilege over counsel's interview notes by its "repeated injection of the substance of the report into this and other litigations and into related litigation contexts." Id. at 470. Despite this extensive and aggressive use of the privileged materials, the

[11] Kidder involved waiver of attorney client privilege and did not address subject matter waiver with respect to work product. Although the courts have consistently held that the attorney-client privilege and work product doctrine are distinct, Defendants' pleadings assume that the standards for their waiver are the same and that subject matter waiver of the attorney-client privilege can be equated with subject matter waiver of the work-product protection. Hollinger distinguishes Kidder from the instant case but does not maintain that the subject matter waiver analysis of Kidder is improperly applied to its claim of work product protection. For purposes of this case, the Court addresses the issue of waiver as framed by the parties.

disclosure ordered in <u>Kidder</u> was limited to only the "purely factual summaries of witness statements" and did not include "core attorney mental processes." <u>Kidder</u>, 168 F.R.D. at 473.

Here, Hollinger is producing the interview memoranda the Special Committee provided to the SEC. The interview memoranda contain the facts concerning the witnesses' statements to counsel but not the Special Committee counsel's mental impressions. Thus, Defendants will have the substance of the factual material regarding the witness interviews, which is similar to the disclosure ordered in <u>Kidder</u>.

<u>Klein</u> also fails to support Defendants' broad subject matter waiver argument. In <u>Klein</u>, the defendant-corporation established an Evaluation Committee, comprised of three outside directors, in response to a shareholder demand letter and later expanded it to cover an investigation into matters raised in shareholder lawsuits. <u>Klein</u>, 2003 WL 22768424, at *3. The Evaluation Committee recommended in its report which was provided to the defendant-corporation and filed with the court that the corporation's board seek dismissal of the shareholders' lawsuit. <u>Id</u>. The board agreed with the report and authorized the Committee's counsel to seek dismissal. <u>Id</u>. The corporation filed a motion to dismiss. <u>Id</u>. Under Florida law, the court was authorized to dismiss the derivative suit if the Committee's determination "in good faith after conducting a reasonable investigation upon which its conclusions are based that the maintenance of the derivative suit is not in the best interests of the corporation." <u>Id</u>. at *4. Thus, the issue with respect to the company's dismissal motions was whether the outside directors who made the decision to terminate the lawsuit were independent, acted in good faith, and reached their decision after conducting a reasonable investigation.

The <u>Klein</u> plaintiff sought to compel, among other things, "[a]ll transcripts, notes, or other memorializations of witness interviews conducted by the Special Committee." <u>Id</u>. at *11. The

14

company argued that the documents were protected by either the attorney client privilege or work product doctrine. The Klein court found that the privileges were waived because of the "manner in which the Report was prepared and communicated." Id. at *12. The court also held that the plaintiff had demonstrated substantial need for the notes of witness interviews. "[T]he interview notes [were] necessary for the Plaintiffs to determine whether the Committee acted in good faith and conducted a reasonable investigation which led to the Report." Id.

In sharp contrast to Klein, the reasonableness of the corporate investigation is not at issue in this case. Hollinger is not asking the court to make a decision based on the findings in the Special Committee Report or the reasonableness of the corporate investigation. Moreover, the waiver in Klein was limited to factual material. It was undisputed in Klein that the interview notes did not "contain anything other than facts." Id. at *13. Defendants are being provided with the facts contained in the Special Committee counsel's interview notes.

The final case cited by Defendants, Granite Partners, involved waiver of the protection of the work product doctrine by placing the subject of the work product in issue. In Granite Partners, a bankruptcy trustee investigated the cause of three hedge funds' losses. Granite Partners, 184 F.R.D. at 51. During the investigation, the trustee and his counsel, accountants and other experts interviewed witnesses, collected and reviewed documents, and performed various analyses for the purpose of publishing a report on the causes of the funds' collapse. Id. The final report of the trustee contained quotes from witness interviews, excerpts and descriptions of information from the collected documents and the results of the experts' analyses. Id. The final report was publicly distributed and filed with the bankruptcy court. The funds filed the civil action to prosecute claims belonging to the funds. Many of the allegations in the funds' complaint and in five investor complaints were taken directly

15

from the final report. Id. at 52. The broker-dealer defendants moved to compel production of documents obtained and created by the funds' bankruptcy trustee and his retained professionals, including notes of witness interviews and expert valuations and analyses. The issue before the court was "whether the Trustee waived any work-product privilege that may have shielded from disclosure the documents underlying the Final Report by using those documents in a published report or offensively." Id. at 54. The district court held that the trustee had waived the work product privilege by placing the undisclosed material "at issue" in the litigation. Id. at 55. The court found that the trustee's use of selected quotes from the interview notes and the fund's use of the notes during depositions to cross-examine defendants' witnesses waived any privilege as to the unquoted portions of the interview notes. Id. By including the expert's findings in the published report, the trustee had also put the accuracy and validity of the expert's analysis at issue. The court noted that the final report concerned most of the allegations in the case and in the investors' suits. The Granite Partners court further held that the defendants had demonstrated a substantial need for the materials. Id. at 56. The court noted that the interview notes and financial analyses on which the trustee relied in producing the final report were "essential" to defendants' ability to prepare an adequate defense. Id. at 55-56.

Granite Partners does not command the result sought by Defendants in the present case. The Granite Partners court did not differentiate between opinion work product and ordinary work product. It is clear, however, that the Granite Partners court was concerned with the unfairness of defendants being denied access to factual material, not attorney mental impressions, conclusions, opinions or legal theories. The court noted that counsel for the funds used the trustee's interview notes and memoranda to cross-examine defendants' witnesses regarding their interviews with the trustee. The interview notes were used "to impeach witnesses as to facts they may have known four years ago but have since

16

forgotten." Id. at 55. The court believed that the portions of the interview notes quoted in the report might omit exculpatory facts and the context of those portions. Granite Partners thus teaches that a company's voluntary disclosure of certain factual information waived the work product privilege with respect to undisclosed factual information necessary to test, verify, or challenge the disclosures. Moreover, the report in Granite Partners was released with the intention that all parties and the bankruptcy court would rely upon its accuracy and upon the opinions of the trustee. Id. at 53. Here, Hollinger does not intend to rely on the Report or to ask the parties or the court to rely on it.[12]

Defendants cite Granite Partners for the proposition that a waiver may be imposed when the privilege holder seeks to use the privilege as both a sword and a shield. Defs' Reply at 9. The sword and shield analogy is rooted in fairness. Fairness considerations may arise when a party partially discloses privileged communications or affirmatively relies on privileged communications to support a claim or defense, and then attempts to shield the underlying communications from the opposing party. In re Grand Jury Proceedings, 219 F.3d 175, 182 (2d Cir. 2002). The Second Circuit has emphasized that "the implied waiver analysis should be guided by fairness principles" as to both the attorney-client privilege and as to the work product doctrine. Id. at 185, 191. Whether fairness

---

[12] The remaining cases cited by Defendants do not support their broad subject matter waiver argument as to the Special Committee counsel's opinion work product. The portion of the Vardon Golf Co., Inc. v. Karsten Mfg. Corp., 213 F.R.D. 528, 532 (N.D. Ill. 2003), case cited by Defendants in their memorandum considered the doctrine of subject matter waiver in discussing the attorney-client privilege, not the work product doctrine. Moreover, the Vardon court held that the attorney's work product protection in the protected material had been waived "only to the extent disclosed." Vardon, 213 F.R.D. at 534. The Vardon court also failed to distinguish between waiver as to ordinary as opposed to opinion work-product. Defendants also cite Burden-Meeks v. Welch, 319 F.3d 897, 899 (7th Cir. 2003). Burden-Meeks dealt with the attorney-client privilege and selective waiver, which is not in issue here. Burden-Meeks states that "[k]nowing disclosure to a third party almost invariably surrenders the privilege with respect to the world at large; selective disclosure is not an option." Id. Hollinger has not disclosed the Special Committee counsel's opinion work product to one party to the exclusion of others.

17

requires disclosure has been decided on a case-by-case basis considering the specific context in which the privilege is asserted. Id at 183.

Fairness does not demand disclosure of the Special Committee counsel's opinion work product here. Defendants' "sword" and "shield" analogy is also not appropriate. Hollinger is not attempting to use the Special Committee counsel's opinion work product as a sword or in order to secure an unfair tactical advantage in this litigation. Hollinger has also not disclosed the Special Committee counsel's opinion work product. The Special Committee counsel took precautions to preserve the confidentiality of its opinion work product when the draft portion of the factual portion of the Special Committee Interim Report on non-competes and the memoranda summarizing witness interviews were produced to the SEC. Hollinger has not put the Special Committee counsel's opinion work product at issue in any litigation. See Holmgren v. State Farm Mut. Auto. Ins. Co., 976 F.2d 573, 577 (9th Cir. 1992) (holding that opinion work product "may be discovered and admitted when mental impressions are *at issue* in a case and the need for the material is compelling.").

Moreover, Hollinger has not taken affirmative steps to inject the Special Committee Report or the materials used to create it into this litigation. The Report has not been used offensively in this litigation. Hollinger has not cited the Special Committee Report in the complaint or any other pleading in this action. Nor has Hollinger suggested that this Court or the district court look to it for guidance. In fact, Hollinger has represented that it will prove its case with evidence, not by citing the Special Committee Report. Finally, no prejudice will result in the absence of disclosure. Defendants have been provided with the final Report, the draft portion of the factual portion of the Report on non-competes, and the factual portions of the interview documents, and they are free to conduct their own discovery. Defendants have not explained why it is unfair for them to have to defend this action

18

without access to the Special Committee counsel's mental impressions and opinions. Defendants would gain an unfair advantage if the Special Committee counsel's opinion work product contained in withheld documents were ordered disclosed. After weighing these circumstances, the Court finds no unfairness in permitting Hollinger to protect the Special Committee counsel's opinion work product from disclosure.

## B.    The Cook Report and Related Documents

Defendants also seek to discover an expert report prepared by Frederick Cook & Co. ("Cook"). Hollinger states that Cook is an executive compensation expert retained by counsel for the Hollinger Special Committee during its investigation. At this stage, Cook is not expected to testify in this case. Federal Rule of Civil Procedure 26(b)(4)(B) provides protection against discovery of information held by experts retained in anticipation of litigation who are not expected to testify. Hollinger argues that Rule 26(b)(4)(B) precludes disclosure of the Cook Report.

Rule 26(b)(4)(B) provides the standard for determining whether Defendants may discover the Cook Report and related materials at this stage of the proceedings.[13] "Rule 26(b)(4) governs the discovery of facts known and opinions held by experts and acquired or developed in anticipation of litigation or for trial." 8 Wright, Miller & Marcus, Federal Practice and Procedure § 2029 (2d ed. 1994). It "forbids the judge to order disclosure in pretrial discovery of the facts found or opinions formulated by an opponent's nontestifying experts except . . . 'upon a showing of exceptional circumstances under which it is impracticable for the party seeking discovery to obtain facts or opinions on the same subject by other means.'" Braun v. Lorillard Inc., 84 F.3d 230, 236 (7th Cir.

---

[13] Defendants cite no authority for their assertion that the discoverability of the Cook Report at this time is not governed by Rule 26. Defs' Memo. at 10.

1996).[14] Rule 26(b)(4)(B) "is designed to promote fairness by precluding unreasonable access to an opposing party's diligent trial preparation." Durflinger v. Artiles, 727 F.2d 888, 891(10th Cir. 1984). Thus, "[t]he party seeking discovery from nontestifying retained experts faces a heavy burden." 8 Wright, Miller & Marcus, Federal Practice and Procedure §2032 (2d ed. 1994).

Defendants argue that Rule 26(b)(4)(B) is inapplicable because Cook was not retained in anticipation of litigation. Whether Cook was retained in anticipation of litigation is determined by examining "the total factual situation in the particular case." Canal Barge Co. v. ComEd, 2001 WL 845468, at *1 (N.D. Ill. July 25, 2001). An examination of the events leading up to Cook's retention makes clear that he was retained because of the prospect of litigation. Hollinger states that in November 2003, the Special Committee determined that Defendants Black, Hollinger Inc., Radler, and Boultbee had received more than $30 million in unauthorized "non-compete" payments. "Black faced potentially serious accusations of self-dealing on his own behalf, and on behalf of [Hollinger Inc.] . . . . He sued for peace . . . agree[ing] to resign as Chief Executive Officer and to repay certain funds without any admission of wrongdoing." Hollinger Int'l Inc., 844 A.2d at 1029. Defendant Radler resigned, and Defendant Boultbee was discharged. On November 18, 2003, Boultbee filed a wrongful termination suit against Hollinger and the members of the Special Committee in Canada. On December 9, 2003, Cardinal Value Equity Partners, L.P., a Hollinger minority shareholder, filed a stockholder derivative action in Delaware Chancery Court against, among other persons, Black,

---

[14] Rule 26(b)(4)(B) states: "A party may, through interrogatories or by deposition, discover facts known or opinions held by an expert who has been retained or specially employed by another party in anticipation of litigation or preparation for trial, only as provided in Rule 35(b) or upon a showing of exceptional circumstances under which it is impracticable for the party seeking discovery to obtain facts or opinions on the same subject by other means." Rule 35(b), which deals with physical and mental examinations, does not apply here.

Radler, and Amiel Black, alleging breach of fiduciary duty claims for unauthorized "non-compete" payments, excessive management fees, and other related-party transactions. Pl's Opp. at 22.

On or about January 7, 2004, Steven Quamme, an attorney and employee of Breeden & Co., contacted Cook, an executive compensation firm, at Breeden's and Rosenberg's direction to assist in this litigation by analyzing the reasonableness of management fees and other payments and compensation received by Hollinger's former senior management. Rosenberg Dec. ¶ 3. At the time Cook was contacted, the Special Committee was preparing a lawsuit against several parties involved in the transactions under investigation. Id. Less than two weeks later, on January 16, 2004, that lawsuit was filed in the Southern District of New York against all Defendants but Boultbee and Amiel Black. On January 28, 2004, the Special Committee voluntarily dismissed that action and filed this case against all Defendants except Amiel Black, who was added in the First Amended Complaint. Rosenberg signed an engagement letter formally hiring Cook on or about January 22, 2004. Thus, by the time Cook was contacted on January 7, 2004, two litigations involving Hollinger, the Special Committee, and Defendants were ongoing and by the time Cook was formally retained on January 22, 2004, a third litigation was filed.

Defendants argue that the Cook Report was not prepared in "anticipation of litigation" because it was relied on and quoted in the Special Committee Report, which was mandated by the SEC Consent Decree under which Hollinger "had an independent obligation to produce" the Special Committee Report. The Ninth Circuit has rejected a similar argument in the context of considering whether documents were created in "anticipation of litigation" for purposes of the work product doctrine, codified in Federal Rule of Civil Procedure 26(b)(3). In In re Grand Jury Subpoena, 357 F.3d 900 (9th Cir. 2004), the corporate defendant was under investigation by the EPA. After being notified

21

by the EPA that it was under investigation, the defendant retained an attorney, and the attorney hired an environmental consultant, Mark Torf, for the purpose of assisting him in preparing a legal defense on behalf of the defendant. Id. at 904. In seeking to avoid litigation, the defendant submitted documents to the EPA pursuant to an Information Request from the EPA and an Administrative Consent Order, in which the defendant agreed to dispose of potentially hazardous substances. Id. The Consent Order required, among other things, that defendant provide access to records related to the conditions of the site as well as its cleanup efforts and to make such documents and information available to the EPA upon request for ten years. Id. at 906. Torf assisted the defendant in the cleanup effort. Approximately a year and a half later, a grand jury investigating the defendant issued a subpoena to Torf for production of records concerning the disposal of waste material for the defendant. Id. The defendant moved to quash the subpoena on the grounds that the documents were protected from disclosure by the work-production doctrine. The government argued that certain of the documents were not prepared "in anticipation of litigation" because they "would have been created in substantially similar form in any event to comply with the Information Request and Consent Order." Id. at 908.

The Ninth Circuit rejected the government's argument and applied the "because of" standard articulated in the Wright & Miller Federal Practice treatise and applied by the Seventh Circuit. Id. at 907-08. That standard provides that a document should be considered prepared "in anticipation of litigation" and thus protected from disclosure under Rule 26(b)(3) if "in light of the nature of the document and the factual situation in the particular case, the document can be fairly said to have been prepared or obtained because of the prospect of litigation." 8 Wright, Miller, & Marcus, Federal Practice and Procedure § 2024 (2d ed. 1994). The determination of whether a document was created

22

in anticipation of litigation "cannot be decided simply by looking at one motive that contributed to a document's preparation." Id. at 908. The Ninth Circuit held that the documents prepared by Torf were entitled to work product protection because "[t]he so-called independent purpose of complying with the Board's request was grounded in the same set of facts that created the anticipation of litigation, and it was the anticipation of litigation that prompted the law firm's work in the first place." Id.

The same reasoning applies here. In May of 2003, one of Hollinger's largest stockholders demanded that its board of directors initiate an investigation into the non-compete payments made to Black, Radler, Boultbee, and Hollinger Inc. Hollinger, 2005 WL 5890000, at *7. In response, the Board established the Special Committee, made up of newly appointed independent directors, in June 2003 to investigate and if necessary, to recover the allegedly improper and unauthorized payments. Id; see also Special Committee Report dated August 30, 2004 at 1 (stating that the Special Committee was formed in June 2003 "in response to allegations of fiduciary duty violations and other misconduct at Hollinger."). In late-2003, O'Melveny and Breeden began preparing an interim report describing the Special Committee's findings on the "non-compete" payments. On January 16, 2004, the Securities and Exchange Commission brought an enforcement action for injunctive and equitable relief against Hollinger Inc., alleging violations of federal securities laws. The Consent Order requires Hollinger to have its Special Committee "complete its independent review and investigation of the matters set forth in its authorizing resolution" and to provide "one or more written reports discussing the result of the investigation within 120 days" to the district court and the SEC. Consent Order ¶ H(1), (4).

The Cook Report was prepared in anticipation of this litigation to assist Hollinger in analyzing the reasonableness of the management fees and other payments and compensation received by its

23

former senior management. Rosenberg Dec. ¶ 3. There is no evidence that the Cook Report had to be made in any event or would have been created irrespective of litigation. The Consent Order required Hollinger to prepare "one or more written reports," it did not require the Cook Report. The fact that the Cook Report was later relied on and quoted in the Special Committee Report, which was prepared and filed in the SEC lawsuit, does not preclude the application of Rule 26(b)(4)(B). The alleged "independent obligation to produce the [Special Committee] Report" arose out the of the same set of circumstances that created the anticipation of litigation. It was the anticipation of litigation that prompted the Special Committee's work in the first place. The alleged independent duty of complying with the Consent Order also arose long after litigation was likely. Finally, Cook's status as a non-testifying expert is not altered by the fact that the retention letter does not explicitly state that Cook was retained as a consulting expert for purposes of this litigation.[15]

Hollinger's disclosure of portions of Cook's findings in the Special Committee Report obviously forfeits protection of Rule 26(b)(4)(B) as to the items actually disclosed, and Hollinger does not contend otherwise. The next issue is whether the forfeiture extends to undisclosed portions of the Cook Report and/or all other documents involving the same subject matter as well. Defendants argue that Hollinger has waived any privilege, including the work product privilege, with regard to the Cook

---

[15] There is no requirement that a consulting expert's engagement letter explicitly state that the expert is being retained in anticipation of litigation or for trial preparation. The engagement letter states that the Special Committee retained Cook to "provide consulting and technical services in a confidential matter involving the identification of total compensation of senior executives of Hollinger International, Inc. ("Hollinger" or the "Company"), development of a peer frame of 10 to 15 comparable companies, and comparative analysis of compensation levels as between Hollinger executives and those of the peer frame ("the Engagement.")." Rosenberg Dec., Exh. A. This is not inconsistent with Rosenberg's statement that Cook was retained "to assist in this lawsuit by analyzing the reasonableness of management fees and other payments and compensation received by Hollinger's former senior management."

Report. Hollinger is not refusing to produce the Cook Report under Rule 26(b)(3). Defendants cite no case law supporting a waiver argument with respect to Rule 26(b)(4). The rule itself does not address waiver, and the courts have generally held that partial disclosure of a non-testifying expert's work product does not waive a party's right to withhold production of the expert's undisclosed work product. See Ludwig v. Pilkington North America, Inc., 2003 WL 22242224 (N.D. Ill. Sept. 29, 2003); Tennessee Gas Pipeline v. Rowan Companies, Inc., 1996 WL 344137 (E.D. Pa. June 19, 1996); Vanguard Savings and Loan Ass'n, 1995 WL 71293 (E.D.Pa. Feb. 17, 1995); and United States v. Hooker Chemicals & Plastics Corp., 112 F.R.D. 333 (W.D. N.Y. 1986). Under the circumstances of this case, the Court holds that the Special Committee's disclosure of certain of Cook's findings in the Special Committee Report did not automatically forfeit the protection of Rule 26(b)(4)(B) as to the withheld information or place the entirety of his work at issue in this case and thus, did not negate Defendants' burden of demonstrating extraordinary circumstances under the rule.[16]

In the end, Defendants' waiver argument rests on principles of fairness. If considered this way, the point dovetails with Defendants' contention that exceptional circumstances allow discovery of the Cook Report under Rule 26(b)(4)(B). Exceptional circumstances require that "it is impracticable for the party seeking discovery to obtain facts or opinions on the same subject by other means." Fed. R. Civ. P. 26(b)(4)(B). Exceptional circumstances may be shown when: (1) the condition observed by the expert is no longer observable; or (2) the condition is subject to replication, but the costs would

---

[16] Granite Partners, the case cited by Defendants in support of their waiver argument, is inapplicable because it did not deal with Rule 26(b)(4)(B). Granite Partners dealt only with attorney work product protection under Rule 26(b)(3), not the work product of a non-testifying expert . Rule 26(b)(4)(B) is distinct from Rule 26(b)(3). Vanguard Savings and Loan Ass'n v. Banks, 1995 WL 71293, at *2 (E.D. Pa. Feb. 17, 1995)(stating it is "clear that Rule 26(b)(4)(B) is unrelated to the work product privilege.").

25

be judicially prohibitive. <u>Ludwig v. Pilkington North America, Inc.</u>, 2003 WL 22242224, at * 3(N.D. Il., Sept. 29, 2003) (<u>citing</u> <u>Braun</u>, 84 F.3d at 236). Defendants have not demonstrated exceptional circumstances justifying the disclosure of the Cook Report. Cook is not the only source of opinions regarding executive compensation. Defendants have the factual information underlying the disclosed portion of Cook's analysis and may retain their own experts to conduct their own analyses. Defendants will also have the opportunity to depose Hollinger's trial experts.

**C.    Documents Relating to Hollinger's Financial Condition**

Defendants' Document Requests Nos. 38-40, 42, 44-45, and 48 seek documents relating to Hollinger's financial condition. Hollinger points out that as a public company, it files quarterly and annual financial statements with the SEC. Hollinger states that it is producing all other financial documents, including documents concerning proposed audit adjustments, revisions, and restatements, to the extent they discuss the transactions at issue in the Complaint. The parties dispute the relevancy of these remaining requests for financial documents: 1) all documents relating to any asset that International sold or purchased between 1995 through present, including any non-compete agreement entered into by the parties and the value of the asset sold or purchased; 2) all documents relating to the Strategic Process; 3) all documents relating to Hollinger's financial performance since the Defendants resigned or were removed from their management positions within Hollinger; 4) all documents relating to any revisions or restatements or communications regarding revisions or restatements of any financial statements of Hollinger for the fiscal years 1995 through present; 5) all unaudited financial statements of Hollinger for the fiscal years 1995 through present; and 6) all documents relating to any proposed audit adjustments communicated by KPMG to Hollinger.

Rule 26(b)(1) allows parties to discover "any matter, not privileged, that is relevant to the claim or defense of any party . . . ." Upon a showing of good cause, the court may also order discovery of "any matter relevant to the subject matter involved in the action." Fed. R. Civ. P. 26(b)(1). "The good cause standard . . . 'is meant to be flexible,' but the party seeking such discovery should ordinarily be able to articulate a reason for believing that it is warranted." 8 Wright, Miller & Marcus, Federal Practice & Procedure § 2008 (2004 pocket part). Although the federal rules contemplate liberal discovery and relevancy under Rule 26 is extremely broad, a court may limit discovery if, for example, it determines that it is unreasonably cumulative or duplicative, obtainable from another source that is more convenient, less burdensome, or less expensive, the party seeking discovery has had ample opportunity by discovery to obtain the information or the burden or expense of the proposed discovery outweighs its likely benefit. Fed. R. Civ. P. 26(b)(2).

Defendants have not adequately shown that they are entitled to the additional financial information they seek. Defendants state that they are entitled to all the financial documents they have requested to determine the present and former value of Hollinger, which is relevant to assessing the claims of excessive fees. Defendants further state that these financial documents are "highly relevant" to a "proper analysis of plaintiff's claims of unjust enrichment, the fairness of the management fees and non-competes, and the financial benefits gained by [Hollinger] as a direct result of defendants' management of the Company," but Defendants fail to cite a single case supporting their relevancy argument and fail to justify the breadth of each request at issue. Defs' Memo. at 12. While in some cases the basis of a relevancy argument may be obvious to Court given the facts and the law, that is not the case here. On the current record, the Court is not persuaded that Defendants are entitled to further financial documents. Defendants' motion to compel production of additional financial

documents from Hollinger is denied without prejudice. Defendants are granted leave to file a renewed motion to compel which provides an analysis of the relevancy of each category of documents, including citations to supporting authority, and justifies the breadth of each request given the financial documents already produced by Hollinger. However, prior to filing any future motion to compel regarding this financial information, counsel are directed to meet and confer in person in an attempt to resolve the matter informally. Counsel shall discuss the Rule 26(b)(2) factors in an effort to reach an acceptable compromise or narrow the scope of disagreement. The Court believes this is type of dispute which should be resolved by the parties without the necessity of a court order.[17]

## CONCLUSION

For the reasons explained above, Defendants' Motion to Compel Production of Documents is denied.

ENTER:

Nan R. Nolan
United States Magistrate Judge

Dated: May 16, 2005

---

[17] Counsel shall similarly meet and confer in an attempt to resolve any remaining dispute regarding the breadth of Defendants' Document Request No. 7.