**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| SUN TIMES MEDIA GROUP, INC. | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 04C-0698 |
| | ) | |
| v. | ) | |
| | ) | Hon. Blanche M. Manning |
| THE RAVELSTON CORPORATION | ) | |
| LIMITED, CONRAD M. BLACK, | ) | |
| JOHN A. BOULTBEE, DANIEL W. COLSON | ) | |
| and BARBARA AMIEL BLACK, | ) | Magistrate Judge Maria Valdez |
| | ) | |
| Defendants. | ) | |

**JOINT STATUS REPORT**

In accordance with the Court's November 10, 2010 order, the parties submit the

following Joint Status Report:

**1.      Remaining parties and claims**

This action has been pending since January 28, 2004.  Plaintiff Sun Times Media Group,

Inc., f/k/a Hollinger International Inc. and n/k/a Chicago Newspaper Liquidation Corp.

("Plaintiff" or "STMG"), filed its Third Amended Complaint on October 8, 2008, which names

as Defendants the following:  (i) The Ravelston Corporation Limited and Ravelston Management

Inc. (collectively, "Ravelston"), STMG's former manager and indirect controlling shareholder;

(ii) Conrad M. Black, the former Chief Executive Officer of STMG and Chairman of its board of

directors; (iii) John A. Boultbee, a former STMG Chief Financial Officer, Executive Vice-

President, and director; (iii) Daniel W. Colson, a former STMG director and Deputy Chairman

and CEO of STMG subsidiary *The Daily Telegraph*; and (iv) Barbara Amiel Black, former

STMG director and Vice President, Editorial.

The Third Amended Complaint alleges twenty separate counts, each asserted against different Defendants or groups of Defendants, predicated on the following causes of action: (1) Breach of Fiduciary Duty (Counts I, III, V, VIII, X, XI, XII, XIII, XV, XVI, XVII and XVIII); (2) Conversion (Counts II, IV, VI, IX and XIV); (3) Fraud (Count VII); (4) Unjust Enrichment (Count XIX); and (5) Illinois Civil Conspiracy (Count XX).  Plaintiff seeks compensatory damages "in an amount to be proven at trial" and punitive damages on the Fraud and Conversion counts.  Plaintiff also seeks disgorgement of (i) compensation paid to the individual Defendants; and (ii) compensation in the form of management fees paid to Defendant Ravelston, pre-judgment interest, and other equitable remedies.  Each Defendant has answered the Third Amended Complaint and asserted a number of affirmative defenses.

Defendant Black asserted a compulsory counter-claim in response to the Second Amended Complaint against Hollinger International Inc. (now STMG) on April 25, 2005, seeking damages and other relief related to STMG's alleged breach of various stock option plans.  STMG answered the counterclaim on May 26, 2005.  STMG thereafter filed its Third Amended Complaint, and Black stated in a footnote in his answer to the Third Amended Complaint that "Conrad Black maintains and continues to pursue his Counterclaim filed contemporaneously with his Answer and Affirmative Defenses to the Second Amended Complaint on April 25, 2005 [Dkt. 340]."  The parties dispute whether Black has forfeited his counterclaim.

**2.    Status of parties**

*(a)    Plaintiff.*  On March 31, 2009, STMG filed for Chapter 11 bankruptcy protection. In or about October 2009 STMG's operating assets were sold and the company was renamed Chicago Newspaper Liquidation Corp.  The bankruptcy action remains pending.

(b)     *Defendant Ravelston.*  On or about April 20, 2005, Ravelston initiated proceedings in Canada under the Companies' Creditors Arrangement Act ("CCAA"), and the Ontario Superior Court of Justice appointed a Receiver for Ravelston's assets.  In August 2005 a federal Grand Jury returned an indictment against Ravelston (and two former STMG officers) for seven counts of mail and wire fraud.  On March 5, 2007, Ravelston pleaded guilty to one count of mail fraud.  On or about December 3, 2008, the Ontario court ordered that Ravelston's CCAA proceedings be terminated and that Ravelston be assigned into bankruptcy.  On June 11, 2009, this Court entered an order of default against Ravelston.

(c)     *Defendant Black.*  Black answered the Third Amended Complaint on November 25, 2008.  On November 17, 2005, the Grand Jury returned a First Superseding Indictment charging Black with eight counts of mail and wire fraud.  On December 10, 2007, the Honorable Amy St. Eve entered a judgment of conviction against him on three counts of mail or wire fraud and one count of obstruction of justice.  (An intervening superseding indictment added the obstruction of justice and other counts.)  On June 24, 2010, the United States Supreme Court reversed and remanded the Seventh Circuit's decision affirming his conviction.  On October 29, 2010, the Seventh Circuit reversed his conviction on two counts of fraud (related to the APC payments), and affirmed his conviction on one count of mail fraud (relating to non-compete payments in the Forum and Paxton transactions) and one count of obstruction justice.  *See United States v. Black, et al.*, Nos. 07-4080, 08-1030, 08-1072, 08-1106 (7th Cir. Oct. 29, 2010), attached hereto at Exhibit A.  Black filed a petition for rehearing *en banc* of that decision on November 12, 2010.  *See* Petition for Rehearing *En Banc* of Conrad M. Black and John A. Boultbee, attached hereto at Exhibit B.  The Honorable Amy St. Eve has set a status hearing in the criminal case for December 2, 2010.

(d)    *Defendant Boultbee.*  Boultbee answered the Third Amended Complaint on November 25, 2008.  On November 17, 2005, the Grand Jury returned a First Superseding Indictment charging Boultbee with eight counts of mail and wire fraud.  On December 10, 2007, the Honorable Amy St. Eve entered a judgment of conviction against him on three counts of mail or wire fraud.  On June 24, 2010, the United States Supreme Court reversed and remanded the Seventh Circuit's decision affirming his conviction.  On October 29, 2010, the Seventh Circuit reversed his conviction on two counts of fraud (related to the APC payments) and affirmed his conviction on one count of fraud (relating to non-compete payments in the Forum and Paxton transactions).  *See* Ex. A.  Boultbee filed a petition for rehearing *en banc* of that decision on November 12, 2010.  *See* Ex. B.  The Honorable Amy St. Eve has set a status hearing in the criminal case for December 2, 2010.

(e)    *Defendant Colson.*  Colson remains a defendant in the case.  Colson answered the Third Amended Complaint on November 14, 2008.

(f)    *Defendant Amiel Black.*  Amiel Black remains a defendant in the case.  Amiel Black answered the Third Amended Complaint on November 14, 2008.

## 3.    Status of case

This case was first stayed on motion of the U.S. Attorney's Office on September 6, 2005.  On February 28, 2006, Magistrate Judge Valdez entered an order extending the stay.  On January 16, 2008, Magistrate Judge Valdez denied STMG's request to lift the stay, and on April 23, 2008, this Court affirmed.  On May 22, 2009, Magistrate Judge Valdez denied STMG's renewed request to lift the stay, finding "that the relevant factors weigh in favor of continuing the stay through the pendency of the appeal before the United States Supreme Court."

Defendants contend that the criminal proceedings giving rise to the stay in this case remain ongoing.  In its October 29, 2010 opinion, the Seventh Circuit reversed on the two "APC" counts, vacated the defendants' sentences, and remanded the case for resentencing on the affirmed count(s) and possible retrial.  Ex. A at 14.  As stated above, Black and Boultbee filed a petition for rehearing *en banc* on November 12, 2010.  To date, the Seventh Circuit has not acted on the petition for rehearing.

Depending on the Seventh Circuit's disposition of the petition, either the government or the criminal defendants would have a right to petition for a *writ of certiorari* if the result of the *en banc* petition is unfavorable to that party.  In addition, the Government has not yet stated its position on the question of whether it will seek retrial on the reversed counts, and the criminal defendants remain subject to resentencing in the District Court.

Dated November 17, 2010.

| | |
|---|---|
| Mark V. Chester<br>JOHNSON AND COLMAR<br>2201 Waukegan Road, Suite 260<br>Bannockburn, IL 60015<br>(847) 607-0111<br>(312) 922-9283 (fax)<br>*Attorneys for Hollinger International Inc.* | Jonathan Rosenberg<br>Abby F. Rudzin<br>O'MELVENY & MYERS<br>Times Square Tower, 7 Times Square<br>New York, NY 10036<br>(212) 326-2000<br>(212) 326-2061 (fax)<br>*Attorneys for Hollinger International Inc.* |
| William Butler Berndt<br>SCHOPF & WEISS<br>312 West Randolph Street, Suite 300<br>Chicago, IL 60606-1721<br>(312) 701-9300<br>(312) 701-9335 (fax)<br>*Attorneys for Conrad M. Black and Barbara Amiel Black* | Alex J. Bourelly<br>Jennifer E. Owens<br>BAKER BOTTS LLP<br>The Warner<br>1299 Pennsylvania Avenue, N.W.<br>Washington, DC 20004-2400<br>(202) 639-7700<br>(202) 639-7890 (fax)<br>*Attorneys for Conrad M. Black* |
| Stephen C. Voris<br>BURKE, WARREN, MACKAY<br>& SERRITELLA, P.C.<br>330 North Wabash Avenue, 22nd Floor<br>Chicago, IL 60611-3607<br>(312) 840-7000<br>(312) 840-7900 (fax)<br>*Attorney for John A. Boultbee* | Ira Lee Sorkin<br>Donald A. Corbett<br>Lowenstein Sandler PC<br>1251 Avenue of the Americas<br>New York, New York 10020<br>Tel. 212-262-6700<br>Fax 212-262-7042<br>*Attorneys for John A. Boultbee* |
| Peter A. Silverman<br>Gregory L. Stelzer<br>FIGLIULO & SILVERMAN<br>Ten South LaSalle Street, Suite 3600<br>Chicago, IL 60603<br>(312) 251-4600<br>(312) 251-4610 (fax)<br>*Attorneys for Daniel W. Colson* | Douglas J. Pepe<br>GREGORY P. JOSEPH LAW OFFICES LLC<br>485 Lexington Avenue, 30th Floor<br>New York, NY 10017<br>(212) 407-1230<br>(212) 407-1299 (fax)<br>*Attorneys for Barbara Amiel Black* |

# EXHIBIT A

In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 07-4080, 08-1030, 08-1072, 08-1106

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

CONRAD M. BLACK, PETER Y. ATKINSON,
    JOHN A. BOULTBEE, and MARK S. KIPNIS,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 05 CR 727—**Amy J. St. Eve**, *Judge.*

ARGUED SEPTEMBER 29, 2010—DECIDED OCTOBER 29, 2010

Before POSNER, KANNE, and SYKES, *Circuit Judges.*

POSNER, *Circuit Judge.*  This case is before us for the
second time, the Supreme Court having vacated the
judgment, which we had affirmed, and remanded the
case to us for reconsideration. *Black v. United States*, 130
S. Ct. 2963 (2010).

The defendants—senior executives of Hollinger Inter-
national—had been convicted by a jury of three counts of

mail and wire fraud, in violation of 18 U.S.C. §§ 1341 and
1342, and defendant Black had also been convicted of
obstruction of justice, in violation of 18 U.S.C. § 1512(c).
The judge had sentenced Black to a total of 78 months
in prison, Atkinson and Boultbee to 24 and 27 months,
and Kipnis to probation with six months of home deten-
tion.

The three fraud counts (which we'll treat as two, be-
cause two of the three relate to transactions with the
same company, APC) were submitted to the jury under
two theories: that of a scheme of fraudulent appropria-
tion of money to which Hollinger was legally entitled
(we'll call this "pecuniary fraud"), and that of a scheme
to deprive Hollinger of the latter's "intangible right of
honest services," 18 U.S.C. § 1346, amending sections 1341
and 1342. The first theory required that the defendants
have obtained a pecuniary benefit at the expense of
Hollinger; the second did not; and because the jury re-
turned a general verdict on the fraud counts, we cannot
be absolutely certain that it found the defendants guilty
of pecuniary fraud as well as, or instead of, honest-
services fraud.

After we affirmed, the Supreme Court held that the
latter form of fraud requires proof that the defendant(s)
received a bribe or kickback, as otherwise section 1346
would be unconstitutionally vague. *United States v.
Skilling*, 130 S. Ct. 2896, 2931 (2010); see *United States v.
Cantrell*, 617 F.3d 919, 921 (7th Cir. 2010); *United States v.
Urciuoli*, 613 F.3d 11, 17-18 (1st Cir. 2010). That was not
proved here and so the defendants could not lawfully

be convicted of honest-services fraud. But if it is not open to reasonable doubt that a reasonable jury would have convicted them of pecuniary fraud, the convictions on the fraud counts will stand. *Hedgpeth v. Pulido*, 129 S. Ct. 530, 531-32 (2008) (per curiam); see *Neder v. United States*, 527 U.S. 1, 15-16 (1999); *United States v. L.E. Myers Co.*, 562 F.3d 845, 855 (7th Cir. 2009); *United States v. Cappas*, 29 F.3d 1187, 1192 (7th Cir. 1994); *United States v. Jackson*, 196 F.3d 383, 386 (2d Cir. 1999). "An instructional error arising in the context of multiple theories of guilt no more vitiates *all* the jury's findings than does omission or misstatement of an element of the offense when only one theory is submitted." *Hedgpeth v. Pulido*, *supra*, 129 S. Ct. at 532 (emphasis in original).

The case would still have to be remanded to the district court for resentencing unless it was reasonably certain that the judge would have imposed the same sentences even if the charge of honest-services fraud had not been submitted to the jury. Suppose no reasonable jury would have failed to find pecuniary fraud. Nevertheless that same jury, having been instructed on honest-services fraud, might have found the defendants guilty of honest-services fraud as well. The judge would then have been incorrectly sentencing the defendant for two crimes rather than one. She might think honest-services fraud the more serious crime, or at least that it made the defendants' conduct more reprehensible and so merited heavier overall sentences.

We begin with defendant Black's argument that the submission of that charge to the jury contaminated his conviction of obstruction of justice, and that therefore

he is entitled to a retrial on the obstruction count as well as on the fraud counts. He was charged with having concealed or attempted to conceal documents "with the intent to impair the [documents'] integrity or availability for use in an official proceeding," in violation of 18 U.S.C. § 1512(c)(1). There was compelling evidence that he knew that the acts that later formed the basis of the fraud charges against him and his codefendants were being investigated by a grand jury and by the SEC. In the midst of these investigations Black with the help of his secretary and his chauffeur removed 13 boxes of documents from his office, put them in his car, was driven home, and helped carry them from the car into his house.

He later returned the boxes; and copies of the documents were available to the government before the boxes were removed; but it was material to the investigation whether Black had had copies in his office. For that would mean that he had received them and might know they were material to the government's investigation. Furthermore, the boxes may have contained documents, of which there were no copies, that he'd removed before returning the boxes. That is speculation; but the possibility of such tampering helps to explain why the obstruction statute does not require proof of obstruction, as distinct from intent to obstruct, in order to convict. The usual consequence of an obstruction of justice is not that a guilty person is acquitted but that the government expends additional resources to prevent the effort at obstruction from succeeding, as in our case of *United*

*States v. Wells*, 154 F.3d 412, 414-15 (7th Cir. 1998), where the defendant's lie about the proceeds of his robbery sent the police on a wild goose chase. Similarly, concern that a suspect may be concealing material documents incites additional investigative efforts by the government. See *United States v. Tankersley*, 296 F.3d 620, 623-24 (7th Cir. 2002).

Thus, as we explained in a portion of our first opinion not disturbed by the Supreme Court and therefore the law of the case, the obstruction of justice statute does not require proof of materiality unless the alleged obstruction takes the form of a lie that could not be expected to have *any* effect on the justice process. *United States v. Buckley*, 192 F.3d 708, 710 (7th Cir. 1999). Being able to deny the materiality of a document is a common reason for concealment. So it is enough for conviction that a document was concealed in order to make it unavailable in an official proceeding. See, e.g., *United States v. Senffner*, 280 F.3d 755, 762 (7th Cir. 2002); *United States v. Philips*, 583 F.3d 1261, 1263-64 (10th Cir. 2009); *United States v. Carson*, 560 F.3d 566, 584 (6th Cir. 2009); *United States v. Lessner*, 498 F.3d 185, 197-98 (3d Cir. 2007). The evidence that the boxes were removed in order to conceal documents from the government investigators was compelling, even though Black's secretary loyally testified that Black intended to remove the documents to a temporary office that she would set up for him in her home because he had to vacate his office at Hollinger within ten days. Her testimony was inconsistent with his having put the boxes in his car (not hers, which was at the scene) and taken them to his home rather than to

hers. There was also evidence that in removing the boxes he tried to avoid the surveillance cameras in his office building—unsuccessfully.

In any event, the sufficiency of the evidence to convict Black of obstruction is no longer an open question; and since the jury was separately instructed on obstruction, the fact that it received an erroneous instruction on another count would ordinarily be irrelevant. *United States v. Holtzer*, 840 F.2d 1343, 1349 (7th Cir. 1988). But Black argues that had the jury not been told it could convict him of honest-services fraud, it might well have acquitted him of obstruction of justice. He appeals to cases in which convictions on counts on which the jury was properly instructed were reversed because a count that was later dismissed was so inflammatory that it created a "prejudicial spillover." E.g., *United States v. Lazarenko*, 564 F.3d 1026, 1042-44 (9th Cir. 2009); *United States v. Edwards*, 303 F.3d 606, 639-40 (5th Cir. 2002); *United States v. Vebeliunas*, 76 F.3d 1283, 1293-94 (2d Cir. 1996). These cases are in superficial tension with our decision in *Holzer* and also in *United States v. Schwartz*, 787 F.2d 257, 264 (7th Cir. 1986), but those are decisions about misjoinder, and hold that the time to sever a trial because of a prejudicial spillover from one count to another is before the trial begins. If a count is submitted to the jury under an instruction apt to poison the jury's consideration of other counts as well, the defendant may be entitled to a new trial.

But this is not such a case. The theory of honest-services fraud submitted to the jury was esoteric rather

than inflammatory; the evidence of such fraud was a subset of the evidence of pecuniary fraud; and the evidence of obstruction of justice was very strong. No reasonable jury could have acquitted Black of obstruction if only it had not been instructed on honest-services fraud. It would still have been the case that Black had known he was being investigated for fraud and could not have known that years later the Supreme Court would invalidate one of the fraud charges. And if he were clairvoyant, he would have known that the other fraud charge—pecuniary fraud—would not be invalidated.

At argument Black's lawyer posed the following amusing hypothetical in an attempt to use the error in the fraud instruction to undermine his client's conviction for obstruction of justice: Suppose the Justice Department launches an investigation of a man suspected of having an affair with Minnie Mouse, and while the investigation is under way the man burns his Disney comics. Although an "official investigation" was pending (and capable of being obstructed) when he destroyed the comics, this could not be construed as an obstruction of justice, because the crime under investigation did not exist and therefore he could not have acted with the corrupt intent necessary for guilt of obstruction. Black's lawyer hoped by this hypothetical case to persuade us that the jury would have interpreted his client's intent in removing the documents differently had it known that the honest-services fraud under investigation at the time was not a crime; it would have been more willing to credit his innocent explanation for his action and conclude that he had not acted with corrupt intent. But Black was not under investigation for an obviously

nonexistent crime, such as carnal knowledge of a fictional mouse; he was under investigation for conventional pecuniary fraud as well as honest-services fraud, and besides it was not obvious at the time of his removing the documents that honest-services fraud was a nonexistent crime. Hundreds of persons must have been convicted of it before the Supreme Court, years after Black's act, narrowed it to cases in which the defendant receives a bribe or a kickback. Black had also to fear—and just as acutely—being prosecuted for pecuniary fraud, as of course he was, and the elements of that crime are unchanged from when he acted.

So the conviction for obstruction will stand. The two fraud counts present a stronger case for ordering a new trial (and for all the defendants, not just Black). The first of these counts concerns a subsidiary of Hollinger called APC, which owned a number of small community newspapers that it was in the process of selling. When it had only one left—a weekly community newspaper serving Mammoth Lake, California (population 7,093 in 2000, the year before the fraud)—defendant Kipnis, Hollinger's general counsel, prepared and signed on behalf of APC an agreement to pay the other defendants, plus another Hollinger executive, a total of $5.5 million in exchange for their promising not to compete with APC for three years after they stopped working for Hollinger. The money was paid. Neither Hollinger's audit committee, which was required to approve transactions between Hollinger's executives and the company or its subsidiaries (such as APC) because of the conflict of interest, nor Hollinger's board of directors, was informed of this transaction.

That Black and the others might start a paper in Mammoth Lake to compete with APC's tiny newspaper there was a ridiculous idea; no one would pay them to promise not to do something they obviously would never want to do. But they argued that really the $5.5 million represented management fees owed them, and that they had characterized the fees as compensation for granting covenants not to compete in the hope that Canada, where a substantial percentage of the management fees had been generated, might not treat the fees as taxable income. Although Hollinger is a large, sophisticated, public corporation, no document was found to indicate that the $5.5 million expenditure was ever approved by the corporation or credited to the management-fees account on Hollinger's books. The checks were drawn on APC even though there was evidence that the defendants had no right to management fees from that entity, and the checks were backdated to the year in which APC had sold most of its newspapers, the purpose being—or so the jury could find—to make the richly compensated covenants not to compete seem less preposterous.

The evidence was certainly sufficient to prove a pecuniary fraud, see *Cleveland v. United States*, 531 U.S. 12, 19-20 (2000); *United States v. Orsburn*, 525 F.3d 543, 546 (7th Cir. 2008); *United States v. Henningsen*, 387 F.3d 585, 589-90 (7th Cir. 2004), and the jury was correctly instructed on the elements of such a fraud. But it was also instructed that it could convict the defendants upon proof that they had schemed to deprive Hollinger and its shareholders of their right to the defendants' honest

services. This instruction did not require the jury to
find that the defendants had taken any money or
property from Hollinger; all it had to find was that in
failing to disclose the recharacterization of the manage-
ment fees to the audit committee and the board, they
had failed to render honest services to Hollinger and
had done so in an effort to obtain a private gain. That
was a good instruction before the Supreme Court ruled
that honest-services fraud requires proof of a bribe or
kickback, but no longer; and the question is therefore
whether a reasonable jury might have convicted the
defendants of depriving the company of their honest
services for private gain but not have convicted them
of pecuniary fraud.

   That is unlikely, but no stronger assertion is possible.
Although the defendants did not deny having *sought* a
private gain, they contended that it was intended to be a
gain purely at the expense of the Canadian government,
not at the expense of Hollinger because (they contend)
Hollinger owed them the money; and they were not
accused of defrauding the Canadian government, only of
defrauding Hollinger. There was plenty of evidence
that Hollinger did not owe them $5.5 million in man-
agement fees, but the evidence was not conclusive,
while all that the jury had to find in order to convict
them of honest-services fraud was their failure to level
with the board and the audit committee, which was
irrefutable.

   Had they disclosed that the recharacterization of man-
agement fees would net them a higher after-tax income,

the board might have decided that the addition to their income warranted a reduction in the size of the fees. "A man is none the less cheated out of his property, when he is induced to part with it by fraud, because he gets a quid pro quo of equal value. It may be impossible to measure his loss by the gross scales available to a court, but he has suffered a wrong; he has lost his chance to bargain with the facts before him." *United States v. Rowe*, 56 F.2d 747, 749 (2d Cir. 1932) (L. Hand, J.); see also *Ranke v. United States*, 873 F.2d 1033, 1039-40 (7th Cir. 1989). The defendants had a duty of candor to the board in the conflict-of-interest situation in which they found themselves, and by violating that duty they caused Hollinger to make false filings with the SEC, and they did so for their private gain. That was a solid honest-services case before the Supreme Court weighed in, but not a solid pecuniary-fraud case. The government did not argue, as it might have done, by analogy to cases such as *United States v. Richman*, 944 F.2d 323, 330 (7th Cir. 1991), and *United States v. Gole*, 158 F.3d 166, 168 (2d Cir. 1998), that even if the defendants were owed the fees, they had obtained them fraudulently, as when an employee who is owed $100 by his employer forges a check to himself for the amount and thus fraudulently appropriates money owed him. Cf. *Edwards v. State,* 181 N.W.2d 383, 387-88 (Wis. 1970); *State v. Self,* 713 P.2d 142, 144 (Wash. App. 1986).

What we're calling the second fraud count involves payments to the defendants (via Hollinger) of $600,000 in connection with Hollinger's sale to two companies, Forum and Paxton, which to simplify we'll treat as one,

of community newspapers; the $600,000 was allegedly compensation for the defendants' promising not to compete with these newspapers after the sale. The defendants don't contend that the money represented management fees owed by Hollinger. The contention rather is that the money was compensation for bona fide covenants not to compete. The contention is implausible because these are small newspapers and the defendants could have no interest in going into competition with them as individuals—for the covenants bind them, not Hollinger or any other company that might want to enter the community-newspaper business. The owners of Forum-Paxton testified that they didn't request such a covenant. Their testimony was not only disinterested but was supported by the clowning note that David Radler, an executive of Hollinger, wrote to the defendants, in which he said that Forum-Paxton had "asked for a 5-year non-compete from Conrad [Black] and me covering not only the states wherein they purchased assets but those states that border the said states. This would leave us only Alaska, Wyoming and Louisiana for us to continue our activities . . . . I have been assured there is [*sic*] suitable accommodations four [*sic*] our new headquarters in Casper, Wyoming."

What makes the contention that the $600,000 was compensation for covenants not to compete additionally and decisively unbelievable is that there are no covenants. The defendants concede that none was prepared, but attribute the omission to innocent mistake. The concession fatally undermines their challenge to the convictions on this count. Either the failure to prepare covenants

was an innocent mistake—in which event the defendants could no more be convicted by a reasonable jury of honest-services fraud than of pecuniary fraud, because a merely careless withholding of services owed a principal by an agent was never criminal fraud under the honest-services provision (or any other provision) of the mail and wire fraud statutes, *United States v. Cochran*, 109 F.3d 660, 667-68 (10th Cir. 1997); see also *United States v. Sorich*, 523 F.3d 702, 707-08 (7th Cir. 2008); *United States v. Bloom*, 149 F.3d 649, 654-55 (7th Cir. 1998)—or no covenants were intended, and the fees were part of the purchase price of the newspapers, owed to Hollinger and stolen by the defendants. No reasonable jury could have acquitted the defendants of pecuniary fraud on this count but convicted them of honest-services fraud.

The defendants argue that maybe the jury believed that the absence of the covenants was an innocent mistake but convicted them because they failed to disclose the payments to the board. The failure to disclose is mentioned in passing in the information, but the evidence at trial, and the closing arguments, focused on whether the absence of a written covenant was merely an oversight or instead proof of pecuniary fraud.

The jury acquitted the defendants on two other counts related to covenants not to compete with Forum-Paxton. But in those instances the fees went to Hollinger, and it is Hollinger that issued covenants not to compete, not the defendants, and Hollinger was a far more plausible entrant into Forum-Paxton's markets than the defendants, as individuals, were. The only

rational explanation for the split verdict is that the jury believed that the $600,000 that the defendants received from Forum-Paxton without covenants not to compete, unlike the other transactions with that company, was proceeds of a plain-vanilla pecuniary fraud—and only a pecuniary fraud. For had the jury believed that a failure to disclose the fees for promising not to compete with the little newspapers was honest-services fraud, it would have convicted the defendants on *all* the fraud counts, because the defendants disclosed those fees neither to the board nor to the shareholders; and the jury didn't do that.

When to this logical point are added the absence of a written record of a $600,000 transaction, the disinterested testimony by the newspapers' buyers that they did not request covenants not to compete, Radler's implicit boast that the covenants were fabrications, and the absence of an economic reason for them (because the defendants had no conceivable interest in becoming individual publishers of small community newspapers), the evidence of pecuniary fraud is so compelling that no reasonable jury could have refused to convict the defendants of it.

To sum up, the convictions on the APC count are reversed, and the convictions on the Forum-Paxton count and the obstruction of justice count are affirmed. The sentences are vacated and the case remanded for resentencing, as well as for trial, limited however to the APC count.

But although the defendants are entitled to a new trial on that count, the entitlement is moot unless the govern-

ment decides to retry them. The government may wish instead, in order to conserve its resources and wind up this protracted litigation, to dismiss the APC count and proceed directly to resentencing. The judge could consider at the resentencing hearing the evidence that had been presented at the original trial concerning APC in determining what sentences to impose on the two counts (the $600,000 fraud involving Forum-Paxton and, with respect to Black, obstruction of justice as well) of which the defendants were properly convicted. 18 U.S.C. § 3661. "A jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence." *United States v. Watts*, 519 U.S. 148, 157 (1997) (per curiam); see also *United States v. Quintero*, 618 F.3d 746, 755 (7th Cir. 2010); *United States v. Duncan*, 400 F.3d 1297, 1304-05 (11th Cir. 2005). (And there was no acquittal on the APC count, just an error warranting—barely—a retrial.) But of course it is for the government to determine, not us, how to proceed on remand.

AFFIRMED IN PART, REVERSED IN PART,
AND REMANDED.

# EXHIBIT B

RECEIVED

NOV 12 2010 LMB

GINO J. AGNELLO
CLERK

**Nos. 07-4080, 08-1030, 08-1072, 08-1106, consolidated**

---

## IN THE
## UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

---

| | |
|---|---|
| UNITED STATES OF AMERICA, | Appeal from the District Court for the Northern District of Illinois, Eastern Division |
| *Plaintiff-Appellee,* | |
| v. | |
| | No. 05-CR-727 |
| CONRAD M. BLACK, PETER Y. ATKINSON, JOHN A. BOULTBEE, and MARK S. KIPNIS, | Judge Amy J. St. Eve |
| | U.S.C.A.–7th Circuit |
| | FILED |
| | NOV 12 2010 LEJ |
| *Defendants-Appellants* | GINO J. AGNELLO CLERK |

---

### PETITION FOR REHEARING *EN BANC*
### OF CONRAD M. BLACK AND JOHN A. BOULTBEE

---

MIGUEL A. ESTRADA
DAVID DEBOLD
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC  20036
(202) 955-8500

  *Counsel for Conrad M. Black*

RICHARD A. GREENBERG
STEVEN Y. YUROWITZ
NEWMAN & GREENBERG
950 Third Avenue
New York, NY  10022
(212) 308-7900

  *Counsel for John A. Boultbee*

DATE OF DECISION

OCT 29 2010



DISTRIBUTED TO JUDGES:

| | | |
|---|---|---|
| EASTERBROOK | Copies | 1 |
| BAUER | Copies | |
| CUDAHY | Copies | |
| POSNER | Copies | 2 |
| COFFEY | Copies | |
| FLAUM | Copies | 2 |
| RIPPLE | Copies | |
| MANION | Copies | |
| KANNE | Copies | 2 |
| ROVNER | Copies | |
| WOOD, D. | Copies | 2 |
| EVANS | Copies | |
| WILLIAMS | Copies | 2 |
| SYKES | Copies | 1 |
| TINDER | Copies | 1 |

# TABLE OF CONTENTS

RULE 35 STATEMENT ................................................................................. 1

ARGUMENT ................................................................................................. 4

    A.    The "Honest Services" Instruction Prejudiced Defendants
         on *All* Fraud Counts ............................................................. 6

    B.    There Is More Than A Reasonable Possibility That The
         Legal Error In The Fraud Instruction Affected The Closely
         Intertwined Obstruction Conviction ...................................... 12

CONCLUSION ............................................................................................. 15

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Arizona v. Fulminante,*
499 U.S.275 (1991) ..................................................................................5, 7

*Bachellar v. Maryland,*
397 U.S. 564 (1970) ...................................................................................14

*California v. Roy,*
519 U.S. 2 (1996) ..........................................................................................4

*Carella v. California,*
491 U.S. 263 (1989) ................................................................................4, 12

*Chapman v. California,*
386 U.S. 18 (1968) ...........................................................................1, 5, 11

*Griffin v. United States,*
502 U.S. 46 (1991) .....................................................................................14

*Harrington v. California,*
395 U.S. 250 (1969) .....................................................................................5

*Hedgpeth v. Pulido,*
129 S. Ct. 530 (2009) ...................................................................................1

*Kotteakos v. United States,*
328 U.S. 750 (1946) .....................................................................................4

*Neder v. United States,*
527 U.S. 1 (1997) ......................................................................................1, 5

*Pope v. Illinois,*
481 U.S. 497 (1987) .....................................................................................6

*Rose v. Clark,*
478 U.S. 570 (1986) .......................................................................1, 2, 4, 5

*Sandstrom v. Montana,*
442 U.S. 510 (1979) .....................................................................................7

*Sullivan v. Louisiana,*
508 U.S. 275 (1993) ..................................................................................1, 5

## TABLE OF AUTHORITIES (continued)

Page(s)

*United States v. Acker,*
   52 F.3d 509 (4th Cir. 1995) ..................................................................2

*United States v. Aguilar,*
   515 U.S. 593 (1995) ...........................................................................13

*United States v. Arthur Andersen,*
   544 U.S. 696 (1995) ...........................................................................13

*United States v. Manning,*
   23 F.3d 570 (1st Cir. 1994) ..................................................................2

*United States v. Martin Linen Supply Co.,*
   430 U.S. 564 (1977) .............................................................................5

*United States v. Matthews,*
   505 F.3d 698 (7th Cir. 2007) .............................................................12

*United States v. Slade,*
   627 F.2d 293 (D.C. Cir. 1980) ............................................................2

*United States v. Vonn,*
   535 U.S. 55 (2002) ...........................................................................1, 6

*In re Winship,*
   397 U.S. 358 (1970) .............................................................................4

*Yates v. Evatt,*
   500 U.S. 391 (1991) ...........................................................1, 5, 6, 7, 8

*Yates v. United States,*
   354 U.S. 298 (1957) ...........................................................................14

**Statutes**

18 U.S.C. § 1512(c)(1) .........................................................................12

## RULE 35 STATEMENT

Conrad M. Black and John A. Boultbee respectfully petition for rehearing *en banc* of a decision rendered by a panel of this Court (Posner, Kanne, & Sykes, JJ.) on October 29, 2010, following a reversal and remand by the United States Supreme Court. The Supreme Court unanimously ruled that one of the two alternative theories of mail fraud that were presented to the jury is not a federal crime, and it remanded for consideration of whether the government can establish harmlessness beyond a reasonable doubt. On remand, the panel ruled that while the error was prejudicial as to two counts of fraud, it was harmless as to the only remaining fraud count on which the jury convicted (count 7) as well as one count of obstruction of justice, which applies to Black alone (count 13).

The panel's decision warrants *en banc* review under FRAP 35(a)(1) because every pertinent Supreme Court decision in the last 40 years, beginning with *Chapman v. California*, 386 U.S. 18 (1967), has rejected the mode of harmless error analysis embraced by the panel. *See, e.g., Rose v. Clark*, 478 U.S. 570, 578 (1986); *Yates v. Evatt*, 500 U.S. 391, 404-05 (1991); *Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993). Review is also warranted under FRAP 35(a)(2) to resolve a question of exceptional importance: When a jury is instructed, in violation of the Due Process Clause of the Fifth Amendment, that it may convict of conduct that is not a crime, is it consistent with the jury-trial right guaranteed by Article III and the Sixth Amendment for an appellate court to deem the error "harmless" based on its own favorable assessment of the persuasive power of the government's case, without accounting for the evidence supporting the defense or the fact that the jurors who actually heard that evidence acquitted defendants on almost every charge—including those where they necessarily rejected the same evidence on which the panel relied? *See, e.g., Neder v. United States*, 527 U.S. 1, 15-16 (1999) (harmlessness review must be conducted "on the whole record"); *United States v. Vonn*, 535 U.S. 55, 68 (2002) ("entire record before the reviewing court"); *Hedgpeth v. Pulido*, 129 S. Ct. 530, 533 n.* (2008) ("record as a whole").

With respect to Count 7, the panel variously described the defense evidence and arguments as "implausible," "decisively unbelievable," and "clowning." Slip op. at 12. It viewed the government's case, by contrast, as supported by the testimony of purportedly "disinterested" witnesses and "so compelling that no reasonable jury could have refused to convict the defendants." *Id.* at 12, 14. Appellate courts, however "are precluded from making independent credibility determinations on appeal." *United States v. Manning*, 23 F.3d 570, 575 (1st Cir. 1994). Juries, for their part, may "refuse" to convict on the government's evidence; any ruling to the contrary is an unvarnished violation of the Sixth Amendment. *Rose*, 478 U.S. at 578 (Sixth Amendment precludes directed verdicts even in cases where proof of guilt is overwhelming). The jury *in this case* did in fact "refuse" to buy a great majority of what the government was selling. It *acquitted* on every count that clearly depended on a theory of "theft": nine fraud counts charging that defendants looted more than $50 million from Hollinger, two tax counts alleging that defendants' purported theft caused an understatement on the corporate tax returns, and one RICO charge (against Black alone) whose predicate acts featured multiple allegations of interstate transportation of money taken by fraud. In other circuits, such a sweeping rejection of the bulk of the government's case would be fatal to the government's claim that an error was harmless. *See United States v. Acker*, 52 F.3d 509, 518 (4th Cir. 1995); *United States v. Slade*, 627 F.2d 293, 308 (D.C. Cir. 1980). Yet the panel did not mention it. Nor did it advert to the ample evidence supporting the theory of defense that it derided, which included exculpatory testimony by the government's own star witness, David Radler. His name does not even appear in the panel opinion.

The same sufficiency-of-the-evidence methodology underlay the panel's analysis of the obstruction count as to Black (Count 13). There was never any dispute that Black moved 13 boxes out of his Toronto office—the entire dispute was about *why* he did so. The government contended that he did it "corruptly"—*i.e.*, to obstruct justice—because just one day ear-

2

lier a lawyer for Black had learned that an SEC document request was to issue. Black put on a defense case that established: (1) he had a perfectly innocent reason for moving the boxes (Hollinger Inc. had evicted him from that office, and he had only six business days left to remove 27 years' worth of belongings); (2) no one told him about the upcoming request, which was to be the SEC's *sixth* request for documents in the investigation; (3) he had faithfully complied with the five previous document demands, producing over 112,000 pages; (4) every document in the Toronto office had been examined, logged and, where relevant, produced to the government by his lawyers (Sullivan & Cromwell); and (5) the boxes largely contained personal effects (such as estate papers for Black's late brother).

The panel was unpersuaded that a juror weighing hotly contested evidence on intent was more likely to credit the prosecution's theory if she believed, however wrongly, that Black was guilty of honest services fraud. Indeed, although the jury was instructed that this flawed fraud prosecution was one of the "official proceedings" on which an obstruction conviction could rest, the panel focused instead on *other* proceedings that *could* legally support a conviction—an SEC or grand jury investigation. Slip op. at 4. And in focusing entirely on the supposedly "compelling" government case, the panel mentioned only *one* of many defense witnesses and then solely to dismiss her testimony as "inconsistent" with other evidence and *biased*. Slip op. at 5 (noting that Black's secretary "loyally" supported his version of events).

The panel's erroneous analysis does not appear to have resulted from a misapprehension of the trial record, as distinct from its acceptance of the government's legal position that harmless error review centers on the purported strength of the government's case. Indeed, the panel grudgingly and "barely" reversed on the two "APC" fraud counts without even noting that Radler had consistently testified—in the grand jury and at trial—that the money in those counts was *not* stolen, or that the government had previously defended those convictions expressly on the ground that the jury could believe Radler on this point and still find

defendants guilty solely due to honest services fraud. Because defendants' Rule 54 submissions already explained that the government's approach (now embraced by the panel) is inconsistent with Supreme Court authority and the law of other circuits, only this Court *en banc*, or the Supreme Court in due course, can now correct the panel's errors.

## ARGUMENT

The Supreme Court already ruled in this case that the jury instructions on honest-services fraud authorized conviction for conduct that is not a crime. That violation of the Due Process Clause of the Fifth Amendment, *see e.g., Carella v. California*, 491 U.S. 263, 265 (1989) (citing *In re Winship*, 397 U.S. 358, 364 (1970)), requires the government to prove beyond a reasonable doubt that the jury *in fact convicted on a proper basis—i.e.,* that the jury actually "has found, in *Winship*'s words, 'every fact necessary' to establish every element of the offense beyond a reasonable doubt." *Carella*, 491 U.S. at 266 (citations omitted). The issue is not whether "the verdict *could* have been the same without" the error, or whether "there was evidence sufficient to support the verdict independently of the [error's] effect." *Yates*, 500 U.S. at 406-07 (emphasis added); *id.* at 407 & n. 7. Even with respect to non-constitutional errors, where the government's burden of persuasion is far lighter, it has long been the rule that "it is not the appellate court's function to determine guilt or innocence." *Kotteakos v. United States*, 328 U.S. 750, 763-64 (1946); *Rose*, 478 U.S. 582 n.11 ("[T]he determination of guilt or innocence, according to the standard of proof required by *Winship* and its progeny, is for the jury rather than the court"). Thus, an error "cannot be rendered harmless by the fact that, given the evidence, no reasonable jury would have found otherwise. To allow the error to be cured in this fashion would be to dispense with trial by jury." *California v. Roy*, 519 U.S. 2, 7 (1996) (Scalia & Ginsburg, JJ., concurring); *see also Rose*, 478 U.S. at 578 ("the error in such a case is that the wrong entity judged the defendant guilty"); *United States v. Martin Linen Supply Co.*, 430 U.S. 564, 572-73 (1977).

Because any application of the harmless error rule must be consistent with the right to trial by jury, the Supreme Court has emphasized that the *Chapman* standard does not permit an appellate court to weigh the evidence, make credibility determinations, or consider *only* the evidence that it believes supports conviction while completely ignoring the case for the defense. The strength of the government's case is relevant only insofar as it may show that the error (for example, the erroneous admission of evidence) was so unimportant in the context of the entire trial record that it could not reasonably have contributed to the decision actually rendered by the jury; to be harmless, the error "must have made no difference in reaching *the verdict obtained.*" *Yates*, 500 U.S. at 407 (emphasis added).[1] Conversely, reversal is *required* "if 'there is a *reasonable possibility* that the [error] complained of *might have contributed* to the conviction.'" *Id.* at 403 (quoting *Chapman*, 386 U.S. at 24) (emphasis added).

Indeed, in *Chapman* itself the state court had embraced an "overwhelming evidence" standard in affirming the convictions. The Supreme Court *rejected* that analysis and reversed because, though the evidence was "strong," "fair-minded jurors might very well have brought in not-guilty verdicts." *Chapman*, 386 U.S. at 23-26 & n.7; *see also Harrington v. California*, 395 U.S. 250, 254 (1969). Thus, as the Supreme Court has explained, the issue for an appellate court is not "whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error." *Sullivan*, 508 U.S. at 279 (emphasis in original); *Pope v. Illinois*, 481 U.S. 497, 503 n.6 (1987) (what must be "clear beyond a reasonable doubt" is that "if the jury had never heard the impermissible instruction its verdict would have been the same"). "[T]he Government's opportunity and burden" is to establish harmlessness under these standards "based on the entire record before the reviewing court."

---

[1]    *See also Arizona v. Fulminante*, 499 U.S. 279, 297 (1991) (rejecting the view that other "overwhelming evidence" rendered the erroneous admission of a confession harmless); *Neder*, 527 U.S. at 17 (overwhelming evidence on an *unconstested* element may show "that the jury verdict would have been the same absent the error").

*Vonn*, 535 U.S. at 68. The Supreme Court gave the government that opportunity, but the panel did not remotely hold the government to its burden.

### A. The "Honest Services" Instruction Prejudiced Defendants on *All* Fraud Counts.

1. The panel opinion did not describe or discuss the fraud and unanimity instructions in this case, even though both are essential predicates to any proper analysis under *Chapman*. The required analysis must take into account the "customary presumption that jurors follow instructions and, specifically, that they consider relevant evidence on a point in issue when they are told that they may do so." *Yates*, 500 U.S. at 404. This is particularly significant in complex white-collar cases like this one, where the jury was given a copy of the instructions to guide its deliberations. Tr. 15158-59; R. 771.

On each count of the Superseding Information (the "Information") that charged mail or wire fraud, the jury was instructed on two theories and told that the theories were "different." Tr. 15169. The first theory was theft—i.e., money/property fraud. The second—"honest services" fraud—was defined entirely under Delaware corporate law. The jury was charged that defendants' state-law fiduciary duties required them to "act in the corporation's best interests" and to "refrain from taking actions that *either* conflict with the corporation's interests *or* that harm the corporation." *Id.* (emphases added). A deprivation of "honest services" was established if defendants "knowingly and intentionally breached [that] duty of loyalty." *Id.* No specific intent to defraud was required; the only "deception" needed was the intent "to deprive the corporation and its shareholders of their right to the honest services of their corporate officers." Tr. 15172. Thus, under the instructions, defendants "intended to defraud" if they simply "knew" they had failed to make a required disclosure. The Information, which the jurors *also* had with them during deliberations (R. 766), expressly described what the missing disclosure was as to *each* fraud count, including Count 7: though the payments were "related party transactions" defendants "failed to disclose these related party transactions to

[Hollinger's] Audit Committee, thereby breaching their fiduciary duty" and "fraudulently depriving [Hollinger] of honest services." SA 73 (¶ 21 (Forum/Paxton)); *see also id.* at 77 (¶ 30 (APC)).

Despite all of this, the panel dismissed the failure-to-disclose theory as a possible basis for a rational juror to convict, in part because such a theory was merely "mentioned in passing in the information." Slip op. at 13. The panel's premise is wrong. Substantially identical language capped *each* fraud allegation in the Information. That language explained to the jury what the honest-services fraud was alleged to *be*. *See, e.g.,* SA 68 (¶ 11(CNHI II)); 70-71 (¶ 15 (Horizon)); 75-76 ( ¶ 27 (CNHI II)).[2]  Based on the instructions and Information, the jury would have no reason even to *consider* the "theft" allegations in order to *convict* of mail fraud, because the non-disclosure theory provided by far the easiest avenue to conviction. As the Supreme Court has noted, the correct *Chapman* analysis must ask whether the flawed instructions "so narrow[ed] the jury's focus as to leave it questionable that a reasonable juror would look to anything" else. *Yates,* 500 U.S. at 405-06; *see also id.* at 406 n.10 (noting that conclusive presumptions tend "to deter a jury from considering any evidence for the presumed fact beyond the predicate evidence; indeed, to do so would be a waste of the jury's time and contrary to its instructions," citing *Sandstrom v. Montana,* 442 U.S. 510, 526 n.13 (1979)); *cf. Fulminante,* 499 U.S. at 313 (Kennedy, J., concurring) (noting that erroneously admitted evidence may be so powerful that the jury will be "tempted to rest its decision on that evidence alone, without careful consideration of other evidence in the case"). Simply asserting that the jury credited the government's evidence and had no need to rely on the er-

---

[2]    In fact, in reversing the two APC counts, the panel noted that "all that the jury had to find in order to convict [defendants] of honest-services fraud was their failure to level with the board and the audit committee." Slip op. at 10. The relevant language of the Information and the relevant instructions on APC were identical to the corresponding language pertaining to Forum/Paxton. In its original opinion, the panel found the APC and Forum/Paxton fraud allegations so "similar," and with "equally compelling evidence" of guilt, that it saw "no reason to extend the opinion with a discussion" of count 7. *United States v. Black,* 530 F.3d 596, 600 (7th Cir. 2008).

ror not only begs the question but also gets the *Chapman* analysis exactly backwards. *See Yates*, 500 U.S. at 406-07 n.11. As the beneficiary of the error, it was *the government's* burden to prove beyond a reasonable doubt that the jury did not take the easy way out.

The unanimity instructions on fraud, which the panel also did not mention, further demonstrate the sheer impossibility of the government's task. The district court rejected a defense request that the jurors be instructed they could convict only if they agreed unanimously on the theory of fraud—*i.e.,* theft or honest services. Tr. 13477. Because these two theories operated as alternative means of establishing the same "scheme to defraud" element, the instructions required jury unanimity only on *whether* a scheme existed, not on *which theory* supported that element. In other words, each juror who voted to convict might choose theft, honest services, or both. *Id.* at 13476-78. The fraud convictions therefore could rest entirely *or partially* on honest services. To establish that the instructional error was harmless beyond a reasonable doubt the government must demonstrate, therefore, that the flawed instructions did not affect the vote of *any* juror. The panel did not remotely suggest that this is possible, much less provable beyond a reasonable doubt.[3]

2. The panel's assessment of the supposed strength of the government's case also ignored all evidence that favored the defense and, remarkably, the sweeping acquittals. The jury could of course *convict* without even considering the theft charge, but it could only *acquit* after considering—and rejecting—*both* of the government's theories of fraud. The large number of acquittals—including nine counts of mail and wire fraud—thus compellingly demonstrates that *this* jury found the government's case so unworthy of belief that it was un-

---

[3]    Indeed, in the original appeal the panel adopted a forfeiture rule that permitted the government to retain a tainted conviction precisely in those circumstances in which the government cannot meet that burden. Recognizing the inherent ambiguity of the guilty verdict, the panel had accepted the government's theory that, by declining a special verdict, defendants were to blame for the ambiguity. The Supreme Court, however, unanimously rejected a rule that defendants forfeit their appellate rights when declining a special verdict. It strains credulity to suppose the government proposed that forfeiture rule—and defended it all the way to the United States Supreme Court—if it could so easily establish the absence of prejudice under conventional standards.

prepared to accept the government's version of events even when given the option to convict on something (fiduciary non-disclosure) that is *not* a crime.

Indeed, the precise testimony that the panel found credible and "disinterested" on Forum and Paxton also underlay the acquittals on counts 2 and 3. As to *all* Forum-Paxton transactions—counts 2, 3 and 7—the purchasers consistently testified that they never asked for, or desired, noncompetition agreements from *anyone*. Tr. 2321, 2355, 2461. Had the jury found those witnesses as credible and "disinterested" as the panel did, it would have convicted on counts 2 and 3. The panel nonetheless deemed these two acquittals as not inconsistent with the conviction on count 7 because "in those instances the fees went to Hollinger, and it is Hollinger"—"a far more plausible entrant into Forum-Paxton's markets than the defendants, as individuals were"—"that issued covenants not to compete." Slip. op. at 13. But the issue is not whether the panel can *hypothesize* a theory that reconciles the acquittals with the guilty verdict. Since the whole point of *Chapman* is to ascertain *whether* the guilty verdict is tainted, the law cannot support an analysis that assumes the guilty verdict is *un*tainted and then makes everything else "fit." *Chapman* is not a rational-basis test. For good measure, the panel's hypothesis is doubly contrary to the record because: (1) the "Hollinger" in counts 2 and 3 was Hollinger *Inc.*, merely a Canadian *holding company* and not, as the opinion suggests, the U.S. publishing empire (Hollinger International), and (2) Black and his associates personally built that international publishing empire from the small Sherbrooke Daily Record. Tr. 7476-77; 8178. Purchasers of Hollinger International's newspaper assets therefore had every reason to fear competition from the executive team that had successfully built a $2 billion empire from a single small suburban newspaper.

Even apart from the jury's rejection both of the supposedly "disinterested" Forum/Paxton testimony and the theft theory underlying so many of the counts, the government's case for theft on count 7 was weak beyond description. According to Radler's contemporary docu-

mentation, the Forum/Paxton purchasers had in fact demanded non-competition agreements with individual officers as part of the transactions. GX CNHI 25 (memorandum from Radler to, *inter alios*, each defendant, dated August 1, 2000, reporting the purchasers' demand). The sales were approved by Hollinger's Executive Committee (and later received unanimous consent of the full board, including the members of the Audit Committee) with a number of provisos, including permission to negotiate non-compete agreements between the purchasers and Hollinger's "executive officers." SA 540, 557. The evidence showed, however, that because of an oversight the recipients did not sign the board-approved non-compete agreements. When Radler learned that no money had been separately *reserved* for the individual non-competes on this transaction he still had every reason to believe the agreements had properly been executed in accordance with the resolutions. On that basis, he directed disbursement of $600,000 to himself, Black, Boultbee, and Atkinson out of funds remaining in the Forum-Paxton reserve as of April 2001. It wasn't until more than two years later (in the fall of 2003), when a Special Committee of the board investigated the matter, that Radler learned from Kipnis that Kipnis had neglected to prepare the requisite documentation. SA 366-68, 370-71. The government presented no evidence that *any* defendant who received payments in 2001 were aware that the non-compete transactions that underlay the payments had not been properly documented. Indeed, Kipnis received a post-verdict judgment of acquittal from the trial court on this count—which the opinion also fails to note.

Defendants thus presented a substantial defense on the question whether they *intended* to steal any part of these funds from Hollinger. At the relevant time, Radler honestly believed that the payments for the Forum/Paxton non-competes had been authorized and properly documented. And if Radler honestly believed he was not stealing from Hollinger, then those defendants who received the non-compete money—and who relied on Radler for their information about these payments—could scarcely have harbored the requisite intent to defraud

either. If properly instructed, "fair-minded jurors might very well have brought in not guilty verdicts" on theft. *Chapman*, 386 U.S. at 26. And even the *im*properly instructed jury in this case could easily have concluded that the issuance of the checks was an innocent mistake, but that defendants nonetheless failed to advise the audit committee of the related-party transaction and thus committed "honest services" fraud.[4]

The panel, however, not only ignored Radler's testimony but also derided the probative value of the contemporary documentation—the August 2000 memorandum—solely because the memorandum, after reporting the purchasers' request for non-competes, also quipped that defendants' publishing activities would soon be restricted to "Alaska, Wyoming and Louisiana." Slip op. at 12 (arguing that Radler's "clowning note" supported government's case). In the panel's evident view, the use of humor in business correspondence suffices convincingly to demonstrate fraud. Perhaps a properly instructed jury *could* conclude that Radler did not mean any part of what he said merely because one part of the memorandum was humorous, even though *this* jury acquitted on the count that was *also* the subject of the humorous memo (count 5 – CNHI II). But it should be apparent that an appellate court cannot reasonably conclude that the memorandum obviously means the opposite of what it actually says— *i.e.*, that the purchasers did *not* request any non-competes—on this basis. This sort of analy-

---

[4]   An important part of the government's theory—for which it elicited testimony—was that defendants *had* deprived Hollinger of honest services simply by not properly disclosing to the Audit Committee their plan to include non-compete agreements in the Forum/Paxton deals. *See, e.g.*, Gov't Br. at 69 & 78-79 (citing testimony). Before the government's investigations, the Audit Committee members had reviewed and signed SEC filings attesting that they had indeed approved the non-competes, but by trial they asserted otherwise and explained their SEC certifications as an innocent oversight. Tr. 5588-89; 6179; 6959. The government urged the jury to accept this explanation, although it was rather implausible since each of the three directors had reviewed the SEC disclosure language multiple times. *E.g.*, Tr. 6966 (director claiming to have "missed" the non-compete approval language 11 times). The panel did not explain how the "only rational explanation" for the count 7 guilty verdicts involves something more than arguable fiduciary breaches and "an innocent mistake" in failing to draft the non-competes (Slip. op. at 13-14), when the government's theory depended on the jury believing that Audit Committee members had themselves made an innocent mistake, many times over, with respect to the Forum/Paxton transactions.

sis "invades the fact-finding function, which in a criminal case the law assigns solely to the jury." *Carella*, 491 U.S. at 268 (Scalia, Brennan, Marshall & Blackmun, JJ., concurring) (internal quotations and brackets omitted).

3.  The panel also stated in passing that the government's "closing arguments[] focused on whether the absence of a written covenant was merely an oversight or instead proof of pecuniary fraud." Slip op. at 13. The jury, of course, was required to follow the court's instructions irrespective of whatever the government argued. In fact, however, the government consistently urged from the beginning of the trial through the summations that "honest services" provided an alternative, and easier, path to conviction based on mere non-disclosures. Indeed, although the Supreme Court eventually ruled on broader grounds, its original grant of certiorari in this case resulted from the government's successful insistence at trial that no pecuniary harm need even be *contemplated* for conviction under its nondisclosure theory. The trial record convincingly shows that the government treated the non-disclosure theory as a stand-alone basis for conviction, but it should suffice for present purposes to note that the government's rebuttal summation emphasized *one* last important plea: "[W]hen you go back to the jury room, ladies and gentlemen, I have one request. When you consider the transactions in this case, think of those two words. Think of honest services." Tr. 15143-44.

**B.    There Is More Than A Reasonable Possibility That The Legal Error In The Fraud Instruction Affected The Closely Intertwined Obstruction Conviction.**

The obstruction statute requires the government to show that the defendant *corruptly* impeded some *underlying* "official proceeding" that was then pending or that he reasonably contemplated. This includes not only a "wrongful intent" but also a "nexus": To "convict a defendant of obstructing justice under [18 U.S.C. § 1512(c)(1)], 'the [obstructive] act must have a relationship in time, causation or logic with the judicial proceedings.'" *United States v. Matthews*, 505 F.3d 698, 707-08 (7th Cir. 2007) (second brackets in original) (quoting

12

*United States v. Aguilar*, 515 U.S. 593, 599 (1995)). Thus, to establish the "corrupt" intent required by the statute the government must prove that the defendant "contemplat[ed]" a "*particular official proceeding* in which those documents might be material.'" *Id.* at 708 (quoting *Arthur Andersen v. United States*, 544 U.S. 696, 707-08 (1995)) (emphasis added). The jury in this case was charged that there were "three official proceedings" on which an obstruction conviction might be based: a then-pending SEC investigation into the non-competes, a grand jury investigation of the same events, and the prosecution in this case (which had not yet been instituted at the time of the events). Tr. 15177-78 (Jury Instructions); *see also* R. 766 at 52-55. The jurors were required to agree unanimously on which "official proceeding[], if any, Black intended to obstruct," but were told that agreement on a single one of those three proceedings was sufficient. Tr. 15178.

1. The SEC and grand jury proceedings had long been ongoing at the time Black moved the boxes in question from his office to his house. Because Black had complied with everything demanded as part of those investigations (faithfully producing a warehouse's worth of paper in the process), the government had no confidence in its ability to persuade this jury that the movement of the boxes was motivated by *those* investigations. Its theory instead was that these proceedings were just preparatory steps on the road to the main event—an eventual criminal trial—the sudden imminence of which was suggested by the forthcoming subpoena and which *was* severe enough to support a motive to obstruct. To this end, the government's questioning of witnesses endeavored to establish that the three proceedings ultimately boiled down to a single important one—the criminal prosecution in this case. The prosecutors argued that Black would have known that criminal prosecutions often follow SEC inquiries and that he had, from the outset, retained attorneys whom the government identified as noted criminal practitioners.[5]

---

[5] See Tr. 11358-59 (AUSA examining Owens) ("an SEC investigation can turn into a criminal investigation, correct?"); *id.* at 11405-06 (AUSA examining Bourelly) ("you know, as a former fed-

Because the obstruction count was focused on this flawed prosecution, the jury's understanding as to what the crime *was* that Black might be seeking to obstruct was crucial to its assessment of the plausibility of the government's corrupt-intent theory. In assessing what sort of future criminal prosecution Black might have contemplated and sought to obstruct, the erroneous instructions on honest services fraud would naturally sway the jury toward conviction. It is no answer to say, as the panel reasoned, that the then-pending investigation (and ultimate criminal indictment) *also* embraced pecuniary fraud, which of course is a real crime. Slip op. at 6-7. That might suggest that a proper obstruction charge *could* have been framed on that basis, but it does not show that *this jury* found obstruction on a proper basis. When a jury may have rested its verdict on an erroneous view of the *law*, it is never a good answer to say that the jury had available *other* legally sound theories on which the verdict might well have rested. *Compare Yates v. United States*, 354 U.S. 298, 311-12 (1957), *and Bachellar v. Maryland*, 397 U.S. 564, 569-72 (1970), *with Griffin v. United States*, 502 U.S. 46, 59 (1991). At a minimum, the instructional error—which told the jury that a vast range of conduct involving fiduciary nondisclosure was criminal—very likely affected the jury's assessment of the plausibility of the government's claim that Black was attempting corruptly to obstruct his criminal investigation or prosecution. The government cannot reasonably posit that the jury in this case would have been indifferent to the fact that the "crime" that the government primarily urged upon the jury—those "two words" that the prosecutor wanted the jury to remember as the fraud in this case—was not a federal crime at all.

---

eral prosecutor, that a grand jury investigation and a federal criminal investigation are pretty much one and the same, correct?"); *id.* at 11423-24 (AUSA asking whether Black had by then "hired criminal lawyers from Williams & Connolly," including "famous criminal lawyer[s]" Brendan Sullivan and Greg Craig, who had respectively represented "Oliver North" and former "President Clinton"); *id.* at 12500-07 (AUSA attempting repeatedly, in the face of multiple objections, to establish that Brendan Sullivan and Greg Craig are "famous" criminal attorneys, and that Sullivan represented "Oliver North"); *id.* at 11481-82 (eliciting that Maida was not aware of a SEC investigation but that it was "general knowledge" and "everybody knew" there was a criminal investigation).

2. The government's evidence managed convincingly to establish only what no one disputed (that Black moved boxes from his office to his house in broad daylight); there was nothing "compelling" (slip op. at 7), though, about the government's evidence on the crucially disputed issue of "corrupt" intent. On the contrary, the removal of *thirteen boxes* while the sun is high in the sky, with two staffers in train and in full view of security cameras that Black knew were there, does not exactly bespeak an intent to hide documents from investigators, especially when: (1) no one told Black that a new document request was forthcoming; (2) he fully complied with all prior ones; and (3) apart from personal papers, the boxes contained nothing of relevance that had not already been produced by Sullivan & Cromwell. Indeed, even the government's own witnesses agreed that a person minded to remove documents from 10 Toronto Street could easily have done so by carrying them in a briefcase at the end of the day without anyone being the wiser. Tr. 10874-75. Had Black been looking to spirit away documents that were material to the prosecution, he had many better and subtler opportunities to do so during the long-pending investigation. In these circumstances, the government cannot possibly establish that fair-minded jurors, if properly charged on the underlying fraud prosecution, could not have acquitted on this charge as well. *See Chapman*, 386 U.S. at 26.

## CONCLUSION

For the above-stated reasons, this Court should grant *en banc* review.

*Miguel A. Estrada /cm*

| | |
|---|---|
| RICHARD A. GREENBERG | MIGUEL A. ESTRADA |
| STEVEN Y. YUROWITZ | DAVID DEBOLD |
| NEWMAN & GREENBERG | GIBSON, DUNN & CRUTCHER LLP |
| 950 Third Avenue | 1050 Connecticut Avenue, N.W. |
| New York, NY 10022 | Washington, DC 20036 |
| (212) 308-7900 | (202) 955-8500 |
| *Counsel for John A. Boultbee* | *Counsel for Conrad M. Black* |

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on November 12, 2010 the following counsel

was served with a copy of the foregoing **PETITION FOR REHEARING *EN BANC* OF**

**CONRAD M. BLACK AND JOHN A. BOULTBEE** by overnight carrier, postage prepaid:

    Julie Porter
    Assistant U.S. Attorney
    219 S. Dearborn St.
    Chicago, IL  60604

Dated: November 12, 2010                   _David Debold (an)_
                                           _____
                                           David Debold

In the

# United States Court of Appeals
### For the Seventh Circuit

Nos. 07-4080, 08-1030, 08-1072, 08-1106

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

CONRAD M. BLACK, PETER Y. ATKINSON,
JOHN A. BOULTBEE, and MARK S. KIPNIS,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 05 CR 727—**Amy J. St. Eve**, *Judge.*

ARGUED SEPTEMBER 29, 2010—DECIDED OCTOBER 29, 2010

Before POSNER, KANNE, and SYKES, *Circuit Judges.*

POSNER, *Circuit Judge.*  This case is before us for the
second time, the Supreme Court having vacated the
judgment, which we had affirmed, and remanded the
case to us for reconsideration. *Black v. United States*, 130
S. Ct. 2963 (2010).

The defendants—senior executives of Hollinger Inter-
national—had been convicted by a jury of three counts of

mail and wire fraud, in violation of 18 U.S.C. §§ 1341 and
1342, and defendant Black had also been convicted of
obstruction of justice, in violation of 18 U.S.C. § 1512(c).
The judge had sentenced Black to a total of 78 months
in prison, Atkinson and Boultbee to 24 and 27 months,
and Kipnis to probation with six months of home deten-
tion.

   The three fraud counts (which we'll treat as two, be-
cause two of the three relate to transactions with the
same company, APC) were submitted to the jury under
two theories: that of a scheme of fraudulent appropria-
tion of money to which Hollinger was legally entitled
(we'll call this "pecuniary fraud"), and that of a scheme
to deprive Hollinger of the latter's "intangible right of
honest services," 18 U.S.C. § 1346, amending sections 1341
and 1342. The first theory required that the defendants
have obtained a pecuniary benefit at the expense of
Hollinger; the second did not; and because the jury re-
turned a general verdict on the fraud counts, we cannot
be absolutely certain that it found the defendants guilty
of pecuniary fraud as well as, or instead of, honest-
services fraud.

   After we affirmed, the Supreme Court held that the
latter form of fraud requires proof that the defendant(s)
received a bribe or kickback, as otherwise section 1346
would be unconstitutionally vague. *United States v.
Skilling*, 130 S. Ct. 2896, 2931 (2010); see *United States v.
Cantrell*, 617 F.3d 919, 921 (7th Cir. 2010); *United States v.
Urciuoli*, 613 F.3d 11, 17-18 (1st Cir. 2010). That was not
proved here and so the defendants could not lawfully

be convicted of honest-services fraud. But if it is not open to reasonable doubt that a reasonable jury would have convicted them of pecuniary fraud, the convictions on the fraud counts will stand. *Hedgpeth v. Pulido*, 129 S. Ct. 530, 531-32 (2008) (per curiam); see *Neder v. United States*, 527 U.S. 1, 15-16 (1999); *United States v. L.E. Myers Co.*, 562 F.3d 845, 855 (7th Cir. 2009); *United States v. Cappas*, 29 F.3d 1187, 1192 (7th Cir. 1994); *United States v. Jackson*, 196 F.3d 383, 386 (2d Cir. 1999). "An instructional error arising in the context of multiple theories of guilt no more vitiates *all* the jury's findings than does omission or misstatement of an element of the offense when only one theory is submitted." *Hedgpeth v. Pulido, supra*, 129 S. Ct. at 532 (emphasis in original).

The case would still have to be remanded to the district court for resentencing unless it was reasonably certain that the judge would have imposed the same sentences even if the charge of honest-services fraud had not been submitted to the jury. Suppose no reasonable jury would have failed to find pecuniary fraud. Nevertheless that same jury, having been instructed on honest-services fraud, might have found the defendants guilty of honest-services fraud as well. The judge would then have been incorrectly sentencing the defendant for two crimes rather than one. She might think honest-services fraud the more serious crime, or at least that it made the defendants' conduct more reprehensible and so merited heavier overall sentences.

We begin with defendant Black's argument that the submission of that charge to the jury contaminated his conviction of obstruction of justice, and that therefore

4                              Nos. 07-4080, 08-1030, 08-1072, 08-1106

he is entitled to a retrial on the obstruction count as well
as on the fraud counts. He was charged with having
concealed or attempted to conceal documents "with the
intent to impair the [documents'] integrity or avail-
ability for use in an official proceeding," in violation of
18 U.S.C. § 1512(c)(1). There was compelling evidence
that he knew that the acts that later formed the basis of
the fraud charges against him and his codefendants
were being investigated by a grand jury and by the SEC.
In the midst of these investigations Black with the help
of his secretary and his chauffeur removed 13 boxes
of documents from his office, put them in his car, was
driven home, and helped carry them from the car into
his house.

   He later returned the boxes; and copies of the docu-
ments were available to the government before the
boxes were removed; but it was material to the investiga-
tion whether Black had had copies in his office. For
that would mean that he had received them and might
know they were material to the government's investiga-
tion. Furthermore, the boxes may have contained docu-
ments, of which there were no copies, that he'd removed
before returning the boxes. That is speculation; but the
possibility of such tampering helps to explain why the
obstruction statute does not require proof of obstruction,
as distinct from intent to obstruct, in order to convict.
The usual consequence of an obstruction of justice is not
that a guilty person is acquitted but that the govern-
ment expends additional resources to prevent the effort
at obstruction from succeeding, as in our case of *United*

*States v. Wells*, 154 F.3d 412, 414-15 (7th Cir. 1998), where the defendant's lie about the proceeds of his robbery sent the police on a wild goose chase. Similarly, concern that a suspect may be concealing material documents incites additional investigative efforts by the government. See *United States v. Tankersley*, 296 F.3d 620, 623-24 (7th Cir. 2002).

Thus, as we explained in a portion of our first opinion not disturbed by the Supreme Court and therefore the law of the case, the obstruction of justice statute does not require proof of materiality unless the alleged obstruction takes the form of a lie that could not be expected to have *any* effect on the justice process. *United States v. Buckley*, 192 F.3d 708, 710 (7th Cir. 1999). Being able to deny the materiality of a document is a common reason for concealment. So it is enough for conviction that a document was concealed in order to make it unavailable in an official proceeding. See, e.g., *United States v. Senffner*, 280 F.3d 755, 762 (7th Cir. 2002); *United States v. Philips*, 583 F.3d 1261, 1263-64 (10th Cir. 2009); *United States v. Carson*, 560 F.3d 566, 584 (6th Cir. 2009); *United States v. Lessner*, 498 F.3d 185, 197-98 (3d Cir. 2007). The evidence that the boxes were removed in order to conceal documents from the government investigators was compelling, even though Black's secretary loyally testified that Black intended to remove the documents to a temporary office that she would set up for him in her home because he had to vacate his office at Hollinger within ten days. Her testimony was inconsistent with his having put the boxes in his car (not hers, which was at the scene) and taken them to his home rather than to

6                           Nos. 07-4080, 08-1030, 08-1072, 08-1106

hers. There was also evidence that in removing the
boxes he tried to avoid the surveillance cameras in his
office building—unsuccessfully.

In any event, the sufficiency of the evidence to convict
Black of obstruction is no longer an open question; and
since the jury was separately instructed on obstruction,
the fact that it received an erroneous instruction on
another count would ordinarily be irrelevant. *United
States v. Holtzer*, 840 F.2d 1343, 1349 (7th Cir. 1988). But
Black argues that had the jury not been told it could
convict him of honest-services fraud, it might well have
acquitted him of obstruction of justice. He appeals to
cases in which convictions on counts on which the jury
was properly instructed were reversed because a count
that was later dismissed was so inflammatory that it
created a "prejudicial spillover." E.g., *United States v.
Lazarenko*, 564 F.3d 1026, 1042-44 (9th Cir. 2009);
*United States v. Edwards*, 303 F.3d 606, 639-40 (5th Cir.
2002); *United States v. Vebeliunas*, 76 F.3d 1283, 1293-94 (2d
Cir. 1996). These cases are in superficial tension with
our decision in *Holzer* and also in *United States v. Schwartz*,
787 F.2d 257, 264 (7th Cir. 1986), but those are deci-
sions about misjoinder, and hold that the time to sever
a trial because of a prejudicial spillover from one count
to another is before the trial begins. If a count is sub-
mitted to the jury under an instruction apt to poison
the jury's consideration of other counts as well, the de-
fendant may be entitled to a new trial.

But this is not such a case. The theory of honest-
services fraud submitted to the jury was esoteric rather

Nos. 07-4080, 08-1030, 08-1072, 08-1106                    7

than inflammatory; the evidence of such fraud was a
subset of the evidence of pecuniary fraud; and the evi-
dence of obstruction of justice was very strong. No rea-
sonable jury could have acquitted Black of obstruction
if only it had not been instructed on honest-services
fraud. It would still have been the case that Black had
known he was being investigated for fraud and could
not have known that years later the Supreme Court
would invalidate one of the fraud charges. And if he were
clairvoyant, he would have known that the other fraud
charge—pecuniary fraud—would not be invalidated.

   At argument Black's lawyer posed the following
amusing hypothetical in an attempt to use the error in
the fraud instruction to undermine his client's convic-
tion for obstruction of justice: Suppose the Justice Depart-
ment launches an investigation of a man suspected of
having an affair with Minnie Mouse, and while the
investigation is under way the man burns his Disney
comics. Although an "official investigation" was pending
(and capable of being obstructed) when he destroyed
the comics, this could not be construed as an obstruction
of justice, because the crime under investigation did not
exist and therefore he could not have acted with the
corrupt intent necessary for guilt of obstruction. Black's
lawyer hoped by this hypothetical case to persuade us
that the jury would have interpreted his client's intent
in removing the documents differently had it known
that the honest-services fraud under investigation at
the time was not a crime; it would have been more
willing to credit his innocent explanation for his action
and conclude that he had not acted with corrupt intent.
But Black was not under investigation for an obviously

nonexistent crime, such as carnal knowledge of a fictional mouse; he was under investigation for conventional pecuniary fraud as well as honest-services fraud, and besides it was not obvious at the time of his removing the documents that honest-services fraud was a nonexistent crime. Hundreds of persons must have been convicted of it before the Supreme Court, years after Black's act, narrowed it to cases in which the defendant receives a bribe or a kickback. Black had also to fear—and just as acutely—being prosecuted for pecuniary fraud, as of course he was, and the elements of that crime are unchanged from when he acted.

So the conviction for obstruction will stand. The two fraud counts present a stronger case for ordering a new trial (and for all the defendants, not just Black). The first of these counts concerns a subsidiary of Hollinger called APC, which owned a number of small community newspapers that it was in the process of selling. When it had only one left—a weekly community newspaper serving Mammoth Lake, California (population 7,093 in 2000, the year before the fraud)—defendant Kipnis, Hollinger's general counsel, prepared and signed on behalf of APC an agreement to pay the other defendants, plus another Hollinger executive, a total of $5.5 million in exchange for their promising not to compete with APC for three years after they stopped working for Hollinger. The money was paid. Neither Hollinger's audit committee, which was required to approve transactions between Hollinger's executives and the company or its subsidiaries (such as APC) because of the conflict of interest, nor Hollinger's board of directors, was informed of this transaction.

That Black and the others might start a paper in Mammoth Lake to compete with APC's tiny newspaper there was a ridiculous idea; no one would pay them to promise not to do something they obviously would never want to do. But they argued that really the $5.5 million represented management fees owed them, and that they had characterized the fees as compensation for granting covenants not to compete in the hope that Canada, where a substantial percentage of the management fees had been generated, might not treat the fees as taxable income. Although Hollinger is a large, sophisticated, public corporation, no document was found to indicate that the $5.5 million expenditure was ever approved by the corporation or credited to the management-fees account on Hollinger's books. The checks were drawn on APC even though there was evidence that the defendants had no right to management fees from that entity, and the checks were backdated to the year in which APC had sold most of its newspapers, the purpose being—or so the jury could find—to make the richly compensated covenants not to compete seem less preposterous.

The evidence was certainly sufficient to prove a pecuniary fraud, see *Cleveland v. United States*, 531 U.S. 12, 19-20 (2000); *United States v. Orsburn*, 525 F.3d 543, 546 (7th Cir. 2008); *United States v. Henningsen*, 387 F.3d 585, 589-90 (7th Cir. 2004), and the jury was correctly instructed on the elements of such a fraud. But it was also instructed that it could convict the defendants upon proof that they had schemed to deprive Hollinger and its shareholders of their right to the defendants' honest

services. This instruction did not require the jury to
find that the defendants had taken any money or
property from Hollinger; all it had to find was that in
failing to disclose the recharacterization of the manage-
ment fees to the audit committee and the board, they
had failed to render honest services to Hollinger and
had done so in an effort to obtain a private gain. That
was a good instruction before the Supreme Court ruled
that honest-services fraud requires proof of a bribe or
kickback, but no longer; and the question is therefore
whether a reasonable jury might have convicted the
defendants of depriving the company of their honest
services for private gain but not have convicted them
of pecuniary fraud.

That is unlikely, but no stronger assertion is possible.
Although the defendants did not deny having *sought* a
private gain, they contended that it was intended to be a
gain purely at the expense of the Canadian government,
not at the expense of Hollinger because (they contend)
Hollinger owed them the money; and they were not
accused of defrauding the Canadian government, only of
defrauding Hollinger. There was plenty of evidence
that Hollinger did not owe them $5.5 million in man-
agement fees, but the evidence was not conclusive,
while all that the jury had to find in order to convict
them of honest-services fraud was their failure to level
with the board and the audit committee, which was
irrefutable.

Had they disclosed that the recharacterization of man-
agement fees would net them a higher after-tax income,

the board might have decided that the addition to their income warranted a reduction in the size of the fees. "A man is none the less cheated out of his property, when he is induced to part with it by fraud, because he gets a quid pro quo of equal value. It may be impossible to measure his loss by the gross scales available to a court, but he has suffered a wrong; he has lost his chance to bargain with the facts before him." *United States v. Rowe*, 56 F.2d 747, 749 (2d Cir. 1932) (L. Hand, J.); see also *Ranke v. United States*, 873 F.2d 1033, 1039-40 (7th Cir. 1989). The defendants had a duty of candor to the board in the conflict-of-interest situation in which they found themselves, and by violating that duty they caused Hollinger to make false filings with the SEC, and they did so for their private gain. That was a solid honest-services case before the Supreme Court weighed in, but not a solid pecuniary-fraud case. The government did not argue, as it might have done, by analogy to cases such as *United States v. Richman*, 944 F.2d 323, 330 (7th Cir. 1991), and *United States v. Gole*, 158 F.3d 166, 168 (2d Cir. 1998), that even if the defendants were owed the fees, they had obtained them fraudulently, as when an employee who is owed $100 by his employer forges a check to himself for the amount and thus fraudulently appropriates money owed him. Cf. *Edwards v. State*, 181 N.W.2d 383, 387-88 (Wis. 1970); *State v. Self*, 713 P.2d 142, 144 (Wash. App. 1986).

What we're calling the second fraud count involves payments to the defendants (via Hollinger) of $600,000 in connection with Hollinger's sale to two companies, Forum and Paxton, which to simplify we'll treat as one,

12                          Nos. 07-4080, 08-1030, 08-1072, 08-1106

of community newspapers; the $600,000 was allegedly
compensation for the defendants' promising not to com-
pete with these newspapers after the sale. The de-
fendants don't contend that the money represented
management fees owed by Hollinger. The contention
rather is that the money was compensation for bona fide
covenants not to compete. The contention is implausible
because these are small newspapers and the defendants
could have no interest in going into competition with
them as individuals—for the covenants bind them, not
Hollinger or any other company that might want to
enter the community-newspaper business. The owners
of Forum-Paxton testified that they didn't request such
a covenant. Their testimony was not only disinterested
but was supported by the clowning note that David
Radler, an executive of Hollinger, wrote to the de-
fendants, in which he said that Forum-Paxton had "asked
for a 5-year non-compete from Conrad [Black] and me
covering not only the states wherein they purchased
assets but those states that border the said states. This
would leave us only Alaska, Wyoming and Louisiana
for us to continue our activities . . . . I have been assured
there is [sic] suitable accommodations four [sic] our new
headquarters in Casper, Wyoming."

   What makes the contention that the $600,000 was com-
pensation for covenants not to compete additionally and
decisively unbelievable is that there are no covenants.
The defendants concede that none was prepared, but
attribute the omission to innocent mistake. The conces-
sion fatally undermines their challenge to the convictions
on this count. Either the failure to prepare covenants

was an innocent mistake—in which event the defendants could no more be convicted by a reasonable jury of honest-services fraud than of pecuniary fraud, because a merely careless withholding of services owed a principal by an agent was never criminal fraud under the honest-services provision (or any other provision) of the mail and wire fraud statutes, *United States v. Cochran*, 109 F.3d 660, 667-68 (10th Cir. 1997); see also *United States v. Sorich*, 523 F.3d 702, 707-08 (7th Cir. 2008); *United States v. Bloom*, 149 F.3d 649, 654-55 (7th Cir. 1998)—or no covenants were intended, and the fees were part of the purchase price of the newspapers, owed to Hollinger and stolen by the defendants. No reasonable jury could have acquitted the defendants of pecuniary fraud on this count but convicted them of honest-services fraud.

The defendants argue that maybe the jury believed that the absence of the covenants was an innocent mistake but convicted them because they failed to disclose the payments to the board. The failure to disclose is mentioned in passing in the information, but the evidence at trial, and the closing arguments, focused on whether the absence of a written covenant was merely an oversight or instead proof of pecuniary fraud.

The jury acquitted the defendants on two other counts related to covenants not to compete with Forum-Paxton. But in those instances the fees went to Hollinger, and it is Hollinger that issued covenants not to compete, not the defendants, and Hollinger was a far more plausible entrant into Forum-Paxton's markets than the defendants, as individuals, were. The only

rational explanation for the split verdict is that the jury believed that the $600,000 that the defendants received from Forum-Paxton without covenants not to compete, unlike the other transactions with that company, was proceeds of a plain-vanilla pecuniary fraud—and only a pecuniary fraud. For had the jury believed that a failure to disclose the fees for promising not to compete with the little newspapers was honest-services fraud, it would have convicted the defendants on *all* the fraud counts, because the defendants disclosed those fees neither to the board nor to the shareholders; and the jury didn't do that.

When to this logical point are added the absence of a written record of a $600,000 transaction, the disinterested testimony by the newspapers' buyers that they did not request covenants not to compete, Radler's implicit boast that the covenants were fabrications, and the absence of an economic reason for them (because the defendants had no conceivable interest in becoming individual publishers of small community newspapers), the evidence of pecuniary fraud is so compelling that no reasonable jury could have refused to convict the defendants of it.

To sum up, the convictions on the APC count are reversed, and the convictions on the Forum-Paxton count and the obstruction of justice count are affirmed. The sentences are vacated and the case remanded for resentencing, as well as for trial, limited however to the APC count.

But although the defendants are entitled to a new trial on that count, the entitlement is moot unless the govern-

Nos. 07-4080, 08-1030, 08-1072, 08-1106                    15

ment decides to retry them. The government may wish instead, in order to conserve its resources and wind up this protracted litigation, to dismiss the APC count and proceed directly to resentencing. The judge could consider at the resentencing hearing the evidence that had been presented at the original trial concerning APC in determining what sentences to impose on the two counts (the $600,000 fraud involving Forum-Paxton and, with respect to Black, obstruction of justice as well) of which the defendants were properly convicted. 18 U.S.C. § 3661. "A jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence." *United States v. Watts*, 519 U.S. 148, 157 (1997) (per curiam); see also *United States v. Quintero*, 618 F.3d 746, 755 (7th Cir. 2010); *United States v. Duncan*, 400 F.3d 1297, 1304-05 (11th Cir. 2005). (And there was no acquittal on the APC count, just an error warranting—barely—a retrial.) But of course it is for the government to determine, not us, how to proceed on remand.

AFFIRMED IN PART, REVERSED IN PART,
AND REMANDED.

---

10-29-10